**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Bid Protest)**

| | |
|---|---|
| The Ravens Group, Inc.<br>Plaintiff,<br>v.<br>United States<br>Defendant,<br>and<br>Rowe Contracting Services, Inc.<br>Third party/Intervenor. | CFC No. 07-243<br>Judge Baskir |

**APPENDIX TO**
**MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR ROWE CONTRACTING SERVICES, INC.'S MOTION TO DISMISS**

Kenneth B. Weckstein
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037
(202) 861-1860
(202) 861-3560 (fax)
kweckstein@ebglaw.com

Counsel for Intervenor

Date: April 26, 2007

# Table of Contents

Exhibits:

*The Ravens Group*, B-296741.5, B-296741.6,
May 19, 2006 ........................................................ Exhibit 1

*The Ravens Group--Reconsideration*, B-296741.7,
July 14, 2006 ........................................................ Exhibit 1

*The Ravens Group*, B-296741.12, B-296741.13,
March 15, 2007 ........................................................ Exhibit 1

Authorities:

Federal Acquisition Regulation ("FAR") §17.207 ......... Tab A

FAR § 33.104 ........................................................ Tab B

FAR § 49.502(b)(1)(i) ........................................................ Tab C

FAR § 52.249-2 ........................................................ Tab D

# Exhibit 1

xxx

GAO
Accountability * Integrity * Reliability

Comptroller General
of the United States

United States Government Accountability Office
Washington, DC 20548

# Decision

**Matter of:** The Ravens Group

**File:** B-296741.5; B-296741.6

**Date:** May 19, 2006

---

**DECISION**

The Ravens Group protests the award of a contract to Rowe Contracting Services, Inc., under Defense Logistics Agency (DLA) request for proposals (RFP) No. HHM402-05-R-0017, for janitorial and custodial services.

We dismiss the protest.

The solicitation, issued on April 14, 2005, provided for award on a "best value" basis, considering cost and technical factors. On June 28, DLA made award to Ravens. On June 29, NOSLOT Cleaning Services, Inc. protested the award to our Office. On August 2, DLA decided to take corrective action in response to the NOSLOT protest by allowing offerors to submit final proposal revisions, reevaluating the proposals and making a new best value determination. As a result, our Office dismissed NOSLOT's protest (B-296741.2, Aug. 4, 2005). Following the submission of revised proposals and the reevaluation, DLA selected Rowe for award. Ravens filed a protest in our Office challenging that decision (B-296741.3; B-296741.4). The agency again proposed corrective action, this time in the form of reconsidering the award decision; accordingly, we dismissed Ravens's protest. DLA is currently implementing the proposed corrective action.

Ravens protests certain actions by Rowe that allegedly occurred after DLA selected Rowe for award following the NOSLOT protest. Specifically, Ravens claims that Rowe obtained access to the automated system the Department of Defense uses to maintain information regarding its employees and contractors (JPAS), and manipulated the data to make it appear that Ravens's personnel were Rowe employees, all without the knowledge of Ravens or the personnel involved. Ravens further asserts that, while its initial protest was pending in our Office, Rowe obtained information about Ravens's proposal by making payments to Ravens employees. According to Ravens, these actions compromised the procurement and warrant eliminating Rowe from the competition.

Our role in resolving bid protests is to ensure that the statutory requirements for full and open competition are met. Pacific Photocopy and Research Servs., B-278698, B-278698.3, Mar. 4, 1998, 98-1 CPD ¶ 69 at 4. Toward this end, our Bid Protest Regulations, 4 C.F.R. § 21.1(c)(4) and (f) (2006), require that a protest include a detailed statement of the legal and factual grounds for protest, and the grounds stated be legally sufficient. These requirements contemplate that protesters will provide, at a minimum, either allegations or evidence sufficient, if uncontradicted, to establish the likelihood that the protester will prevail in its claim of improper agency action. Id.

Ravens's assertions do not constitute a valid basis of protest because, even if we found them meritorious, they would not provide a basis for sustaining the protest. In this regard, prejudice is an essential element of any viable protest and, even where the record establishes a procurement deficiency, we will sustain a protest only where the deficiency resulted in competitive prejudice to the protester. See Johnson Controls World Servs., Inc., B-285144, July 6, 2000, 2000 CPD ¶ 108 at 3. Ravens has not demonstrated competitive prejudice here. Proposals were submitted prior to the alleged actions about which Ravens complains, and DLA's proposed corrective action is limited to reconsidering its award decision based on the proposals as already submitted; DLA will not request new or revised proposals, and will not reevaluate the proposals but, rather, will only review the evaluations that followed NOSLOT's protest and the award to Rowe, and make a new best value determination. Since the new award decision will be based on the proposals as submitted before Rowe's alleged improper actions, Rowe will be unable to gain any competitive advantage from those actions. It follows that Ravens was not competitively prejudiced, and that there would be no basis for sustaining the protest.[1]

The protest is dismissed.

Anthony H. Gamboa
General Counsel

---

[1] Ravens irrationally asserts that the only way to eliminate competitive harm to Ravens is to allow offerors to submit revised proposals. If Ravens's allegations are correct, Rowe would potentially benefit from its actions if DLA solicits revised proposals. Thus, DLA's plan not to allow offerors to submit revised proposals is the appropriate way to protect Ravens from competitive harm.

GAO
Accountability • Integrity • Reliability

Comptroller General
of the United States

United States Government Accountability Office
Washington, DC 20548

# Decision

**Matter of:** The Ravens Group, Inc.–Reconsideration

**File:** B-296741.7

**Date:** July 14, 2006

## DECISION

The Ravens Group, Inc. requests reconsideration of our May 16, 2006 dismissal (B-296741.5, B-296741.6) of its protest regarding request for proposals (RFP) No. HHM402-05-R-0017, issued by the Defense Intelligence Agency (DIA) for janitorial and custodial services.

We deny the request.

The solicitation was issued on April 14, 2005, and DIA made award to Ravens on June 28. On June 29, NOSLOT Cleaning Services, Inc. challenged the award in a protest filed in our Office. We dismissed the protest on August 4 (B-296741.2), after DIA notified our Office that it intended to take corrective action. In implementing the corrective action, DIA reevaluated the proposals it had received, conducted discussions, received and evaluated final proposal revisions, evaluated the revised proposals, and selected Rowe Contracting Services for award on March 22, 2006. Ravens protested the award decision on March 27 and April 6. We dismissed those protests (B-296741.3, B-296741.4) as academic on April 6 and April 17, respectively, after the agency again proposed corrective action, this time in the form of reconsidering the award decision.

While DIA was implementing the second round of corrective action, Ravens filed two additional protests (B-296741.5, B-296741.6), in which it alleged that Rowe had improperly obtained access to the automated system (JPAS) the Department of Defense uses to maintain information regarding its employees and contractors, and manipulated data to make it appear that Ravens's personnel were Rowe employees. Ravens further asserted that, while its initial protest was pending in our Office, Rowe improperly obtained information about Ravens's proposal by making payments to Ravens employees. Ravens argued that these actions compromised the procurement and required that Rowe be eliminated from the competition. We dismissed the protests on May 19 for failure to state a valid protest basis, because the proposals on

which the award to Rowe was based were submitted prior to the actions about which Ravens was complaining. Since DIA's proposed corrective action was to be based on a reevaluation of those same proposals, and Rowe therefore would be unable to use any of the allegedly improperly acquired information to gain a competitive advantage, we concluded, Ravens would not be competitively prejudiced even if its allegations were correct. Ravens requests that we reconsider our decision.

To obtain reconsideration, the requesting party either must show that our prior decision contains errors of fact or law, or must present information not previously considered that warrants reversal or modification of the decision. 4 C.F.R. § 21.14(a) (2006). We will not reconsider a decision where the request is based on information that was available to the requester and could have been presented during our initial consideration of the protest. Department of Commerce–Recon., B-294121.5, Apr. 12, 2005, 2005 CPD ¶ 64; Specialty Marine, Inc.–Recon., B-292053.2, July 29, 2003, 2003 CPD ¶ 135 at 3 n.2.

Ravens argues that our decision is based on errors of fact and law because at least some of Rowe's allegedly improper conduct took place while NOSLOT's protest was pending, that is, prior to the time that offerors submitted their revised proposals. Thus, Ravens asserts, our decision wrongly concluded that the new evaluation and award decision will be based on proposals submitted before Rowe's improper conduct. To support this argument, Ravens points to sworn statements by Ravens employees that were submitted with Ravens's April 6 protest. Ravens maintains that these statements recount how, on April 3, 2006[1] and March 27, 2006, respectively, a Rowe official told these Ravens employees that Rowe received the award following the original corrective action because Rowe submitted a work schedule that was based on the schedule that Ravens submitted with its initial proposal.[2] Ravens argues that these statements show both that Rowe obtained information–Ravens's

---

[1] This statement actually indicates that the conversation took place on April 3, 2005. However, since this is before the solicitation was issued, it appears that the date in the statement is a typographical error.

[2] Ravens's reconsideration request includes another sworn statement by this employee, dated June 1, 2006, in which the employee now recounts that during the April 3 communication the Rowe official admitted having certain information about Ravens's proposal while the agency was implementing the corrective action in response to the NOSLOT protest, that is, before final proposal revisions (FPR) were submitted. This conversation allegedly took place on April 3, however, so that the information was available on April 6, when Ravens first protested Rowe's allegedly improper conduct. Since the information was not presented at that time, it cannot now be used to form the basis of a reconsideration request. Department of Commerce–Recon., supra; Specialty Marine, Inc.–Recon., supra.

work schedule--from Ravens's proposal before Rowe submitted its final proposal revision, and that Rowe used the information in its final proposal revision to win the award.

Ravens mischaracterizes the Ravens employee's statements. The first statement declares, in relevant part, that "[the Rowe representative] informed me that during the initial bid The Ravens Group submitted a schedule whereas his company did not submit one." Similarly, the second statement recounts, in relevant part, that "[the Rowe representative stated] the only reason he did not win the original bid was because The Ravens Group submitted a work schedule and he did not." These statements do not indicate that the Rowe official stated that its employees viewed Ravens's work schedule before, or even after, Rowe submitted its FPR, or stated that the firm's work schedule was based on Ravens's. Further in this regard, Ravens stated in its April 6 protest that its employees admitted that Rowe had paid them for information regarding Ravens's schedule and employees "during the pendency of the Ravens Group's Protest."[3] Ravens's protests, as discussed above, were submitted after Rowe received the contract award and, therefore, after Rowe's FPR had been submitted. We conclude that Ravens has not demonstrated that our decision was based on an error of fact or law.

The request for reconsideration is denied.

Gary L. Kepplinger
General Counsel

---

[3] Ravens also reiterates its argument that we should require the agency to eliminate Rowe from the competition based on its allegedly improper business practices --accessing the JPAS database and paying Ravens's employees for information. However, this constitutes no more than disagreement with our conclusion that these actions did not cause any competitive harm to Ravens. Accordingly, this argument provides no basis for us to reconsider the decision. See HK Sys., Inc.--Protest and Recon., B-291647.6, B-291647.7, Aug. 29, 2003, 2003 CPD ¶ 159.

GAO
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

Comptroller General
of the United States

# Decision

**Matter of:** The Ravens Group, Inc.

**File:** B-296741.12; B-296741.13

**Date:** March15, 2007

**DECISION**

The Ravens Group, Inc. protests the award of a contract to Rowe Contracting Services, Inc. under request for proposals (RFP) No. HHM402-05-R-0017, issued by the Defense Intelligence Agency (DIA) for janitorial services.

We dismiss the protest.

The solicitation was issued on April 14, 2005 and DIA made award to Ravens on June 28. However, that award was challenged in a series of protests filed in our Office by various offerors, and subsequent corrective actions by DIA resulted in reevaluations and new award determinations, with award finally being made to Rowe.

Ravens challenges various aspects of the award decision. Our Bid Protest Regulations contain strict rules for the timely submission of protests. Under those Regulations, a protest based on other than a solicitation impropriety must be filed within 10 days after the protester knows or should have known the basis of protest. 4 C.F.R. § 21.2(a)(2) (2006). Ravens's challenges are raised in a January 8 protest, which is based on information contained in the award notice DIA faxed to Ravens on December 19. Supplemental Protest, Jan. 8, 2007, at 1. Ravens therefore knew or should have known of the basis for its January 8 protest no later than December 19, and its protest, filed more than 10 days later, is untimely.

Ravens claims that its January 8 protest is timely because DIA sent the December 19 award notice to the wrong fax number; this prevented Ravens from receiving the notice in a timely fashion. In this regard, the agency faxed the award notice to a 202 area code number on the cover sheet of its proposal. Ravens states that, on June 17, 2006, one of its principals specifically told the contracting officer to send formal communications to a different fax number (also on its proposal cover sheet), this one with a 301 area code. Ravens claims that, since that time, on a number of

occasions over the course of the procurement, it advised the agency that it had used the wrong–i.e., the 202 area code–number, but that the agency last used the 202 number in March 2006. Ravens concludes that the protest is timely because it did not receive the December 19 notice at its preferred 301 area code fax number until December 29.[1]

Ravens's argument is unpersuasive. The principal agency contracting officials who conducted this procurement--a contracting specialist who was responsible for the procurement until June 2006, and the current contracting officer, who became involved at that time–deny that they were ever given instructions by Ravens to send correspondence to the 301 area code number, E-mail from Army to GAO, Jan. 31, 2007, and the agency states that it does not know of any written instructions from Ravens to that effect. E-mail from Army to GAO, Jan. 26, 2007. DIA also notes that it has communicated with Ravens using the 202 area code number on a regular basis, and has submitted a copy of a notice that it faxed to Ravens at the 202 number as late in September 2006. Id. Ravens does not deny that the 202 area code number is under its control, and does not deny that the notice was received at that number on December 19. Nor has Ravens provided any evidence corroborating its claim that it asked the agency to send correspondence to the 301 area code number.[2] Given these facts, we find that faxing the award notice to the 202 area code number listed on Ravens's proposal was a reasonable means of providing the notice to Ravens, and that Ravens therefore was on notice of its protest grounds on December 19. Ravens's failure to monitor its fax machine does not excuse its failure to raise the issues in its supplemental protest within 10 days after December 19.[3]

---

[1] Ravens has not explained how the notice made its way from the location of the 202 area code fax machine to the location of the 301 area code machine. However, documentation Ravens submitted to our Office shows that the notice was faxed to the 301 area code number on December 29.

[2] Ravens argues that DIA should have known that the 301 area code number was its preferred fax number because in January 2006 Ravens provided DIA a novation agreement explaining that Ravens was incorporating and changing its name, and that its principal office was in Lanham, Maryland, with a 301 area code. In light of the evidence discussed above–including the fact that the agency used the 202 area code number as late as September 2006–this argument does not change our conclusion. In any case, we note that the novation agreement shows that Ravens's principal place of business also was in Lanham prior to the date of the agreement. Novation Agreement at 1.

[3] Ravens asserts that the agency previously followed up its faxes with a phone call, e-mail, or a mailed hard copy. However, the agency's prior actions are irrelevant given our conclusion that the December 19 fax was sufficient to put Ravens on notice of its protest grounds.

Ravens also argues that DIA improperly made award to Rowe without providing Ravens with discussions, as it allegedly promised to do in an October 12 letter. This argument is timely (since it was raised in Ravens's original protest, which was filed on December 29), but is clearly without merit. We have reviewed the letter (Ravens provided it to our Office in response to our specific request) and it does not even mention discussions.

The protest is dismissed.

Gary L. Kepplinger

# Tab A

(c) The period shall be set so as to provide the contractor adequate lead time to ensure continuous production.

(d) The period may extend beyond the contract completion date for service contracts. This is necessary for situations when exercise of the option would result in the obligation of funds that are not available in the fiscal year in which the contract would otherwise be completed.

(e) Unless otherwise approved in accordance with agency procedures, the total of the basic and option periods shall not exceed 5 years in the case of services, and the total of the basic and option quantities shall not exceed the requirement for 5 years in the case of supplies. These limitations do not apply to information technology contracts. However, statutes applicable to various classes of contracts, for example, the Service Contract Act (see 22.1002-1), may place additional restrictions on the length of contracts.

(f) Contracts may express options for increased quantities of supplies or services in terms of—

(1) Percentage of specific line items,

(2) Increase in specific line items; or

(3) Additional numbered line items identified as the option.

(g) Contracts may express extensions of the term of the contract as an amended completion date or as additional time for performance; *e.g.*, days, weeks, or months.

### 17.205 Documentation.

(a) The contracting officer shall justify in writing the quantities or the term under option, the notification period for exercising the option, and any limitation on option price under 17.203(g); and shall include the justification document in the contract file.

(b) Any justifications and approvals and any determination and findings required by Part 6 shall specify both the basic requirement and the increase permitted by the option.

### 17.206 Evaluation.

(a) In awarding the basic contract, the contracting officer shall, except as provided in paragraph (b) of this section, evaluate offers for any option quantities or periods contained in a solicitation when it has been determined prior to soliciting offers that the Government is likely to exercise the options. (See 17.208.)

(b) The contracting officer need not evaluate offers for any option quantities when it is determined that evaluation would not be in the best interests of the Government and this determination is approved at a level above the contracting officer. An example of a circumstance that may support a determination not to evaluate offers for option quantities is when there is a reasonable certainty that funds will be unavailable to permit exercise of the option.

### 17.207 Exercise of options.

(a) When exercising an option, the contracting officer shall provide written notice to the contractor within the time period specified in the contract.

(b) When the contract provides for economic price adjustment and the contractor requests a revision of the price, the contracting officer shall determine the effect of the adjustment on prices under the option before the option is exercised.

(c) The contracting officer may exercise options only after determining that—

(1) Funds are available;

(2) The requirement covered by the option fulfills an existing Government need;

(3) The exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors (see paragraphs (d) and (e) of this section) considered; and

(4) The option was synopsized in accordance with Part 5 unless exempted by 5.202(a)(11) or other appropriate exemptions in 5.202.

(d) The contracting officer, after considering price and other factors, shall make the determination on the basis of one of the following:

(1) A new solicitation fails to produce a better price or a more advantageous offer than that offered by the option. If it is anticipated that the best price available is the option price or that this is the more advantageous offer, the contracting officer should not use this method of testing the market.

(2) An informal analysis of prices or an examination of the market indicates that the option price is better than prices available in the market or that the option is the more advantageous offer.

(3) The time between the award of the contract containing the option and the exercise of the option is so short that it indicates the option price is the lowest price obtainable or the more advantageous offer. The contracting officer shall take into consideration such factors as market stability and comparison of the time since award with the usual duration of contracts for such supplies or services.

(e) The determination of other factors under (c)(3) of this section should take into account the Government's need for continuity of operations and potential costs of disrupting operations.

(f) Before exercising an option, the contracting officer shall make a written determination for the contract file that exercise is in accordance with the terms of the option, the requirements of this section, and Part 6. To satisfy requirements of Part 6 regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract, *e.g.*—

(1) A specific dollar amount;

(2) An amount to be determined by applying provisions (or a formula) provided in the basic contract, but not including renegotiation of the price for work in a fixed-price type contract;

(3) In the case of a cost-type contract, if—

(i) The option contains a fixed or maximum fee; or

(ii) The fixed or maximum fee amount is determinable by applying a formula contained in the basic contract (but see 16.102(c));

(4) A specific price that is subject to an economic price adjustment provision; or

(5) A specific price that is subject to change as the result of changes to prevailing labor rates provided by the Secretary of Labor.

(g) The contract modification or other written document which notifies the contractor of the exercise of the option shall cite the option clause as authority.

**17.208 Solicitation provisions and contract clauses.**

(a) Insert a provision substantially the same as the provision at 52.217-3, Evaluation Exclusive of Options, in solicitations when the solicitation includes an option clause and does not include one of the provisions prescribed in paragraph (b) or (c) of this section.

(b) Insert a provision substantially the same as the provision at 52.217-4, Evaluation of Options Exercised at Time of Contract Award, in solicitations when the solicitation includes an option clause, the contracting officer has determined that there is a reasonable likelihood that the option will be exercised, and the option may be exercised at the time of contract award.

(c) Insert a provision substantially the same as the provision at 52.217-5, Evaluation of Options, in solicitations when—

(1) The solicitation contains an option clause;

(2) An option is not to be exercised at the time of contract award;

(3) A firm-fixed-price contract, a fixed-price contract with economic price adjustment, or other type of contract approved under agency procedures is contemplated; and

(4) The contracting officer has determined that there is a reasonable likelihood that the option will be exercised. For sealed bids, the determination shall be in writing.

(d) Insert a clause substantially the same as the clause at 52.217-6, Option for Increased Quantity, in solicitations and contracts, other than those for services, when the inclusion of an option is appropriate (see 17.200 and 17.202) and the option quantity is expressed as a percentage of the basic contract quantity or as an additional quantity of a specific line item.

(e) Insert a clause substantially the same as the clause at 52.217-7, Option for Increased Quantity—Separately Priced Line Item, in solicitations and contracts, other than those for services, when the inclusion of an option is appropriate (see 17.200 and 17.202) and the option quantity is identified as a separately priced line item having the same nomenclature as a corresponding basic contract line item.

(f) Insert a clause substantially the same as the clause at 52.217-8, Option to Extend Services, in solicitations and contracts for services when the inclusion of an option is appropriate. (See 17.200, 17.202, and 37.111.)

(g) Insert a clause substantially the same as the clause at 52.217-9, Option to Extend the Term of the Contract, in solicitations and contracts when the inclusion of an option is appropriate (see 17.200 and 17.202) and it is necessary to include in the contract any or all of the following:

(1) A requirement that the Government must give the contractor a preliminary written notice of its intent to extend the contract.

(2) A statement that an extension of the contract includes an extension of the option.

(3) A specified limitation on the total duration of the contract.

# Tab B

be approved at a level above the contracting officer, or by another official pursuant to agency procedures.

(4) Pursuing an agency protest does not extend the time for obtaining a stay at GAO. Agencies may include, as part of the agency protest process, a voluntary suspension period when agency protests are denied and the protester subsequently files at GAO.

(g) Agencies shall make their best efforts to resolve agency protests within 35 days after the protest is filed. To the extent permitted by law and regulation, the parties may exchange relevant information.

(h) Agency protest decisions shall be well-reasoned, and explain the agency position. The protest decision shall be provided to the protester using a method that provides evidence of receipt.

### 33.104 Protests to GAO.

Procedures for protests to GAO are found at 4 CFR Part 21 (GAO Bid Protest Regulations). In the event guidance concerning GAO procedure in this section conflicts with 4 CFR Part 21, 4 CFR Part 21 governs.

(a) *General procedure.* (1) A protester is required to furnish a copy of its complete protest to the official and location designated in the solicitation or, in the absence of such a designation, to the contracting officer, so it is received no later than 1 day after the protest is filed with the GAO. The GAO may dismiss the protest if the protester fails to furnish a complete copy of the protest within 1 day.

(2) Immediately after receipt of the GAO's written notice that a protest has been filed, the agency shall give notice of the protest to the contractor if the award has been made, or, if no award has been made, to all parties who appear to have a reasonable prospect of receiving award if the protest is denied. The agency shall furnish copies of the protest submissions to such parties with instructions to (i) communicate directly with the GAO, and (ii) provide copies of any such communication to the agency and to other participating parties when they become known. However, if the protester has identified sensitive information and requests a protective order, then the contracting officer shall obtain a redacted version from the protester to furnish to other interested parties, if one has not already been provided.

(3)(i) Upon notice that a protest has been filed with the GAO, the contracting officer shall immediately begin compiling the information necessary for a report to the GAO. The agency shall submit a complete report to the GAO within 30 days after the GAO notifies the agency by telephone that a protest has been filed, or within 20 days after receipt from the GAO of a determination to use the express option, unless the GAO—

(A) Advises the agency that the protest has been dismissed; or

(B) Authorizes a longer period in response to an agency's request for an extension. Any new date is documented in the agency's file.

(ii) When a protest is filed with the GAO, and an actual or prospective offeror so requests, the procuring agency shall, in accordance with any applicable protective orders, provide actual or prospective offerors reasonable access to the protest file. However, if the GAO dismisses the protest before the documents are submitted to the GAO, then no protest file need be made available. Information exempt from disclosure under 5 U.S.C. 552 may be redacted from the protest file. The protest file shall be made available to non-intervening actual or prospective offerors within a reasonable time after submittal of an agency report to the GAO. The protest file shall include an index and as appropriate—

(A) The protest;

(B) The offer submitted by the protester;

(C) The offer being considered for award or being protested;

(D) All relevant evaluation documents;

(E) The solicitation, including the specifications or portions relevant to the protest;

(F) The abstract of offers or relevant portions; and

(G) Any other documents that the agency determines are relevant to the protest, including documents specifically requested by the protester.

(iii) At least 5 days prior to the filing of the report, in cases in which the protester has filed a request for specific documents, the agency shall provide to all parties and the GAO a list of those documents, or portions of documents, that the agency has released to the protester or intends to produce in its report, and those documents that the agency intends to withhold from the protester and the reasons for the proposed withholding. Any objection to the scope of the agency's proposed disclosure or nondisclosure of the documents must be filed with the GAO and the other parties within 2 days after receipt of this list.

(iv) The agency report to the GAO shall include—

(A) A copy of the documents described in 33.104(a)(3)(ii);

(B) The contracting officer's signed statement of relevant facts, including a best estimate of the contract value, and a memorandum of law. The contracting officer's statement shall set forth findings, actions, and recommendations, and any additional evidence or information not provided in the protest file that may be necessary to determine the merits of the protest; and

(C) A list of parties being provided the documents.

(4)(i) At the same time the agency submits its report to the GAO, the agency shall furnish copies of its report to the protester and any intervenors. A party shall receive all relevant documents, except—

(A) Those that the agency has decided to withhold from that party for any reason, including those covered by a protective order issued by the GAO. Documents covered by a protective order shall be released only in accordance with the terms of the order. Examples of documents the agency may decide to exclude from a copy of the report include documents previously furnished to or prepared by a party; classified information; and information that would give the party a competitive advantage; and

(B) Protester's documents which the agency determines, pursuant to law or regulation, to withhold from any interested party.

(ii)(A) If the protester requests additional documents within 2 days after the protester knew the existence or relevance of additional documents, or should have known, the agency shall provide the requested documents to the GAO within 2 days of receipt of the request.

(B) The additional documents shall also be provided to the protester and other interested parties within this 2-day period unless the agency has decided to withhold them for any reason (see subdivision (a)(4)(i) of this section). This includes any documents covered by a protective order issued by the GAO. Documents covered by a protective order shall be provided only in accordance with the terms of the order.

(C) The agency shall notify the GAO of any documents withheld from the protester and other interested parties and shall state the reasons for withholding them.

(5) The GAO may issue protective orders which establish terms, conditions, and restrictions for the provision of any document to an interested party. Protective orders prohibit or restrict the disclosure by the party of procurement sensitive information, trade secrets or other proprietary or confidential research, development or commercial information that is contained in such document. Protective orders do not authorize withholding any documents or information from the United States Congress or an executive agency.

(i) *Requests for protective orders.* Any party seeking issuance of a protective order shall file its request with the GAO as soon as practicable after the protest is filed, with copies furnished simultaneously to all parties.

(ii) *Exclusions and rebuttals.* Within 2 days after receipt of a copy of the protective order request, any party may file with the GAO a request that particular documents be excluded from the coverage of the protective order, or that particular parties or individuals be included in or excluded from the protective order. Copies of the request shall be furnished simultaneously to all parties.

(iii) *Additional documents.* If the existence or relevance of additional documents first becomes evident after a protective order has been issued, any party may request that these additional documents be covered by the protective order. Any party to the protective order also may request that individuals not already covered by the protective order be included in the order. Requests shall be filed with the GAO, with copies furnished simultaneously to all parties.

(iv) *Sanctions and remedies.* The GAO may impose appropriate sanctions for any violation of the terms of the protective order. Improper disclosure of protected information will entitle the aggrieved party to all appropriate remedies under law or equity. The GAO may also take appropriate action against an agency which fails to provide documents designated in a protective order.

(6) The protester and other interested parties are required to furnish a copy of any comments on the agency report directly to the GAO within 10 days, or 5 days if express option is used, after receipt of the report, with copies provided to the contracting officer and to other participating interested parties. If a hearing is held, these comments are due within 5 days after the hearing.

(7) Agencies shall furnish the GAO with the name, title, and telephone number of one or more officials (in both field and headquarters offices, if desired) whom the GAO may contact who are knowledgeable about the subject matter of the protest. Each agency shall be responsible for promptly advising the GAO of any change in the designated officials.

(b) *Protests before award.* (1) When the agency has received notice from the GAO of a protest filed directly with the GAO, a contract may not be awarded unless authorized, in accordance with agency procedures, by the head of the contracting activity, on a nondelegable basis, upon a written finding that—

(i) Urgent and compelling circumstances which significantly affect the interest of the United States will not permit awaiting the decision of the GAO; and

(ii) Award is likely to occur within 30 days of the written finding.

(2) A contract award shall not be authorized until the agency has notified the GAO of the finding in paragraph (b)(1) of this section.

(3) When a protest against the making of an award is received and award will be withheld pending disposition of the protest, the contracting officer should inform the offerors whose offers might become eligible for award of the protest. If appropriate, those offerors should be requested, before expiration of the time for acceptance of their offer, to extend the time for acceptance to avoid the need for resolicitation. In the event of failure to obtain such extensions of offers, consideration should be given to proceeding under paragraph (b)(1) of this section.

(c) *Protests after award.* (1) When the agency receives notice of a protest from the GAO within 10 days after contract award or within 5 days after a debriefing date offered to the protester for any debriefing that is required by 15.505 or 15.506, whichever is later, the contracting officer shall immediately suspend performance or terminate the awarded con-

tract, except as provided in paragraphs (c)(2) and (3) of this section.

(2) In accordance with agency procedures, the head of the contracting activity may, on a nondelegable basis, authorize contract performance, notwithstanding the protest, upon a written finding that—

(i) Contract performance will be in the best interests of the United States; or

(ii) Urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the GAO's decision.

(3) Contract performance shall not be authorized until the agency has notified the GAO of the finding in paragraph (c)(2) of this section.

(4) When it is decided to suspend performance or terminate the awarded contract, the contracting officer should attempt to negotiate a mutual agreement on a no-cost basis.

(5) When the agency receives notice of a protest filed with the GAO after the dates contained in paragraph (c)(1), the contracting officer need not suspend contract performance or terminate the awarded contract unless the contracting officer believes that an award may be invalidated and a delay in receiving the supplies or services is not prejudicial to the Government's interest.

(d) *Findings and notice.* If the decision is to proceed with contract award, or continue contract performance under paragraphs (b) or (c) of this section, the contracting officer shall include the written findings or other required documentation in the file. The contracting officer also shall give written notice of the decision to the protester and other interested parties.

(e) *Hearings.* The GAO may hold a hearing at the request of the agency, a protester, or other interested party who has responded to the notice in paragraph (a)(2) of this section. A recording or transcription of the hearing will normally be made, and copies may be obtained from the GAO. All parties may file comments on the hearing and the agency report within 5 days of the hearing.

(f) *GAO decision time.* GAO issues its recommendation on a protest within 100 days from the date of filing of the protest with the GAO, or within 65 days under the express option. The GAO attempts to issue its recommendation on an amended protest that adds a new ground of protest within the time limit of the initial protest. If an amended protest cannot be resolved within the initial time limit, the GAO may resolve the amended protest through an express option.

(g) *Notice to GAO.* If the agency has not fully implemented the GAO recommendations with respect to a solicitation for a contract or an award or a proposed award of a contract within 60 days of receiving the GAO recommendations, the head of the contracting activity responsible for that contract shall report the failure to the GAO not later than 5 days after the expiration of the 60-day period. The report shall explain the reasons why the GAO's recommendation, exclusive of costs, has not been followed by the agency.

(h) *Award of costs.* (1) If the GAO determines that a solicitation for a contract, a proposed award, or an award of a contract does not comply with a statute or regulation, the GAO may recommend that the agency pay to an appropriate protester the cost, exclusive of profit, of filing and pursuing the protest, including reasonable attorney, consultant, and expert witness fees, and bid and proposal preparation costs. The agency shall use funds available for the procurement to pay the costs awarded.

(2) The protester shall file its claim for costs with the contracting agency within 60 days after receipt of the GAO's recommendation that the agency pay the protester its costs. Failure to file the claim within that time may result in forfeiture of the protester's right to recover its costs.

(3) The agency shall attempt to reach an agreement on the amount of costs to be paid. If the agency and the protester are unable to agree on the amount to be paid, the GAO may, upon request of the protester, recommend to the agency the amount of costs that the agency should pay.

(4) Within 60 days after the GAO recommends the amount of costs the agency should pay the protester, the agency shall notify the GAO of the action taken by the agency in response to the recommendation.

(5) No agency shall pay a party, other than a small business concern within the meaning of section 3(a) of the Small Business Act (see 19.001, "Small business concern"), costs under paragraph (h)(2) of this section—

(i) For consultant and expert witness fees that exceed the highest rate of compensation for expert witnesses paid by the Government pursuant to 5 U.S.C. 3109 and 5 CFR 304.105; or

(ii) For attorneys' fees that exceed $150 per hour, unless the agency determines, based on the recommendation of the Comptroller General on a case-by-case basis, that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee. The cap placed on attorneys' fees for businesses, other than small businesses, constitutes a benchmark as to a "reasonable" level for attorneys' fees for small businesses.

(6) Before paying a recommended award of costs, agency personnel should consult legal counsel. Section 33.104(h) applies to all recommended awards of costs that have not yet been paid.

(7) Any costs the contractor receives under this section shall not be the subject of subsequent proposals, billings, or claims against the Government, and those exclusions should be reflected in the cost agreement.

(8) If the Government pays costs, as provided in paragraph (h)(1) of this section, where a postaward protest is sustained as the result of an awardee's intentional or negligent

misstatement, misrepresentation, or miscertification, the Government may require the awardee to reimburse the Government the amount of such costs. In addition to any other remedy available, and pursuant to the requirements of Subpart 32.6, the Government may collect this debt by offsetting the amount against any payment due the awardee under any contract between the awardee and the Government.

**33.105 [Reserved]**

**33.106 Solicitation provision and contract clause.**

(a) The contracting officer shall insert the provision at 52.233-2, Service of Protest, in solicitations for contracts expected to exceed the simplified acquisition threshold.

(b) The contracting officer shall insert the clause at 52.233-3, Protest After Award, in all solicitations and contracts. If a cost reimbursement contract is contemplated, the contracting officer shall use the clause with its Alternate I.

# Tab C

## Subpart 49.5—Contract Termination Clauses

**49.501 General.**

This subpart prescribes the principal contract termination clauses. This subpart does not apply to contracts that use the clause at 52.213-4, Terms and Conditions—Simplified Acquisitions (Other Than Commercial Items). For contracts for the acquisition of commercial items, this part provides administrative guidance which may be followed when it is consistent with the requirements and procedures in the clause at 52.212-4, Contract Terms and Conditions—Commercial Items. In appropriate cases, agencies may authorize the use of special purpose clauses, if consistent with this chapter.

**49.502 Termination for convenience of the Government.**

(a) *Fixed-price contracts that do not exceed the simplified acquisition threshold (short form)*— (1) *General use.* The contracting officer shall insert the clause at 52.249-1, Termination for Convenience of the Government (Fixed-Price) (Short Form), in solicitations and contracts when a fixed-price contract is contemplated and the contract amount is not expected to exceed the simplified acquisition threshold, except—

(i) If use of the clause at 52.249-4, Termination for Convenience of the Government (Services) (Short Form) is appropriate,

(ii) In contracts for research and development work with an educational or nonprofit institution on a no-profit basis,

(iii) In contracts for architect-engineer services, or

(iv) If one of the clauses prescribed or cited at 49.505(a), (b), or (e), is appropriate.

(2) *Dismantling and demolition.* If the contract is for dismantling, demolition, or removal of improvements, the contracting officer shall use the clause with its Alternate I.

(b) *Fixed-price contracts that exceed the simplified acquisition threshold*— (1)(i) *General use.* The contracting officer shall insert the clause at 52.249-2, Termination for Convenience of the Government (Fixed-Price), in solicitations and contracts when a fixed-price contract is contemplated and the contract amount is expected to exceed the simplified acquisition threshold except in contracts for —

(A) Dismantling and demolition,

(B) Research and development work with an educational or nonprofit institution on a no-profit basis, or

(C) Architect-engineer services; it shall not be used if the clause at 52.249-4, Termination for Convenience of the Government (Services) (Short Form), is appropriate (see 49.502(c)), or one of the clauses prescribed or cited at 49.505(a), (b), or (e), is appropriate.

(2) *Construction.* If the contract is for construction, the contracting officer shall use the clause with its Alternate I.

(i) *Partial payments.* If the contract is with an agency of the U.S. Government or with State, local, or foreign governments or their agencies, and if the contracting officer determines that the requirement to pay interest on excess partial payments is inappropriate, the contracting officer shall use the clause with its Alternate II. In such contracts for construction, the contracting officer shall use the clause with its Alternate III.

(ii) *Dismantling and demolition.* The contracting officer shall insert the clause at 52.249-3, Termination for Convenience of the Government (Dismantling, Demolition, or Removal of Improvements) in solicitations and contracts for dismantling, demolition, or removal of improvements, when a fixed-price contract is contemplated and the contract amount is expected to exceed the simplified acquisition threshold. If the contract is with an agency of the U.S. Government or with State, local, or foreign governments or their agencies, and if the contracting officer determines that the requirement to pay interest on excess partial payments is inappropriate, the contracting officer shall use the clause with its Alternate I.

(c) *Service contracts (short form).* The contracting officer shall insert the clause at 52.249-4, Termination for Convenience of the Government (Services) (Short Form), in solicitations and contracts for services, regardless of value, when a fixed-price contract is contemplated and the contracting officer determines that because of the kind of services required, the successful offeror will not incur substantial charges in preparation for and in carrying out the contract, and would, if terminated for the convenience of the Government, limit termination settlement charges to services rendered before the date of termination. Examples of services where this clause may be appropriate are contracts for rental of unreserved parking space, laundry and dry cleaning, etc.

(d) *Research and development contracts.* The contracting officer shall insert the clause at 52.249-5, Termination for the Convenience of the Government (Educational and Other Nonprofit Institutions), in solicitations and contracts when either a fixed-price or cost-reimbursement contract is contemplated for research and development work with an educational or nonprofit institution on a nonprofit or no-fee basis.

(e) *Subcontracts*—(1) *General use.* The prime contractor may find the clause at 52.249-1, Termination for Convenience of the Government (Fixed-Price) (Short Form), or at 52.249-2, Termination for Convenience of the Government (Fixed-Price), as appropriate, suitable for use in fixed-price subcontracts, except as noted in paragraph (e)(2) of this section; provided, that the relationship between the contractor and subcontractor is clearly indicated. Inapplicable conditions (*e.g.*, paragraph (d)) in 52.249-2 should be deleted and the periods reduced for submitting the subcontractor's termination settlement proposal (*e.g.*, 6 months), and for requesting an equitable price adjustment (*e.g.*, 45 days).

# Tab D

xxx

(g) *Collateral savings.* If a VECP is accepted, the Contracting Officer will increase the instant contract amount by 20 percent of any projected collateral savings determined to be realized in a typical year of use after subtracting any Government costs not previously offset. However, the Contractor's share of collateral savings will not exceed the contract's firm-fixed-price or estimated cost, at the time the VECP is accepted, or $100,000, whichever is greater. The Contracting Officer is the sole determiner of the amount of collateral savings.

(h) *Subcontracts.* The Contractor shall include an appropriate value engineering clause in any subcontract of $55,000 or more and may include one in subcontracts of lesser value. In computing any adjustment in this contract's price under paragraph (f) of this clause, the Contractor's allowable development and implementation costs shall include any subcontractor's allowable development and implementation costs clearly resulting from a VECP accepted by the Government under this contract, but shall exclude any value engineering incentive payments to a subcontractor. The Contractor may choose any arrangement for subcontractor value engineering incentive payments; *provided*, that these payments shall not reduce the Government's share of the savings resulting from the VECP.

(i) *Data.* The Contractor may restrict the Government's right to use any part of a VECP or the supporting data by marking the following legend on the affected parts:

These data, furnished under the Value Engineering—Construction clause of contract __________, shall not be disclosed outside the Government or duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate a value engineering change proposal submitted under the clause. This restriction does not limit the Government's right to use information contained in these data if it has been obtained or is otherwise available from the Contractor or from another source without limitations.

If a VECP is accepted, the Contractor hereby grants the Government unlimited rights in the VECP and supporting data, except that, with respect to data qualifying and submitted as limited rights technical data, the Government shall have the rights specified in the contract modification implementing the VECP and shall appropriately mark the data. (The terms "unlimited rights" and "limited rights" are defined in Part 27 of the Federal Acquisition Regulation.)

(End of clause)

*Alternate I (Apr 1984).* When the head of the contracting activity determines that the cost of calculating and tracking collateral savings will exceed the benefits to be derived in a construction contract, delete paragraph (g) from the basic clause and redesignate the remaining paragraphs accordingly.

### 52.249-1 Termination for Convenience of the Government (Fixed-Price) (Short Form).

As prescribed in 49.502(a)(1), insert the following clause:

TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (SHORT FORM) (APR 1984)

The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest. If this contract is terminated, the rights, duties, and obligations of the parties, including compensation to the Contractor, shall be in accordance with Part 49 of the Federal Acquisition Regulation in effect on the date of this contract.

(End of clause)

*Alternate I (Apr 1984).* If the contract is for dismantling, demolition, or removal of improvements, designate the basic clause as paragraph (a) and add the following paragraph (b):

(b) Upon receipt of the termination notice, if title to property is vested in the Contractor under this contract, it shall revest in the Government regardless of any other clause of the contract, except for property that the Contractor (a) disposed of by bona fide sale or (b) removed from the site.

### 52.249-2 Termination for Convenience of the Government (Fixed-Price).

As prescribed in 49.502(b)(1)(i), insert the following clause:

TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (MAY 2004)

(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.

(b) After receipt of a Notice of Termination, and except as directed by the Contracting Officer, the Contractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this clause:

(1) Stop work as specified in the notice.

(2) Place no further subcontracts or orders (referred to as subcontracts in this clause) for materials, services, or facilities, except as necessary to complete the continued portion of the contract.

(3) Terminate all subcontracts to the extent they relate to the work terminated.

(4) Assign to the Government, as directed by the Contracting Officer, all right, title, and interest of the Contractor under the subcontracts terminated, in which case the Government shall have the right to settle or to pay any termination settlement proposal arising out of those terminations.

(5) With approval or ratification to the extent required by the Contracting Officer, settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts; the approval or ratification will be final for purposes of this clause.

(6) As directed by the Contracting Officer, transfer title and deliver to the Government—

(i) The fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced or acquired for the work terminated; and

(ii) The completed or partially completed plans, drawings, information, and other property that, if the contract had been completed, would be required to be furnished to the Government.

(7) Complete performance of the work not terminated.

(8) Take any action that may be necessary, or that the Contracting Officer may direct, for the protection and preservation of the property related to this contract that is in the possession of the Contractor and in which the Government has or may acquire an interest.

(9) Use its best efforts to sell, as directed or authorized by the Contracting Officer, any property of the types referred to in paragraph (b)(6) of this clause; *provided*, however, that the Contractor (i) is not required to extend credit to any purchaser and (ii) may acquire the property under the conditions prescribed by, and at prices approved by, the Contracting Officer. The proceeds of any transfer or disposition will be applied to reduce any payments to be made by the Government under this contract, credited to the price or cost of the work, or paid in any other manner directed by the Contracting Officer.

(c) The Contractor shall submit complete termination inventory schedules no later than 120 days from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Contractor within this 120-day period.

(d) After expiration of the plant clearance period as defined in Subpart 49.001 of the Federal Acquisition Regulation, the Contractor may submit to the Contracting Officer a list, certified as to quantity and quality, of termination inventory not previously disposed of, excluding items authorized for disposition by the Contracting Officer. The Contractor may request the Government to remove those items or enter into an agreement for their storage. Within 15 days, the Government will accept title to those items and remove them or enter into a storage agreement. The Contracting Officer may verify the list upon removal of the items, or if stored, within 45 days from submission of the list, and shall correct the list, as necessary, before final settlement.

(e) After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Contractor shall submit the proposal promptly, but no later than 1 year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Contractor within this 1-year period. However, if the Contracting Officer determines that the facts justify it, a termination settlement proposal may be received and acted on after 1 year or any extension. If the Contractor fails to submit the proposal within the time allowed, the Contracting Officer may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(f) Subject to paragraph (e) of this clause, the Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid or remaining to be paid because of the termination. The amount may include a reasonable allowance for profit on work done. However, the agreed amount, whether under this paragraph (f) or paragraph (g) of this clause, exclusive of costs shown in paragraph (g)(3) of this clause, may not exceed the total contract price as reduced by (1) the amount of payments previously made and (2) the contract price of work not terminated. The contract shall be modified, and the Contractor paid the agreed amount. Paragraph (g) of this clause shall not limit, restrict, or affect the amount that may be agreed upon to be paid under this paragraph.

(g) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (f) of this clause:

(1) The contract price for completed supplies or services accepted by the Government (or sold or acquired under paragraph (b)(9) of this clause) not previously paid for, adjusted for any saving of freight and other charges.

(2) The total of—

(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under paragraph (g)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are

properly chargeable to the terminated portion of the contract if not included in subdivision (g)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (g)(2)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (g)(2)(iii) and shall reduce the settlement to reflect the indicated rate of loss.

(3) The reasonable costs of settlement of the work terminated, including—

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

(h) Except for normal spoilage, and except to the extent that the Government expressly assumed the risk of loss, the Contracting Officer shall exclude from the amounts payable to the Contractor under paragraph (g) of this clause, the fair value, as determined by the Contracting Officer, of property that is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government or to a buyer.

(i) The cost principles and procedures of Part 31 of the Federal Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause.

(j) The Contractor shall have the right of appeal, under the Disputes clause, from any determination made by the Contracting Officer under paragraph (e), (g), or (l) of this clause, except that if the Contractor failed to submit the termination settlement proposal or request for equitable adjustment within the time provided in paragraph (e) or (l), respectively, and failed to request a time extension, there is no right of appeal.

(k) In arriving at the amount due the Contractor under this clause, there shall be deducted—

(1) All unliquidated advance or other payments to the Contractor under the terminated portion of this contract;

(2) Any claim which the Government has against the Contractor under this contract; and

(3) The agreed price for, or the proceeds of sale of, materials, supplies, or other things acquired by the Contractor or sold under the provisions of this clause and not recovered by or credited to the Government.

(l) If the termination is partial, the Contractor may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract. The Contracting Officer shall make any equitable adjustment agreed upon. Any proposal by the Contractor for an equitable adjustment under this clause shall be requested within 90 days from the effective date of termination unless extended in writing by the Contracting Officer.

(m)(1) The Government may, under the terms and conditions it prescribes, make partial payments and payments against costs incurred by the Contractor for the terminated portion of the contract, if the Contracting Officer believes the total of these payments will not exceed the amount to which the Contractor will be entitled.

(2) If the total payments exceed the amount finally determined to be due, the Contractor shall repay the excess to the Government upon demand, together with interest computed at the rate established by the Secretary of the Treasury under 50 U.S.C. App. 1215(b)(2). Interest shall be computed for the period from the date the excess payment is received by the Contractor to the date the excess is repaid. Interest shall not be charged on any excess payment due to a reduction in the Contractor's termination settlement proposal because of retention or other disposition of termination inventory until 10 days after the date of the retention or disposition, or a later date determined by the Contracting Officer because of the circumstances.

(n) Unless otherwise provided in this contract or by statute, the Contractor shall maintain all records and documents relating to the terminated portion of this contract for 3 years after final settlement. This includes all books and other evidence bearing on the Contractor's costs and expenses under this contract. The Contractor shall make these records and documents available to the Government, at the Contractor's office, at all reasonable times, without any direct charge. If approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions may be maintained instead of original records and documents.

(End of clause)

*Alternate I (Sept 1996).* If the contract is for construction, substitute the following paragraph (g) for paragraph (g) of the basic clause:

(g) If the Contractor and Contracting Officer fail to agree on the whole amount to be paid the Contractor because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined as follows, but without duplication of any amounts agreed upon under paragraph (f) of this clause:

(1) For contract work performed before the effective date of termination, the total (without duplication of any items) of—

(i) The cost of this work;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(1)(i) of this clause; and

(iii) A sum, as profit on subdivision (g)(1)(i) of this clause, determined by the Contracting Officer under 49.202 of