SEYFARTH ATTORNEYS SHAW



Thus, when a proper analysis of Rowe's and Olympus' manpower proposals is performed based upon FTEs, instead o[redacted]wer employees than Rowe, as the SSA mistakenly concluded, Olympus actually o[redacted]ore employees, (i.e. FTEs) than Rowe offered over the term of the contract. Therefore, any best value tradeoff decision in favor of Rowe that is predicated upon the SSA's "R[redacted]alysis, instead of the correct [redacted] analysis is irrational on its face.

**C. The SSA Admits Using The Manpower Each Offeror Proposed As A Discriminator In The Best Value Decision.**

In the Legal Memorandum supporting the Agency Report on Olympus' First Supplemental Protest, DIA argues that the SSA "properly considered the number of employees offerors proposed when making the source selection decision." AR, Tab 38, pp. 5-6.

> Protester correctly observes that the Contracting Officer considered the number of employees each offeror proposed when making her source selection decision, however, this consideration was proper.

Id., at pp. 5-6 (emphasis added). In addition, in the Contracting Officer's Statement, the SSA confirms that she considered the number of employees offered in the best value tradeoff analysis:

> The number of employees offered is a factor in best value trade off analysis and a factor in the cost realism analysis in accordance with the solicitation.

AR, Tab 39, p. 2, (emphasis added).[4] These statements are consistent with DIA's statements regarding this issue in the Legal Memorandum and in the Contracting Officer's statement

---

[4] In the SSD, the SSA asserts that, in accordance with FAR 15. 404-1(b)92)(i), she did not need to perform a cost realism analysis, because there was adequate price competition. However, in the Contracting Officer's Statement in the Agency Report on Olympus' First Supplemental Protest, the SSA states that she took account of the number of employees offered in the cost realism analysis.

supporting the Agency Report on Olympus' initial protest. See, AR, Tab 1, p. 9; AR, Tab 2, p 8. Therefore, DIA cannot deny that the SSA relied upon her mistaken conclusion regarding the number of employees that Rowe offered compared to the number that Olympus offered when she selected Rowe for award.

**D. The Best Value Decision Is Invalid, Because The SSA Mistakenly Credited Rowe With Offering More Manpower Than Olympus When The Opposite Is True.**

GAO cannot uphold a source selection decision that is premised upon a material mistake of fact. American Development Corp., B-251,876, B-251876.4, 93-2 CPD P 49 (protest sustained where cost/technical tradeoff was based on incomplete and inaccurate information). Here, both the SSA and her attorney-adviser have repeatedly confirmed that the SSA considered Rowe's offer to represent the best value because Rowe's offer was slightly lower in price than Olympus' and Rowe offered more manpower. If the SSA had properly determined that Olympus offe[redacted] than Rowe offered over the contract term, she would have realized that this increased manpower more than offset the less t[redacted]nt difference between Olympus' price and Rowe's price. Gemmo Impianti SpA, B-290,427, 2002 CPD P 146 (agency's source selection decision was unreasonable where tradeoff decision contained material defects that prejudiced protester).

---

However, there are no documents in the record to indicate that the SSA actually performed a cost realism analysis of offers.

## II. In The Alternative, GAO Cannot Determine Whether DIA's Best Value Decision Was Reasonable In The Absence Of Any Documents In The Record To Show How The SSA Evaluated Rowe's Manpower Proposal.

### A. There Are No Documents In The Record Showing How The SSA Performed The Manpower Analysis That GAO Can Review To Determine Whether The SSA's Tradeoff Was Reasonable.

The Agency Report in this procurement contains the entire record that supports the agency's contract award to Rowe. There are no documents in this record that shed even a ray of light on the data the SSA considered or the process she used to reach the mistaken conclusion that Rowe offered [redacted] more employees than Olympus, and therefore that Rowe represented the best value. The references to the SSA's conclusion in this regard that appear in the SSD and in the Legal Memorandum and Contracting Officer's Statements in the Agency Reports on Olympus' initial and First Supplemental Protests do not provide any reference to an evaluation document or to any type of analysis, or even to raw data in the offerors' proposals, that the SSA considered. The SSA's mistaken [redacted] more employees" conclusion appears to have dropped from the sky. Without understanding how the SSA developed the [redacted] re employees" it attributes to Rowe, GAO cannot determine whether the SSA's best value tradeoff decision is reasonable.

### B. GAO Has Consistently Held That Where The Decision Record Is Incomplete, GAO Cannot Determine Whether A Procurement Decision Is Reasonable.

It is well-established that if there is not an adequate record of the evaluation and the source selection decision in a procurement, GAO cannot determine the reasonableness of the agency's evaluation. In <u>Biospherics Incorporated</u>, B-278508.4, .5, .6, 98-2 CPD ¶ 96. In <u>Biospherics</u>, GAO sustained the protest of a disappointed offeror where the agency's Source Selection Decision memorandum failed to contain a discussion of the results of the SSA's evaluation of revised proposals after discussions. Accordingly, GAO determined that, as a consequence of the absence of

an adequate record, it could not discern the basis for the agency's conclusion that the awardee's final proposal was technically superior to the protester's;

> In sum, the evaluation and source selection record furnished to our Office—numerical scores and a blanket determination of acceptability, no post-discussion narratives, and the source selection memorandum which contains no explanation of how the revised proposal affected the initial evaluation—is insufficient for our Office to determine the reasonableness of the agency's evaluation of proposals and the reasonableness of the agency's selection decision.

Id., at p.4 (emphasis added). See also, Teltara Inc., B-280,922, 98-2 CPD ¶ 124 (protest sustained where the source selection memorandum contains only conclusory information that does not support the best value decision); Opti-Lite Optical, B-281,693, 99-1 CPD ¶ 61 (protest sustained where the record does not provide any documentation or explanation which supports the price/technical tradeoff); Green Valley Transportation, Inc., B-285,283, 2000 CPD ¶ 133 (protest sustained where record is devoid of qualitative analysis of offerors' past performance); J&J Maintenance, Inc., B-284708.3, 2000 CPD ¶ 106 (protest sustained where record does not establish the reasonableness of the evaluation or the cost/technical tradeoff underlying the source selection decision); Cortland Memorial Hospital, B-286,890, 2001 CPD ¶ 48 (protest sustained where there is inadequate support in the record for the scoring that the contracting officer relied on in making the contract award); Marshall-Putnam Soil and Water Conservation District, B-289,949, .2, 2002 CPD ¶ 90 (protest sustained where record does not contain contemporaneous documentation supporting or explaining the agency's evaluation); Midland Supply, Inc., B-298,720, .2, 2007 CPD ¶ 2 (protest sustained where record lacks any documentation reflecting a meaningful comparative analysis of proposals).

Consistent with this precedent, GAO must sustain Olympus' protest because there is not adequate documentation in the record to support the SSA's determination that Rowe offered five more employees than Olympus offered, and therefore that Rowe represented the best value.

**COMMENTS ON THE AGENCY REPORT ON**
**OLYMPUS' FIRST SUPPLEMENTAL PROTEST**

This procurement for janitorial services at the DIA facility at Bolling AFB, Virginia began in the Spring of 2005, and has involved four successive contract awards and three agency corrective actions. Despite this tortured history, the only record before GAO in this case are the documents that pertain to the agency's decision to make a contract award worth approximately $20 million to Rowe. This record was compiled by three technical evaluators and the Contracting Officer/SSA, who performed the past performance evaluation and the price evaluation and made the source selection decision. As set forth in Olympus' First Supplemental Protest, this record contains multiple, material errors, in addition to the SSA's material error regarding the manpower evaluation, discussed above. Specifically, the record does not support the award to Rowe because:

1. DIA ignored Rowe's failure to submit a complete, coherent and responsive offer;

2. The SSA's past performance ratings of Olympus and Rowe were irrational and based upon errors of fact;

3. The SSA's evaluation of price proposals was irrational because she did not consider whether Rowe's failure to provide for supply or equipment price increases over the term of the contract presented performance risk; and

4. The overall evaluation record in this case is insufficient to enable GAO to determine whether the best value decision was reasonable.

## I. Rowe Did Not Submit A Complete, Coherent And Responsive Final Proposal.

### A. Neither The Agency Nor The Awardee Can Produce Rowe's Final Technical Proposal.

In its Supplemental Protest, Olympus noted the agency's identification of three weaknesses in Rowe's Technical Proposal during discussions. One of these weaknesses was the lack of a "security awareness plan." AR, Tab 21, p. 1. The document Rowe submitted in its final revised proposal entitled "Security Awareness Plan" consisted of three sentences on a quarter-page, followed by an indeterminate number of pages of generic material on terrorism and security printed from the Department of Defense website.

In the Legal Memorandum supporting the Agency Report on Olympus' First Supplemental Protest, DIA quotes the Technical Evaluation Board's ("TEB") conclusion that Rowe offered a security plan, however, the TEB does not cite to any pages in Rowe's final revised proposal that contain this alleged security awareness plan. AR, Tab 26, p. 6. Moreover, agency counsel has not been able to identify Rowe's Security Awareness Plan, or to agree with Rowe on the number of pages the "plan" includes. See, February 9, 2007 e-mail from LTC Frank March to GAO and the parties regarding missing pages from Rowe's final proposal:

> Despite the minor issue regarding the document in the AR that constitutes Rowe's proposal, it is obvious that whatever the TEB evaluated satisfied them to the extent that they rated Rowe as Excellent.

AR, Tab 38, p. 3 (emphasis added). The agency's extremely cavalier attitude towards whether agency evaluators had a complete copy of Rowe's final technical proposal when they evaluated it, and whether "whatever the TEB evaluated" actually contained a Security Awareness Plan, makes a mockery of the agency's competitive procurement process. If the TEB thought that Rowe's lack of

a Security Awareness Plan was sufficiently important for them to identify this lack as a "weakness" in Rowe's proposal, the TEB and the SSA should make some effort to determine whether Rowe, in fact, Rowe submitted a complete Security Awareness Plan in its final revised proposal, and to reference it in the technical evaluation and SSD. DIA has done neither.

**B. The TEB Did Not "Figure Out" How To Assemble Rowe's Final Proposal, And Consequently Gave Rowe A "Strength" For An Element Not In Rowe's Final Proposal.**

Agency counsel interprets Olympus' claim that Rowe's final proposal was incomplete and incoherent as suggesting that Olympus believes "the TEB and Contracting Officer were not smart enough to figure out how to insert the replacement pages into Rowe's original proposal." AR, Tab 38, p. 2. A close inspection of the TEB's evaluation report suggests that this was, in fact, the case. Based upon its understanding of the proper insertion of the unnumbered, partially blank pages of Rowe's final proposal into its initial proposal, the TEB concluded that Rowe's technical proposal should be given a "strength" for its strong personnel/staffing plan:

STRENGTHS

[redacted]

AR, Tab 26, p. 15 (emphasis added). However, unnumbered page 17 of Rowe's final technical proposal contains a list of o[redacted] Moreover, unlike in Rowe's initial proposal, the replacement page has a blank space in the place where th[redacted] workers names appeared in Rowe's original proposal, suggesting that, at the time of Rowe's final proposal, the originally-named workers may no longer have been available.

Therefore, the TEB identified as a "strength" an aspect of Rowe's technical proposal that was not in the final version because it apparently did not "figure out how to insert the replacement pages into Rowe's original proposal." Accordingly, the TEB improperly gave Rowe a "strength" for an element in its proposal that, like the Emperor's Clothes in the classic children's tale, simply was not there.

**C. The SSA Did Not Make An Independent Determination That Rowe's Final Technical Proposal Was Complete.**

Federal Acquisition Regulation (FAR) 15.308 provides that the SSA "may use reports and analyses prepared by others" in making a contract award, however "the source selection decision shall represent the SSA's independent judgment." In this case, the SSA did not follow this mandate and use her independent judgment to even determine whether Rowe had submitted a complete final proposal. Instead of reviewing Rowe's final proposal herself, she relied on the TEB to tell her that Rowe's final proposal was complete:

> Rowe submitted their final proposal in accordance with the discussion letter dated 08 Nov 2005. The final proposal was reviewed by the Technical Evaluators who found that the proposal addressed all issues. Therefore, as the Source Selection Authority, I determine that Rowe's final proposal was complete, coherent and responsive.

AR, Tab 39, p. 1 (emphasis added). The SSA cannot determine that Rowe's final proposal was "complete, coherent and responsive" based upon the Technical Evaluators conclusion to that effect. The SSA has to make her own independent judgment that Rowe's proposal was "complete, coherent and responsive." The SSA's failure to use her own independent judgment to determine that Rowe's final proposal was complete, coherent and responsive, should cause GAO to sustain Olympus' protest on this ground alone. See University Research Co. LLC, B-294,358, B-294358.2-.5, 2004 CPD ¶ 217 ("FAR 15.308 requires documentation of source selection decisions, and recognizes that

SEYFARTH SHAW ATTORNEYS



while the selection official may rely on reports and analyses prepared by others, the ultimate decision reflects the selection officials' independent judgment.").

In sum, the SSA cannot establish that Rowe's final proposal was complete, coherent and responsive, because she relied on the TEB for this information, and the TEB apparently did not "figure out" how to properly insert the unnumbered pages of Rowe's final proposal into its initial proposal, as evidenced by its giving Rowe a "strength" for an element that was not included in Rowe's final proposal.

## II. The Agency's Past Performance Evaluation Of Olympus Was Irrational, Unreasonable And Prejudicial.

### A. The SSA Mistakenly Concluded That A Government Agency Had Issued A Cure Notice To Olympus.

Olympus has consistently stated that the agency unfairly evaluated its past performance record, by downgrading its overall past performance rating from the "Excellent" the agency had given Olympus in its 2005 past performance eva[redacted]ich Olympus received in the agency's 2006 evaluation of this same Olympus past performance record. In 2006, the SSA, who performed the past performance evaluation, unreasonably focu[redacted]o the exclusion of all other available information, including an "Excellent" rating from the customer how had noted the issuance of the cure notice

In response, the agency has contended tha[redacted]is a sufficiently serious event to justify Olympus' lower past performance rating. It therefore came as a considerable shock to read in paragraph 4 of the Contracting Officer's Statement issued in response to Olympus' First Supplemental Protest, that at this late date, the Contracting Officer/SSA mistakenly believes that <u>the Government</u>, not a commercial cust[redacted]

Olympus. The SSA's statement indicates that she considers this [redacted] to be a black mark on Olympus' past performance record because "[t]he Government does [redacted] unless a major problem carries on for a long period." AR, Tab 39, pg. 2 (emphasis added). This statement suggests that the SSA who evaluated offerors past performance, was wholly unfamiliar with Olympus' past performance record when she performed the past performance evaluation. If she had read and understood Olympus' past performance questionnaires, she would have known that a commercial customer, not the Government, [redacted] and that th[redacted]" Olympus promptly developed a plan for resolving the underlying issue, and had the problem completely resolved within 30 days [redacted] See, AR, Tab 29, p.5

The Contracting Officer's most recent Statement only supports Olympus' contention that the agency failed to reasonably and accurately consider all of Olympus' past performance information during the 2006 evaluation leading up to the award to Rowe. In light of the closeness of this competition, and the numerous other defects in the agency's evaluation of proposals that Olympus has identified, the SSA's obvious misunderstanding of Olympus' the facts contained in Olympus' past performance record materially affected the award decision.

**B. The SSA's Past Performance Rating Of Olympus Was Based Upon Her Mistaken Conclusion That The Government [redacted] nd Did Not Give Proper Weight To Olympus' Exclusively "Excellent" and "Outstanding" Past Performance Ratings.**

In its First Supplemental Protest, Olympus argued that the SSA ignored the exclusively "Excellent" and "Outstanding" ratings Olympus received in the past performance questionnaire responses, while ignoring the se[redacted]ings that Rowe received from one of its past performance references. Most important, the SSA ignored the fact that Olympus received

these universally high ratings from the very same party that [redacted] Of the 24 applicable subjects on the past performance questionnaire, Wachenhut Services, Inc. ("Wachenhut") gave Olympus 9 "Outstanding" ratings and 15 "Excellent" ratings. This includes the "Excellent" rating Olympus received under question 4(f), the same question where Wachenhut noted that [redacted] Olympus' other past performance reference, in addition to providing high ratings, also indicated that it had awarded Olympus a second contract.

Neither the Contracting Officer nor agency counsel provided any substantive response to this protest allegation in the supplemental Agency Report. Agency counsel devoted precisely one paragraph to addressing Olympus' protest of the agency's past performance evaluation. Without citing to the record or to any legal authority, agency counsel merely asserted that the past performance evaluation was reasonable, and that Olympus was not prejudiced by the agency's failure to adequately consider all of the past performance information available.

Similarly, the Contracting Officer failed to explain whether she considered the superior ratings that Olympus actually received from its past performance references. She merely focused on [redacted] "carried on a long time," when, in fact, Olympus had quickly resolved issu[redacted]

The SSA's determination that Olympus deserved a "[redacted]st performance rating cannot be reasonable because it was based upon a material mistake of fact regarding the cure notice issue, and because it ignored the exclusively "Excellent" and "Outstanding" past performance ratings that Olympus received from all of its references.

**III. The Evaluation of Price Proposals Was Irrational Because The SSA Did Not Consider Whether Rowe's Failure To Include Price Increases For Supplies And Equipment Over The Term Of The Contract Presented Performance Risk.**

Rowe's price proposal reveals that its overall price for performing janitorial services at the DIA facilities actually declines over the five-year period of performance. In contrast, Olympus' price increases over the five-year period, to reflect expected increases in the cost of supplies and equipment. AR, Tab 40, pp. 2-11; Tab 41, pp. 9, 15, 21, 27, 33.[5] For example, Olympus' proposed price for supplies and materials in Option Year 1 is [redacted]hile its price for these same supplies and materials in Option Year 3 increased t[redacted]AR, Tab 41, pp. 15 and 33.

The SSA, who performed the price analysis of proposals, did not consider, or even note, this fact in the SSD. The SSA's entire analysis of Rowe's price proposal, which appears in the "Price/Cost Analysis" section of the SSD, consists of one sentence: "Rowe submitted the lowest priced offer and is capable of performing excellent quality work." AR, Tab 32, p. 13. There is no other document in the record that reflects the SSA's evaluation of price proposals in this approximately $20 million procurement.

The SSA does not do any better in responding to Olympus' protest allegation regarding her failure to consider whether Rowe's price structure over the five-year contract performance period created performance risk:

> <u>It is true that Rowe's failure to provide any price increases for supplies or services over the five-year contract term was outcome determinative in the Agency's September 2006</u> decision to select NOSLOT for award instead of Rowe. <u>However, the Agency took corrective action in response to the protests by Rowe, Raven and Olympus. As the Government was taking corrective action, it was</u>

[5] Consistent with FAR 52,222-43, Fair Labor Standards Act and Service Contract Act – Price Adjustment, none of the offerors included increases in labor rates over the term of the contract in their price proposals.

> noted that Rowe's Proposal offered premium wages and the proposal responded to the solicitation clause FAR 52.222-43 Fair Labor Standards Act and Service Contract Act – Price Adjustment.

AR, Tab 39, p. 1 (emphasis added). It is not clear what the SSA means by the phrase; "As the Government was taking corrective action, it was noted that Rowe's Proposal offered premium wages," particularly because Rowe offered the wages that were specified in the applicable Service Contract Act Wage Determination, as did the other offerors. Most important, the SSA never even addresses the issue of her failure to consider whether Rowe's failure to include price increases for supplies and equipment over the five-year contract period presented any performance risk, particularly since all the other offerors, including Olympus, included such increases in their proposal.

Finally, even the Independent Government Cost Estimate (IGCE) included price increases for supplies and equipment over the five-year period. AR, Tab 32, p. 3. This suggests that DIA, itself, considered it reasonable for contractors to plan for likely increases in the cost of supplies and equipment needed to perform the contract over the five-year term. Therefore, it was patently unreasonable for the SSA not to even consider this issue and the performance risk associated with Rowe's proposal in the price evaluation.

**IV. The Record In This Case Is Incomplete, Therefore GAO Cannot Determine Whether The Award To Rowe Is Reasonable.**

DIA has admitted that it is unable to produce a complete record to support the award to Rowe. For example, DIA cannot produce a complete copy of Rowe's final revised proposal. In response to Olympus' repeated requests for a complete copy of the proposal, the agency off-handedly noted that "whatever the TEB evaluated satisfied them to the extent that they rated Rowe as Excellent." AR, Tab 38, p.3.

In addition, in the SSD, the SSA refers to her consideration of three Olympus past performance evaluations, but counsel for DIA has stated that the SSA actually considered only two past performance evaluations. AR, Tab 32, p. 13; January 29, 2007 e-mail message from LTC Frank March. Despite agency counsel's assurance, GAO cannot ignore the specific reference in the SSD to a third past performance questionnaire response that purportedly offered a partially negative assessment of Olympus' past performance. See AR, Tab 32, pg. 1[redacted] This reference was undoubtedly included in the SSD to bolster the agency's determination that Olympus only des[redacted]t performance rating. The agency's failure to actually produce this phantom past performance questionnaire was therefore prejudicial to Olympus, and offers one more example of the agency's failure to conduct a fair and reasonable competition.

Accordingly, DIA's failure to produce a complete and accurate record to support its decision is a sufficient ground for GAO to sustain Olympus' protest.

## CONCLUSION

It is understandable that after nearly two years, four contract awards, and multiple bid protests, both DIA and GAO are eager for this procurement to be completed. However, it would be unfair to the offerors and it would compromise the integrity of the competitive procurement process for GAO to uphold the award to Rowe merely to complete this procurement. GAO does not have to stand in the shoes of agency evaluators to conclude that DIA has made material errors in selecting Rowe for award. It merely has to review the record in this procurement.

SEYFARTH ATTORNEYS SHAW



In the alternative, the record of the agency's source selection decision is so incomplete that it is impossible for GAO to determine whether there is a reasonable basis for the award to Rowe. For these reasons, we request that GAO sustain Olympus' protests

Respectfully submitted,

SEYFARTH SHAW LLP

Grace Bateman
Amanda Weiner
Counsel for Olympus Building Services, Inc.

cc: LTC Frank A. March
Kenneth B. Weckstein, Esq.

DEPARTMENT OF THE ARMY
UNITED STATES ARMY LEGAL SERVICES AGENCY
901 NORTH STUART STREET
ARLINGTON, VA 22203-1837
(703) 696-2826; DSN 426; Fax ext. 1537
E-mail: frank.march@hqda.army.mil

REPLY TO
ATTENTION OF

February 14, 2007

Contract and Fiscal law Division

Mary G. Curcio, Esq.
Office of the General Counsel
Government Accountability Office
441 G. Street, NW
Washington, D.C. 20548

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GAO PROTECTIVE ORDER**

Subject: Protest of Olympus Building Services, Inc. (B-296741.14)

Dear Ms. Curcio:

Please find enclosed the Government's administrative report ("AR") responding to the subject supplemental protest. Pursuant to 4 Code of Federal Regulations ("C.F.R.") § 21.3(c), the Government has sent a copy of the report directly to Grace Bateman, Esq., attorney for Olympus Building Services, Inc., (hereafter "Protester" or "Olympus") on this date. This report contains protected information. Any comments by the Protester regarding this motion should be sent directly to your office with a copy forwarded to:

LTC Frank A. March
Contract and Fiscal Law Division, Team I
ATTN: JALS-KFLD
901 North Stuart Street, Suite 500
Arlington, Virginia 22203-1837

## I. Statement of the Facts

The Defense Intelligence Agency ("DIA") responded to Protester's initial protest on January, 29, 2007. This memorandum incorporates the facts provided in the legal memorandum submitted to GAO and Protester on January 29, 2007. After filing its report,

DIA provided GAO and Protester an update to tabs 21 and 26 and provided a corrected Contracting Officer's statement on January 30, 2007. On February 2, 2007, Protester filed a supplemental protest alleging: 1. Rowe's final proposal is incomplete, incoherent, and unresponsive, and can not form the basis for a valid Government contract; 2. DIA's price evaluation of Rowe's proposal and the SSA's award decision are fatally flawed; 3. The SSA implies an unstated evaluation factor when he used the number of employees offerors proposed to perform the contract as a discriminator in the best value decision; and 4. DIA's past performance of Olympus' proposal is irrational.

On February 8, 2007, Protester filed its comments on the AR. Among its comments, Protester alleges that DIA improperly upgraded Rowe's past performance proposal. Also on February 8, 2007, Rowe submitted comments. In its comments at exhibit A, Rowe provides a version of its revised proposals that differs from Rowe's revised proposal found at tab 22 of the AR.

## II. Argument

### A. Rowe's BAFO combined with its initial proposal may form the basis for a valid Government contract.

Protester contends that Rowe's revised proposal was incomplete because it contained only the pages that were changed compared to its initial proposal. Protester also alleges that Rowe's revised proposal did not contain a security awareness plan. Protester implies that the TEB and Contracting Officer were not smart enough to figure out how to insert the replacement pages into Rowe's original proposal. In fact, the Contracting Officer recognizes

that the primary intent of Rowe's revised proposal was to respond to the noted deficiencies in its discussion letter. (AR, tab 38) On November 8, 2005, the Contracting Officer sent Rowe a discussion letter where she informed Rowe of the weaknesses in its proposal. (AR, tab 21) This discussion letter noted that there were no deficiencies in Rowe's initial proposal. Obviously, Rowe responded to the concerns of the TEB as indicated in its final technical evaluation. (AR, tab 26) In Rowe's technical evaluation, the TEB states: "The offeror does include a security plan which lists several forms necessary to transfer worker clearances from ROWE to DIA and addresses security awareness in many areas of the proposal." Id. at 6. Despite the minor issue regarding the document in the AR that constitutes Rowe's proposal, it is obvious that whatever the TEB evaluated satisfied them to the extent that they rated Rowe as Excellent. Contrary to the assertions of Protester, Rowe has submitted a proposal that is eligible for the award of a Government contract.

**B. DIA properly evaluated Rowe's price proposal.**

Protester alleges that Rowe failed to provide for increased cost for supplies and for maintaining a staff for the five years of the contract. The relevant RFP provision provides: "Offers that are unrealistically low in total price will be considered indicative of a lack of understanding of the complexity and risk in meeting contract requirements and will not be considered for award." (AR, tab 3, p. 40)

The Contracting Officer provides the following concerning this issue:

[redacted]

[redacted]

(AR, tab 38)

Protester points to language the Contracting Officer used in a superseded source selection decision regarding risk in the trade-off analysis between NOSLOT and Rowe. (AR, tab 16, p. 15) While risk is referenced, this trade-off analysis was not part of the risk analysis, which was the subject of its own subsection. In addition, this source selection decision is superseded. That decision was protested and then set aside as part of the corrective action took in response to a protest.

Protester quotes Trauma Service Group, B-242902.2, June 17, 1991, 91-1 CPD ¶ 573, 1991 U.S. Comp. Gen. LEXIS 655, for the proposition an agency may consider the risk of poor performance when conducting a "cost realism" analysis in the solicitation of fixed-price proposals. There, GAO noted that "cost realism" is not ordinarily considered in such circumstances and that an agency may conduct this evaluation "in their discretion." Id. GAO also found that the price evaluation must be reasonable and consistent with the RFP evaluation criteria. Id.

The Contracting Officer did find that she did not expect that there would be significant risk with any offeror with an Excellent past performance rating. (AR, tab 32, p. 16) Because Rowe was awarded a fixed-price contract, it will be obligated to fully perform its obligation under the contract at that price, subject to adjustment in accordance with the Service Contract Act price adjustment clause under FAR 52.222-43. Finally, Protester has not shown that Rowe's total contract price is unrealistically low. The Contracting Officer noted that Rowe's price was higher than the independent government estimate ("IGE") and that she based the price reasonableness determination on competition. Rowe's price is in line with two of its competitors, Olympus and Ravens. Because Rowe's total contract price is higher than the IGE and in line with its competitors, its price is not unrealistically low. The Contracting Officer would have had no basis to reject Rowe's proposal as unrealistically low. In line with Protester's cited authority that requires the evaluations be consistent with the RFP, the Contracting Officer could not go behind Rowe's total contract price in performing a risk assessment based on Rowe's price. When a protester steps into the shoes of an SSA and conducts its own post hoc evaluation of other offeror's proposals, it is subject to the same limitations as the SSA. The bottom line here is that Rowe's total contract price was not unrealistically low and Protester's attempt to examine Rowe's price any further is not consistent with the RFP evaluation criteria.

**C. DIA properly considered the number of employees offerors proposed when making the source selection decision.**

Protester correctly observes that the Contracting Officer considered the number of employees each offeror proposed when making her source selection decision, however, this

consideration was proper. The RFP provided a contract objective requiring the contractor to provide the necessary personnel to provide the contract requirements. (AR, tab 3, p. 7) The technical factor under the RFP also evaluated how the offerors addressed the personnel requirements to accomplish the statement of objectives under the contract. Id. at 40. This is clearly communicated under the first assessment area under Subfactor A, Technical Area, of the Technical factor. Id. It should be clear to the offerors, that they were required to provide their proposed staffing and all of them did. It should have also been clear that this information would be considered.

"While agencies are required to identify the major evaluation factors, they are not required to identify all areas of each factor which might be taken into account, provided that the unidentified areas are reasonably related to or encompassed by the stated criteria." Command Management Services, Inc., B-292893.2, June 30, 2004, 2004 U.S. Comp. Gen. LEXIS 149. See also, Unidynamics/St. Louis, Inc., B-232295, Dec. 21, 1988, 88-2 CPD ¶ 609 ("selection officials may properly take into account specific, albeit not expressly identified, matters that are logically encompassed by or related to the stated [evaluation] criteria"); Farnham Security, Inc., B-280959.5, Feb. 9, 1999, 99-1 CPD ¶ 100 ("In evaluating a proposal, an agency properly may take into account specific, albeit not expressly identified, matters that are logically encompassed by or related to the stated evaluation criteria"); and NCLN20, Inc., B-287692, July 25, 2001, 2001 CPD ¶ 136 ("While procuring agencies are required to identify the significant evaluation factors and subfactors in a solicitation, they are not required to

identify the various aspects of each factor which might be taken into account, provided that such aspects are reasonably related to or encompassed by the RFP's stated evaluation criteria").

In another case the GAO found that "since the alleged undisclosed evaluation factors [e.g., schedule adherence] are reasonably within the scope of the past performance evaluation factor, they serve as logical and related aspects of assessing and distinguishing between the proposals, even though the RFP did not list them as specific subfactors of the past performance factor for review." Infrared Technologies Corporation, B-282912, Sep. 2, 1999, 1999 U.S. Comp. Gen. LEXIS 152. The GAO also found that "an agency is not precluded from considering an element of a proposal under more than one evaluation criterion where the element is relevant and reasonably related to each criterion under which it is considered." Id.

The RFP is clear that the offerors' proposed staffing was fair game for consideration by the SSA. Even if Protester does not feel this criteria was "spelled out," the listed criteria that is listed logically encompasses and is reasonably related to the staffing levels Protester is complaining about.

**D. DIA's past performance evaluation of Olympus was reasonable.**

Protester contends that DIA's past performance evaluation was unreasonable because it believes DIA should have given it better th[redacted]his is classic "mere disagreement." Protester basically provides a "tain't fair" argument. While it is Protester's prerogative to argue that, this argument does not undermine the basis for the Contracting Officer's determination that Olympus merited [redacted] Contrary to Protester's arguments, it was not downgraded. Though the other offerors received higher

ratings, Protester's [redacted] was not a bad rating and this rating was not the cause of it not being selected for award. The source selection decision clearly states that even if Protester had received an Excellent rating for past performance, it still would not have been selected for award. The bottom line is that DIA's past performance evaluation of Protester was not unreasonable and Protester was not prejudiced by its past performance rating.

**E. DIA's past performance evaluation of Rowe was reasonable.**

In its comments on the AR, Protester alleges that the SSA improperly upgraded Rowe's past performance. Protester contends that based on its own analysis of Rowe's past performance, that it would have given Rowe a '[redacted]t performance rating. Protester bases this reanalysis of Rowe's past performance on its own observation that Rowe was given [redacted] The bottom line on this issue is that Protester is stepping into the shoes of the SSA again and attempting to render its own past performance evaluation of Rowe. The entire basis of Protester's comment concerning Rowe's past performance evaluation is just "mere disagreement." DIA's past performance rating of Rowe was reasonable.

## III. Conclusion

Rowe's initial and revised proposals do form the basis for the award of a Government contract. The DIA's technical and past performance evaluation of Protester was reasonable. DIA did properly evaluate Rowe's price proposal. DIA did properly consider the proposed

number of employees in its source selection decision. DIA's past performance of Olympus and Rowe were reasonable.

**WHEREFORE,** for the reasons set forth above, the Government respectfully requests that GAO deny Olympus' protest. If you have any questions regarding this matter, please contact LTC Frank March at (703) 696-2826; fax (703) 696-1537.

Sincerely,

Frank A. March
Lieutenant Colonel, U.S. Army
Chief, Trial Team I

Copies Furnished:

Protester:
Grace Bateman, Esq.
Seyfarth Shaw LLP
815 Connecticut Ave., NW, Suite 500
Washington, DC 20006-4004
Telephone: 703-256-7754
Facsimile: 703-256-7883

Intervenor :
Kenneth B. Weckstein, Esq.
Epstein Becker & Green, P.C.
1227 25th St., N.W., Suite 700
Washington, DC 20037
Telephone: 202-861-0900
Facsimile: 202-861-3560

Installation Attorney:
Virginia Contracting Activity/Defense Intelligence Agency
ATTN: Lt. Col. Joe Treanor, DIAC-DAP-2
Building 6000
Bolling Air Force Base
Washington, DC 20340-5100

Telephone: 202-231-2821
Facsimile: 202-231-2831

Directorate of Contracting:
Virginia Contracting Activity/Defense Intelligence Agency
ATTN: Cheong Chon, Contracting Officer
Building 6000
Bolling Air Force Base
Washington, DC 20840-5100,
Telephone: 202-231-8416
Facsimile: 202-231-2831

DEFENSE INTELLIGENCE AGENCY

WASHINGTON, D.C. 20340-

GAO Supplemental Protest by Olympus Cleaning Service (296741.14) against Award of Contract Number HHM402-07-C-0006 to Rowe Contracting Service, Inc. for Janitorial Service for the Defense Intelligence Agency.

## CONTRACTING OFFICER'S STATEMENT

1. Rowe's final proposal is incomplete, incoherent, and unresponsive, and cannot form the basis for a valid Government contract.

**Rowe submitted their final proposal in accordance with the discussion letter dated 08 Nov 2005. The final proposal was reviewed by the Technical Evaluators, who found that the proposal addressed all issues. Therefore, as the Source Selection Authority, I determine that Rowe's final proposal was complete, coherent and responsive.**

2. [redacted]

[redacted]

[redacted]

3. The SSA applied an unstated evaluation factor when he used the number of employees offerors proposed to perform the contract as a discriminator in the best value decision.

**The number of employees offered is a factor in best value trade off analysis and a factor in the cost realism analysis in accordance with the solicitation.**

4. DIA's past performance evaluation of Olympus' proposal is irrational because both the technical evaluators and the SSA gave great weight to a Government prime contractor's issuance of a cure notice to Olympus, but entirely ignored that the prime contractor gave Olympus all "Excellent" and "Outstanding" ratings in the past performance evaluation, and stated that it would contract with Olympus again.

[redacted]

**As previously stated in (1) Source Selection Decision document dated 15 December 2006 and (2) Contracting Officer's Statement dated 29 Jan 2007, "...even if Olympus' overall past performance rating had been 'EXCELLENT,' its offer still would not have provided the Government the best overall value due to its higher cost ($557, 546 price differential with the Awardee)".**

**Olympus' Comments**
**Dated 8 February 2007**

5. The SSA improperly upgraded Rowe's past performance evaluation. (From p. 7 of Protester's comments on the AR)

[redacted]

[redacted]

CHEONG J. CHON
Contracting Officer
Defense Intelligence Agency

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER

BASE YEAR 7 months [illegible]

[redacted]

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER

Expansion BASE YEAR: REVISED

[redacted]