PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



[redacted]. *See id.* These rates are equal to or lower than the rates offered by Rowe.

[redacted]

[4] For all full time positions, the hourly rate is calculated by dividing the annual salary proposed by Olympus by 2080 hours.

[redacted]

*id.*

For all of the above reasons, Rowe has adequately addressed employee retention and its proposed wage rates do not pose a performance risk to the Government.

*2. The slightly lower total price for the option years in Rowe's price proposal is attributed to start-up costs.*

Olympus' argument that Rowe's price proposal fails to account for increased costs of equipment and/or supplies is equally misplaced. If Rowe had failed to reasonably estimate equipment costs, one would presume that it would have budgeted

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



less than Olympus. But Rowe actually budgeted more – i[redacted]ore than Olympus had budgeted for Equipment costs over the entire contract. *Compare* Rowe Price Proposal "Other Operating Costs" line item Equipment for base year and all option years *with* Olympus Price Proposal line item "Equipment" at 9, 15, 21, 27, 33.

It is the same story for the costs of supplies. Rowe budgeted [redacted]r supplies over the entire contract, [redacted]re than Olympus. *Compare* Rowe Price Proposal "Other Operating Costs" line item "Supplies" for base year and all option years *with* Olympus Price Proposal line item "Supply & Material Cost" at 9, 15, 21, 27, 33.

[redacted] These amounts account for the slight drop in Rowe's total annual price.

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



3. *Rowe's proposed price includes sufficient profit to account for any unexpected losses.*

Finally, even if Rowe experiences unexpected losses during the performance of this contract, Rowe has built in sufficient profit to cover any unexpected cost increases. See Rowe Price Proposal "Grand Totals" line item "Profit" for base years and all option years. Also, as discussed above, Rowe had budgeted a [redacted] more for equipment and supplies than did Olympus. Rowe also proposed greater or comparable wage rates for its labor force than did Olympus. Given these facts, Rowe's profit is most than sufficient to cover any unexpected cost increases.

**Conclusion**

For the reasons set forth above, as well as in Rowe's Request for Dismissal and the Agency Report, Olympus' Protest and Supplemental Protest should be dismissed.

Very truly yours,

Kenneth B. Weckstein
Pamela A. Reynolds

cc: Grace Bateman, Esq.
Lt. Col. Frank March, Esq.

DEPARTMENT OF THE ARMY
UNITED STATES ARMY LEGAL SERVICES AGENCY
901 NORTH STUART STREET
ARLINGTON, VA 22203-1837
(703) 696-2826; DSN 426; Fax ext. 1537
E-mail: frank.march@hqda.army.mil

REPLY TO
ATTENTION OF

February 27, 2007
**(Corrected February 28, 2007)**

Contract and Fiscal law Division

Mary G. Curcio, Esq.
Office of the General Counsel
Government Accountability Office
441 G. Street, NW
Washington, D.C. 20548

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GAO PROTECTIVE ORDER**

Subject: Protest of Olympus Building Services, Inc. (B-296741.15)

Dear Ms. Curcio:

Please find enclosed the Government's administrative report ("AR") responding to the subject supplemental protest. This report also responds to other issues that GAO requested that the Government Address. Pursuant to 4 Code of Federal Regulations ("C.F.R.") § 21.3(c), the Government has sent a copy of the report directly to Grace Bateman, Esq., attorney for Olympus Building Services, Inc., (hereafter "Protester" or "Olympus") on this date. This report contains protected information. Any comments by the Protester regarding this report should be sent directly to your office with a copy forwarded to:

LTC Frank A. March
Contract and Fiscal Law Division, Team I
ATTN: JALS-KFLD
901 North Stuart Street, Suite 500
Arlington, Virginia 22203-1837

## I. Statement of the Facts

The Defense Intelligence Agency ("DIA") responded to Protester's initial protest on January, 29, 2007 and its first supplemental protest on February 14, 2007. This memorandum

incorporates the facts provided in the legal memorandum submitted to GAO and Protester on January 29, 2007 and February 14, 2007. After filing the report to the first supplemental protests, Olympus filed its second supplemental protest on February 20, 2007 alleging: 1. The SSA's tradeoff analysis is fatally flawed because it is based upon a material error of fact regarding the offerors proposed manpower; and 2. In the alternative, GAO cannot determine whether DIA's best value decision was reasonable in the absence of any documents in the record to show how the SSA evaluated the manpower proposal. On February 23, 2007, GAO requested that the Government respond to several questions to clarify the record. This report addresses the issues in the second supplemental protest and the questions to clarify the record.

## II. Argument

### Second Supplemental Protest

**A. Protester is not an interested party.**

This protest should be dismissed because Protester is not an interested party to bring this protest before the GAO. In adopting the language of the Competition in Contracting Act of 1984 ("CICA"),[1] the GAO Bid Protest Regulations define an interested party as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or by the failure to award a contract." 4. C.F.R. § 21.0(a). Protester does not have a direct economic interest because it would not be in line for award even if it was successful in challenges to the award decisions because Protester has included its required escorts as

employees charged under the contract as FTEs when the RFP requires that such escorts be provided at no additional cost to the Government. (AR, tab 3, p. 6)

This issue came to light when Protester raised the issue of whether DIA properly calculated the FTEs of the offeror. A review of Protester's cost proposal shows the following costs for escort services in Olympus' price proposal:

[redacted]

(AR, tab 41)

This huge unauthorized cost in its price proposal either renders Protester ineligible for award or displaces it as "next in line" for award. A protester is not an interested party where it would not be in line for contract award were its protest to be sustained. ECS Composites, Inc., B-235849.2, Jan. 3, 1990, 90-1 CPD ¶ 7.

**B. The second supplemental protest is untimely.**

Though without merit, the second supplemental protest is untimely in accordance with 4 C.F.R. § 21.2(a)(2) because Protester should have known of the basis of its protest greater than ten days before it filed the second supplemental protest. Protester states that the basis of the protest is the February 14, 2007 report and a February 15, 2007 e-mail from agency counsel. Though Protester characterizes the e-mail as stating that the "agency does not have any

---

[1] *31 U.S.C. § 3551 et seq.*

evaluation documents to support the SSA's analysis of the manpower the respective firms offered," counsel actually informed Protester that it had no documents responsive to one of its document requests.[2] Though Protester is hinging the timeliness of its protest on these February 14 and 15 events, it should have been aware of the basis of this protest issue when it received the source selection decision (AR, tab 32) in the AR on January 29, 2007. On that date, Protester was aware of the comparison between the number of employees proposed by Olympus and Rowe. Protester was also aware of the documents that were produced in the record. By Protester's logic, it could conceivably wait until any stage of the protest process to inquire about the existence of a document and then file a supplemental protest concerning the absence of that document. GAO does not allow this. Protester's allegation that the tradeoff was flawed because the SSA based her decision upon a material error of fact is untimely because the source selection decision produced in the January 29, 2007 report fully disclosed this fact. Protester's alternative allegation is also untimely because Protester should have known of the absence of any documents based on the documents that were produced with the AR on January 29, 2007.

**C. The SSA's did not base her decision on a material error regarding the offerors' proposed manpower.**

Protester alleges that the SSA was wrong in her assessment that Rowe o[redacted] proposed by Olympus. (Second Sup. Protest at 3) The Contracting Officer explains:

---

[2] A 7:31 a.m., February 15, 2007 e-mail of agency counsel stated: Protester requests all documents prepared by DIA in performing analysis or review of the offerors' price/cost proposals. There are no other documents responsive to this request other than any documents that are already contained in the AR."

[redacted]

(AR, tab 43) Though there was an error, the error was in Protester's favor. In the source selection decision, Protester was at a deficit of only [redacted]Es as opposed to [redacted]FTEs.

**D. The GAO can determine whether DIA's best value analysis was reasonable concerning how the SSA evaluated Rowe's manpower proposal.**

Protester contends that because there are no documents showing how the SSA arrived at the conclusion that Rowe offered to provide five more employees than Olympus, that there is no basis for GAO to conclude that the source selection decision is reasonable. It is notable that this allegation is an alternative argument. This is an apparent concession that the employee comparison contained in the source selection decision is actually accurate. If Rowe actually proposed to provide [redacted] or more FTEs than Olympus, then this alternative argument is without merit. The SSA's analysis of the differences in FTEs is well documented in the source selection decision. (AR, tab 32, pp. 14-16) While the underlying issue (whether Rowe really does offer [redacted] or more FTEs than Olympus) is important, documentation of the actual analysis is not that

[3] The Contracting Officer's response to the clarification questions are contained below in the legal memorandum, however, in the Contracting Officer's statement response 1(f) was before the section where the Contracting Officer addressed the second supplemental protest issue regarding the FTEs.

important. It is clear that the SSA documented that Rowe offers [redacted] FTEs and that Olympus offer [redacted] FTEs. Id. That is adequate documentation of the analysis. It is clear that [redacted] 6 FTEs is better than [redacted] As long as it is accurate that Rowe actually proposed to provide [redacted] e or more FTEs than Olympus, then the source selection decision provides GAO adequate documentation to determine that the source selection decision is reasonable.

**Clarification Questions**

Below are the Contracting Officer's responses to the clarification questions:

***QUESTION 1***

***a. What is the final FPR that ROWE submitted and that was evaluated by the TEB?***

The final FPR that ROWE submitted and was evaluated by the Technical Evaluation Board was: Best and Final Offer, Final revised Proposal for Custodial Services at the Defense Intelligence Analysis Center (DIAC, at Bolling AFB, Washington, DC, for Solicitation Number HHM402-05-R-0017 and its amendments, submitted 29 November 2005, by ROWE Contracting Services, INC, Mandeville, Louisiana, 70471. The TEB evaluated this FPR which included a security awareness plan in conjunction with the original proposal as one document.

***b. How did the TEB evaluate the FPR of ROWE?***

The TEB evaluated the FPR of ROWE as second best out of five offerors. Please note that the top rated offeror at the time is disqualified. The methodology used by the TEB was set forth by the Source Selection Plan, HHM402-05-R-0017, pages 7 and 8, paragraph 3.6 Ratings. The rating criteria given and defined were: Excellent; Good; Marginal; and Unacceptable. These criteria were used in evaluating each of the vendors' proposals.

***c. That is, how did the agency read the FRP replacement pages in conjunction with the FPR?***

The TEB read the FRP replacement pages in conjunction with the FPR as one complete document.

[redacted]

[redacted]

[redacted]

[redacted]

***g. What did the TEB make of ROWE not listing by name the cleared personnel in the requirement?***

ROWE listed the names and clearance level of 26 cleared level 6 personnel in their original proposal. The FPR did not indicate any change in number of personnel nor level of clearance. The alphabet A through R blank indicated to me that there was no change from the initial proposal because the personnel and clearance level were not addressed in the discussion letter (see paragraph d above). It was clear that ROWE's FPR responded only to the discussion letter dated 15 Sep 06. Alternatively, to construe the blank as a suggestion that ROWE intended to

offer no cleared personnel would be nonsensical by virtue of the fact they were competing for this contract.

***h. What is the security awareness plan that the TEB found in ROWE's proposal?***

[redacted]

***i. What forms is the TEB referencing regarding transferring worker clearances from ROWE to DIA?***

The security forms mentioned by the TEB which were interpreted as necessary to transfer worker clearances from ROWE to DIA are:

- DD Form 441
- DD Form 441-1
- DISCO Form 562
- DD Form 398
- DD Form 398-2
- SF 86
- SF 312

These forms are mentioned in ROWE's FPR security awareness plan of DoD self-inspection handbook for contractors section, pages 6 & 7.

***QUESTION 2***

***a. What price realism analysis was conducted and by whom?***

The price realism analysis was not conducted for competition of commercial services for firm-fixed price in accordance with the FAR Part 15.404-1(b) & (d). However, all offered prices were reviewed by previous contracting officer and all price proposals were determined to be in response to the clause addendum 52.212-1 of the solicitation then.

b. ***The source selection document that the prices proposed by all Offerors are realistic, but she does not elaborate on how she reached this conclusion?***

My analysis was based on FAR 15.505-1(b)(2)(i), adequate price competition establishes price reasonableness. The cost realism was determined based on the price reasonableness. Additional cost realism analysis was not required for a firm-fixed-price.

*__QUESTION 3.__*

*__a. What/How many past performance references were considered in evaluating the past performance of Olympus?__*

Only two past performance references were considered.

[redacted]

c. *__What did the contracting officer think when she was performing the past performance evaluation.__*

I evaluated the cumulative information located in the AR file. In the case of Olympus, the overwhelming factor was [redacted] I did also consider the positive aspects of the questionnaires for Olympus.

d. *__What reference is the contracting officer citing when she states that a reference stated that they would award to Olympus again if certain changes were made in lower level management?__*

As aforementioned, there was one wrong past performance questionnaire which does not belong to Olympus ' file. I did not look at the offeror's name when I reviewed. It was in the Olympus file and I assumed that it belonged to Olympus. I realized the mistake after the initial PNM and I removed this questionnaire from the file; however, the comment from this questionnaire was carried over to the December 2006 PNM by mistake. Despite this fact, it was clear from my narrative on page 13 of the PNM that t[redacted]was the deciding factor in assigning Olympus a [redacted]rating instead of "Excellent." Additionally, this comment concerning the discarded questionnaire was not a factor in the tradeoff analysis. To further minimize the impact

of the statement from the discarded questionnaire, I specifically found during my contemporaneous review that, had Olympus received an "Excellent" for past performance, it still would not have been a best value due to its higher price.

*QUESTION 4.*

*a. What is the difference between the Tab 26/Tab 27 evaluations of Rowe and Olympus and the Tab 31 concensus evaluation?*

Tab 26 and Tab 27 provide each vendor's technical evaluation.
Tab 31 supports ranking order of the technical evaluation.

*b. Is Olympus correct (page 8 of the Feb 2 supplemental protest) that the Tab 31 consensus is from Sept 2006?*

Olympus is not correct. My file does not indicate the date of consensus. However, I spoke with TEB and I was informed that their record shows the Tab 31 was prepared in May 2006.

*c. When were they each completed relative to the award decisions?*

All technical evaluations, to include the consensus evaluation at tab 31 were completed prior to my source selection decisions in September and December 2006.

*d. Which is the evaluation that the final source selection decision is based on?*

I used the most recent technical evaluations (tabs 26 and 27) and consensus (tab 31) submitted by the second SEB. However, I made my own Source Selection Authority's independent judgment as shown in the Source Selection Decision.

## III. Conclusion

The entire supplemental protest is untimely. DIA properly concluded that Rowe proposed 5 or more FTEs than Olympus. This fact is well documented in the source selection decision and this is more than sufficient documentation for GAO to conclude that five more FTEs is better than five less FTEs. DIA has clarified all open issues regarding the record.

**WHEREFORE,** for the reasons set forth above, the Government respectfully requests that GAO deny Olympus' protest. If you have any questions regarding this matter, please contact LTC Frank March at (703) 696-2826; fax (703) 696-1537.

Sincerely,

Frank A. March
Lieutenant Colonel, U.S. Army
Chief, Trial Team I

Copies Furnished:

Protester:
Grace Bateman, Esq.
Seyfarth Shaw LLP
815 Connecticut Ave., NW, Suite 500
Washington, DC 20006-4004
Telephone: 703-256-7754
Facsimile: 703-256-7883

Intervenor :
Kenneth B. Weckstein, Esq.
Epstein Becker & Green, P.C.
1227 25th St., N.W., Suite 700
Washington, DC 20037
Telephone: 202-861-0900
Facsimile: 202-861-3560

Installation Attorney:
Virginia Contracting Activity/Defense Intelligence Agency
ATTN: Lt. Col. Joe Treanor, DIAC-DAP-2
Building 6000
Bolling Air Force Base
Washington, DC 20340-5100
Telephone: 202-231-2821
Facsimile: 202-231-2831

Directorate of Contracting:

Virginia Contracting Activity/Defense Intelligence Agency
ATTN: Cheong Chon, Contracting Officer
Building 6000
Bolling Air Force Base
Washington, DC 20840-5100,
Telephone: 202-231-8416
Facsimile: 202-231-2831

## RESPONSE TO GAO SUPPLEMENTAL PROTEST QUESTIONS

***QUESTION 1***

***a. What is the final FPR that ROWE submitted and that was evaluated by the TEB?***

The final FPR that ROWE submitted and was evaluated by the Technical Evaluation Board was: Best and Final Offer, Final revised Proposal for Custodial Services at the Defense Intelligence Analysis Center (DIAC, at Bolling AFB, Washington, DC, for Solicitation Number HHM402-05-R-0017 and its amendments, submitted 29 November 2005, by ROWE Contracting Services, INC, Mandeville, Louisiana, 70471. The TEB evaluated this FPR which included a security awareness plan in conjunction with the original proposal as one document.

***b. How did the TEB evaluate the FPR of ROWE?***

The TEB evaluated the FPR of ROWE as second best out of five offerors. Please note that the top rated offeror at the time is disqualified. The methodology used by the TEB was set forth by the Source Selection Plan, HHM402-05-R-0017, pages 7 and 8, paragraph 3.6 Ratings. The rating criteria given and defined were: Excellent; Good; Marginal; and Unacceptable. These criteria were used in evaluating each of the vendors' proposals.

***c. That is, how did the agency read the FRP replacement pages in conjunction with the FPR?***

The TEB read the FRP replacement pages in conjunction with the FPR as one complete document.

[redacted]

[redacted]

***g. What did the TEB make of ROWE not listing by name the cleared personnel in the requirement?***

ROWE listed the names and clearance level of 26 cleared level 6 personnel in their original proposal. The FPR did not indicate any change in number of personnel nor level of clearance. The alphabet A through R blank indicated to me that there was no change from the initial proposal because the personnel and clearance level were not addressed in the discussion letter (see paragraph d above). It was clear that ROWE's FPR responded only to the discussion letter dated 15 Sep 06. Alternatively, to construe the blank as a suggestion that ROWE intended to offer no cleared personnel would be nonsensical by virtue of the fact they were competing for this contract.

[redacted]

[redacted]

***i. What forms is the TEB referencing regarding transferring worker clearances from ROWE to DIA?***

The security forms mentioned by the TEB which were interpreted as necessary to transfer worker clearances from ROWE to DIA are:

- DD Form 441
- DD Form 441-1
- DISCO Form 562
- DD Form 398
- DD Form 398-2
- SF 86
- SF 312

These forms are mentioned in ROWE's FPR security awareness plan of DoD self-inspection handbook for contractors section, pages 6 & 7.

***QUESTION 2***

***a. What price realism analysis was conducted and by whom?***

The price realism analysis was not conducted for competition of commercial services for firm-fixed price in accordance with the FAR Part 15.404-1(b) & (d). However, all offered prices were reviewed by previous contracting officer and all price proposals were determined to be in response to the clause addendum 52.212-1 of the solicitation then.

b. ***The source selection document that the prices proposed by all Offerors are realistic, but she does not elaborate on how she reached this conclusion?***

My analysis was based on FAR 15.505-1(b)(2)(i), adequate price competition establishes price reasonableness. The cost realism was determined based on the price reasonableness. Additional cost realism analysis was not required for a firm-fixed-price.

***QUESTION 3.***

***a. What/How many past performance references were considered in evaluating the past performance of Olympus?***

Only two past performance references were considered.

[redacted]

c. ***What did the contracting officer think when she was performing the past performance evaluation.***

I evaluated the cumulative information located in the AR file. In the case of Olympus, the overwhelming factor was the cure notice. I did also consider the positive aspects of the questionnaires for Olympus.

d. ***What reference is the contracting officer citing when she states that a reference stated that they would award to Olympus again if certain changes were made in lower level management?***

As aforementioned, there was one wrong past performance questionnaire which does not belong to Olympus ' file. I did not look at the offeror's name when I reviewed. It was in the Olympus file and I assumed that it belonged to Olympus. I realized the mistake after the initial PNM and I removed this questionnaire from the file; however, the comment from this questionnaire was carried over to the December 2006 PNM by mistake. Despite this fact, it was clear from my narrative on page 13 of the PNM that [redacted] Additionally, this comment concerning the discarded questionnaire was not a factor in the tradeoff analysis. To further minimize the impact of the statement from the discarded questionnaire, I specifically found during my contemporaneous review that, had Olympus received an "Excellent" for past performance, it still would not have been a best value due to its higher price.

***QUESTION 4.***

***a. What is the difference between the Tab 26/Tab 27 evaluations of Rowe and Olympus and the Tab 31 concensus evaluation?***

Tab 26 and Tab 27 provide each vendor's technical evaluation.
Tab 31 supports ranking order of the technical evaluation.

***b. Is Olympus correct (page 8 of the Feb 2 supplemental protest) that the Tab 31 consensus is from Sept 2006?***

Olympus is not correct. My file does not indicate the date of consensus. However, I spoke with TEB and I was informed that their record shows the Tab 31 was prepared in May 2006.

***c. When were they each completed relative to the award decisions?***

All technical evaluations, to include the consensus evaluation at tab 31 were completed prior to my source selection decisions in September and December 2006.

***d. Which is the evaluation that the final source selection decision is based on?***

I used the most recent technical evaluations (tabs 26 and 27) and consensus (tab 31) submitted by the second SEB. However, I made my own Source Selection Authority's independent judgment as shown in the Source Selection Decision.

***Second Supplemental Protest***

Rowe offered 62.5 full time equivalents. As explained in my answer to question number 1f above, initially, the error occurred when I mistakenly read the 15 (FT) to 15 (PT) of the DIAC expansion offer page. I have discovered the additional error of 1 FTE erroneously credited. The new calculation shows the full time equivalent of 37 employees for the DIAC and 25.5 FTE employees for the DIAC Expansion, resulting in a total of 62.5 FTEs. I have verified that 51 FTEs are still the correct number for Olympus. Thus the difference in FTEs between ROWE and Olympus is 11.5 in ROWE's favor. Again, however, this difference in the number of FTE personnel was a secondary consideration to the cost differential in determining best value.

Date: 27 February 2007

CHEONG J. CHON
DIA Contracting Officer

EBG
EPSTEIN BECKER & GREEN P.C.

EPSTEIN BECKER & GREEN, P.C.
ATTORNEYS AT LAW
1227 25TH STREET, NW, SUITE 700
WASHINGTON, DC 20037-1175
TEL: 202.861.0900
FAX: 202.296.2882
DIRECT: 202.861.0900 DIRECT FAX: 202.861.3560

FACSIMILE COVER SHEET

## PRIVILEGED AND CONFIDENTIAL

| To: | Fax Number: | Telephone Number: |
|---|---|---|
| Lt. Col. Frank March | (703) 696-1537 | (703) 696-2826 |

| | | | | |
|---|---|---|---|---|
| From: Kenneth B. Weckstein | Atty. No. | 052 | Pages (including cover): | 16 |
| Date: February 28, 2007 | Client No.: | 053807.005 | | |

Comments:

**PROTECTED MATERIAL**

**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**

**<u>GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER</u>**

NOTICE OF PRIVILEGE AND CONFIDENTIALITY

THIS TELECOPY IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED SOLELY FOR THE ADDRESSEE. ANY UNAUTHORIZED DISCLOSURE, REPRODUCTION, DISTRIBUTION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS INFORMATION IS PROHIBITED. IF YOU RECEIVED THIS TELECOPY IN ERROR, PLEASE NOTIFY US IMMEDIATELY.

THIS COMMUNICATION DOES NOT CONFORM TO THE STANDARDS OF A COVERED OPINION WITHIN THE MEANING OF CIRCULAR 230 ISSUED BY THE UNITED STATES SECRETARY OF THE TREASURY. ACCORDINGLY, ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION CANNOT BE USED, AND WAS NOT INTENDED OR WRITTEN TO BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES TAX PENALTIES. IN ADDITION, ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION MAY NOT BE USED TO PROMOTE, MARKET OR RECOMMEND A TRANSACTION TO ANOTHER PERSON.

*IF YOU DO NOT RECEIVE ALL PAGES OR HAVE ANY PROBLEMS IN RECEIVING THIS TELECOPY, PLEASE CALL THE SENDER IMMEDIATELY.*

EPSTEIN BECKER & GREEN, P.C.
ATTORNEYS AT LAW
1227 25TH STREET, NW, SUITE 700
WASHINGTON, DC 20037-1175
202.861.0900
FAX: 202.296.2882
EBGLAW.COM

KENNETH B. WECKSTEIN
TEL: 202.861.0900
FAX: 202.861.3560
KWECKSTEIN@EBGLAW.COM

February 28, 2007

**VIA TELEFAX**

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER**

Mary G. Curcio, Esquire
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Re: Comments on Agency Report on Second Supplemental Protest of Olympus Building Services, Inc.
B-296741.15
Solicitation No. HHM402-05-R-0017

Dear Ms. Curcio:

Rowe Contracting Services, Inc. ("Rowe") is the awardee under the referenced solicitation and has intervened in this protest. Rowe, through its undersigned counsel, hereby submits its Comments on the Agency Report on the Second Supplemental Protest of Olympus Building Services, Inc. ("Olympus"), filed on February 20, 2007. ("Second Supplemental Protest"). For the reasons set forth below, the Second Supplemental Protest should be dismissed or denied.

Olympus has filed three protests in this matter. As it must, Olympus has argued that the Defense Intelligence Agency ("DIA", "Agency" or "Government") made material errors in making contract award to Rowe. However, the record shows otherwise.

Olympus initially complained that its past performance was wrongly evaluated as being "Good". Specifically, Olympus argued that it was improper for DIA to have assigned it a past performance rating [redacted] *See* Comments of Rowe dated February 20, 2007 generally and at 15-16 (comparing the specific costs of the Rowe and Olympus proposals). Rowe's price and proposed costs are reasonable (and more than adequate) standing alone and when compared to Olympus' proposed costs. *Id.* at 6-17.

[redacted]

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



Olympus' Second Supplemental Protest also argues that the source selection documents produced by DIA do not support DIA's decision to make award to Rowe. However, as the Agency has noted, the source selection documents were produced to Olympus on or before January 29, 2007. On that date, at the latest, Olympus knew what was and was not in the source selection decision and what source selection documents existed. Any protest about the inadequacy of the source selection documents had to be filed on or before February 8, 2007. Olympus' protest of that issue on February 20, 2007 was not timely.

[redacted]

At the end of the day, there were no material errors in the DIA decision to award to Rowe. Rowe offered a lower price than did Olympus. [redacted]

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



[redacted] And Rowe surpassed all requirements of the solicitation for cleared personnel. To the extent that Olympus has asserted any other alleged errors, they are not material. Olympus has not been in any way prejudiced. Olympus has not shown that DIA's decision to award to Rowe was unreasonable or unlawful or that Olympus should have received contract award.

**I. Olympus' Protest of the SSA's Evaluation of the Proposed Manpower Has No Basis.**

***A. The SSA was not mistaken when she found that Rowe offered more productive employees than Olympus offered.***

In its Second Supplemental Protest, Olympus claims that the SSA incorrectly calculated the number of FTEs that Rowe and Olympus offered. *See* Supplemental Protest, at 2. [redacted] e Supplemental Protest, at 5 fn. 3. For Rowe, Olympus calculated 60.1 FTEs for Option Year 1. *See id.* at 5. [redacted]

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



[redacted] *See id.* Olympus' math is wrong.

Olympus included in its hours a substantial amount of "non-productive" hours, which were not counted in Rowe's numbers. For instance, Olympus included holiday and vacation days in its own calculations for its janitorial staff. This is hardly an accident. [redacted]

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



Notwithstanding the above, the figure used in Olympus' Second Supplemental Protest was calculated based [redacted]

[redacted]

As Olympus recognized when it did its initial calculation of FTEs, escorts do not provide any benefit to the Government. Escorts do not provide any cleaning services. Escorts only are permitted as an accommodation to contractors who do not have their own cleared personnel. For this reason, the solicitation provided that while escorts could

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



be used, escorts could not be charged to the Government on this contract.[1] *See* AR Tab 3, at 6 ("The contractor is responsible for all escorts at no additional cost to the Government."). Olympus acknowledged that escorts do not provide productive work when Olympus excluded them from the productive labor hours for the janitorial personnel. *See* Supplemental Protest, at 5.

The actual FTE calculations are as follows:

**Rowe's Proposed Total Manpower (Janitorial and Management) for the DIAC and the Expansion Building[2]**

| Contract Period | Total Annual Labor Hours | Total FTEs |
|---|---|---|
| 7 Month Base Period | [redacted] | |
| Option 1 | | |
| Option 2 | | |
| Option 3 | | |
| Option 4 | | |
| Total | | |

[1] To the extent Olympus now attempts to argue that its inclusion of costs for escorts in its proposal should have been regarded as a deficiency, that argument fails for two reasons. First, the argument would not be timely because Olympus knew at its debriefing that its inclusion of costs for escorts was not regarded as a deficiency. Second, Olympus' technical proposal received a rating of "Excellent." Accordingly, while DIA could have downgraded Olympus for being overly dependent on escorts, failure to label Olympus' inclusion of escort costs as a serious weakness or deficiency did not prejudice Olympus. In any event, contrary to its arguments in the Second Supplemental Protest, Olympus offered fewer janitorial employees than did Rowe.

[2] Rowe's price proposal for the Base Year and Option Years has separate pages for the DIAC and Expansion Building. The Total Annual Labor Hours includes janitorial staff and management staff. The first number in the parenthesis is for the DIAC and the second is for the expansion building. The total FTEs were calculated by dividing the total annual productive hours by 2000—the figure used by Rowe in its proposal.

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



**Olympus' Proposed Manpower Proposal (Janitorial and Management) for the DIAC and the Expansion Building**[3]

| Contract Period | Total Annual Labor Hours | Total FTEs |
|---|---|---|
| 7 Month Base Period | [redacted] | [redacted] |
| Option 1 | [redacted] | [redacted] |
| Option 2 | [redacted] | [redacted] |
| Option 3 | [redacted] | [redacted] |
| Option 4 | [redacted] | [redacted] |
| Total | [redacted] | [redacted] |

Olympus' argument that it o[redacted] more employees than Rowe offered over the term of the contract is wrong. The proper way to compare the number of FTE's or productive hours offered by Rowe and Olympus is to compare the [redacted] productive hours offered by Rowe with the [redacted] "productive" hours offered by Olympus.[4] This shows that Rowe offered [redacted] more productive hours than did Olympus over the course of the contract. That obviously was a benefit to the Government, as was found by DIA. Therefore, the SSA's analysis noting that Rowe had proposed *more FTEs than Olympus* was correct.

---

[3] Olympus' price proposal presents hours for janitorial staff and management on separate pages for each contract period. The Total Annual Labor Hours includes janitorial staff and management staff (excluding escort hours). The first number in the parenthesis is for janitorial staff and the second is for management staff. The total FTEs were calculated by dividing the total annual productive hours by 2080 -- the figure used by Olympus i[redacted]

[4] As discussed above, [redacted] For purposes of this comparison, Rowe used the higher total for Olympus, which included non-productive hours.