The interesting point that becomes clear when the productive hours of Rowe and Olympus are compared is that over the course of the c[redacted]

***B. Olympus was not prejudiced by the SSA's manpower analysis.***

Even if Olympus is correct that the SSA incorrectly analyzed the offerors' manpower, which she did not do, Olympus was not prejudiced. Therefore, Olympus' protest based on this ground should be denied. Olympus already received the highest technical rating – the same as Rowe's rating. But Rowe still offered the lowest price and therefore, even without the manpower analysis, Rowe would have represented the best value to the Government. This is fatal to Olympus' protest because before GAO will sustain a protest, a protestor must show that it suffered prejudice as a result of the alleged impropriety. *See Dube Travel Agency & Tours, Inc.*, B-270438.2, 96-1 CPD ¶ 141 (Comp. Gen. 1996) (stating that GAO will "not sustain protests against alleged evaluation errors unless the protestors are somehow prejudiced"); see *also MetaMetrics, Inc.*, B-248603.2, 92-2 CPD ¶ 306 (Comp. Gen. 1992) (finding no

---

5 [redacted]

prejudice where an offeror would not have won award even if its non-cost evaluations received the highest ratings possible because it had a higher cost proposal).

Here, if Olympus is correct that there was no difference between the FTE's offered by it and Rowe or that it offered more FTE's (neither of which are true), Olympus would have received the same "Excellent" score on its Technical proposal, the same "Good" score on its past performance and the same price evaluation showing that its price was [redacted] higher than Rowe's price. Olympus still did not offer the best value to the Government and would not have been selected for award.

**C. *The Agency's Post-Protest Explanations of the Best Value Analysis are Credible and Consistent with the Contemporaneous Record.***

Olympus claims that the record for this procurement is incomplete and, therefore, GAO cannot determine whether this procurement decision was reasonable. *See* Supplemental Protest, at 8. Although there are instances where inadequate supporting documentation will prevent GAO from determining that an award decision was reasonable, that is not the case here. Where post-protest explanations provide sufficient detail by which the rationality of an evaluation decision can be judged, it is possible to conclude that the agency had a reasonable basis for the decision. *See Quality Elevator Co., Inc.*, B-276750, 97-2 CPD ¶ 28 (Comp. Gen. 1997). "Post-protest explanations that provide a detailed rationale for contemporaneous conclusions, as is the case here, simply fill in previously unrecorded details, and will generally be considered in our review of the rationality of selection decisions, so long as those

explanations are credible and consistent with the contemporaneous record." *See Jason Associates Corp.*, B-278,689.3, 98-1 CPD ¶ 67 (Comp. Gen. 1998). Here, the Agency has provided detailed explanations of the DIA's evaluation. Here, the Record as a whole, including the price proposals of Rowe and Olympus, shows that Rowe offered more FTE's than did Olympus. There is no need for the SSA to further document that finding.

**II. Olympus' Alternate Protest Ground Based on the Absence of Documents in the Agency Report as to How the SSA Evaluated Manpower is Untimely.[6]**

Olympus now claims that is unable to determine whether the DIA's best value analysis was reasonable because there are no documents in the record to show how the SSA performed its manpower analysis. Supplemental Protest, at 8. According to Rule 21.2(a)(2) of the Bid Protest Regulations, a protest "shall be filed not later than 10 days after the basis of protest is known or should have been known." As discussed below, Olympus should have filed this protest ground 10 days from January 29, 2007, when it received the Source Selection Decision included with the Agency Report. The time for Olympus to raise this protest ground has long passed. This protest ground should be dismissed as untimely.

Olympus received the initial Agency Report on January 29, 2007. The AR contained the Source Selection Decision that contained the manpower analysis to which

[6] As the Agency noted in its February 27, 2007 Agency Report, Olympus' protest that the tradeoff analysis was flawed ([redacted]) also is untimely. Also, any protest of the cleared personnel issue is untimely because Olympus learned the basis for that issue on January 29, 2007.

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



Olympus refers in its Second Supplemental Protest. Olympus knew on January 29, 2007 that the Agency did not have and would not produce any other documents relating to the Source Selection Decision, its best value analysis, or any other documents explaining DIA's evaluation of technical or price proposals not already contained in the Agency Report. Below are the pertinent document requests and the Agency's January 26, 2007 response:

| | |
|---|---|
| Document Request #4: | DIA's Source Selection Decision for this acquisition, as required by FAR 15.308, and all related drafts of the Source Selection Decision. |
| Agency Response: | Only the final version Source Selection Decision is contained in the contract file. Any such drafts are not relevant because only the final signed version of the Source Selection Decision is used as the basis for the award decision. Any other versions that may exist are not relevant. |
| Document Request #5: | All documents that DIA reviewed or considered in making its decision to award a contract to Rowe. |
| Agency Response: | All documents responsive to this request are included in the AR. |
| Document Request #6: | All documents prepared by DIA evaluators in performing analysis or review of the proposals for the purpose of selecting the best value proposal for contract award. |
| Agency Response: | All documents responsive to this request are included in the AR. |
| Document Request #12: | All documents relating to or explaining DIA's evaluation of technical proposals. |

| | |
|---|---|
| Agency Response: | All relevant documents responsive to this request are included in the AR. |
| Document Request #14: | All documents identifying DIA's evaluation of the offerors' price proposals. |
| Agency Response: | All relevant documents responsive to this request are included in the AR. |
| Document Request #15: | All notes or evaluation forms of individual evaluators who participated in the evaluation of offerors' technical and price proposals and their past performance. |
| Agency Response: | All relevant documents responsive to this request are included in the AR. |

*See* Government's Response to Protestor's Document Request dated January 26, 2007 from Ltc. Frank A. March, Trial Division, U.S. Army to Mary G. Curcio, Esq., Government Accountability Office (indicating a copy was furnished to Grace Bateman, Esq.). In its production of documents, the Agency was clear and Olympus was on notice that no other documents relating to the Source Selection Decision, the best value analysis, or the evaluation of the technical or price proposals would be produced.

Despite the above, Olympus claims that this protest ground is timely because it was filed "within 10 days of February 15, 2007, the date on which Olympus received an e-mail message from DIA disclosing that the agency does not have any evaluation documents to support the SSA's analysis of the manpower the respective firms offered." *See* Supplemental Protest, at 2. The February 15, 2007 email responded to a February 14, 2007 request from Olympus and merely confirmed what Olympus knew on January

29, 2007. Olympus seems to believe that simply requesting documents a second time will extend the timeliness rules for raising a protest ground. That is not the case. The GAO should not "permit the timing of the protest process to be governed by a protestor's discretionary decision. . . ." *See Professional Rehabilitation Consultants, Inc.*, B-275,871, 97-1 CPD ¶ 94 (Comp. Gen. 1997).

**Conclusion**

For all of the foregoing reasons, Olympus' Protest should be dismissed and/or denied. Like most of its prior protest grounds, Olympus' Second Supplemental Protest is untimely and/or fails to show that Olympus suffered any prejudice. There is no need to decide a protest on the merits if it will have no impact on the award decision. Here, nothing Olympus has asserted will change the result that Rowe offered the best value to the Government and DIA properly made award to Rowe. Moreover, the Record shows that the Agency's best value determination was rationale and consistent with the stated evaluation criteria. Therefore, any argument based on the adequacy of the Record should be dismissed.

A hearing will not change any of the salient facts. Olympus' protests will not become timely. Olympus' fixed price will not become lower than Rowe's fixed price. Olympus will not have offered more FTE's, supplies or equipment than Rowe offered. Rowe's 18 cleared employees still will substantially exceed the contract requirement and the 13 cleared employees offered by Olympus. And, Olympus cannot make its

PROTECTED MATERIAL TO BE RELEASED ONLY IN ACCORDANCE WITH GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER



recent [redacted] go away or prove that the assignment of a [redacted] ating to it for past performance was arbitrary. While the procurement was not perfect, the selection decision was reasonable and DIA fully complied with the solicitation and all laws. Here, the Agency's award decision should be respected and the Olympus protests should be dismissed and/or denied.

Very truly yours,

Kenneth B. Weckstein
Pamela A. Reynolds

cc: Grace Bateman, Esq.
Lt. Col. Frank March, Esq.

SEYFARTH SHAW LLP
ATTORNEYS

815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006-4004
(202) 463-2400
Fax (202) 828-5393
www.seyfarth.com

# Facsimile Transmission

Date: February 28, 2007

| RECIPIENT | COMPANY | PHONE NO. | FAX NO. |
|---|---|---|---|
| **LTC Frank A. March** | Defense Intelligence Agency | 703-696-2826 | **703-696-1537** |
| **Ken Weckstein** | Epstein Becker & Green | 202-861-0900 | **202-861-3560** |

**FROM:** Grace Bateman

**PHONE:** (202) 828-5359

**RE:** **REPLY FAX NO.: (202) 828-5393**

| **File No:** | 24134.016 | **Number of Pages, Including Cover:** | 19 |
|---|---|---|---|

☐ Hard copy to follow
☐ Per your request
☐ Please telephone me
☒ Hard copy will not follow
☐ Please review and revise if necessary

**MESSAGE:**

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND MAY ALSO CONTAIN PRIVILEGED ATTORNEY-CLIENT INFORMATION OR WORK PRODUCT. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THE FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE. THANK YOU.

ANY TAX INFORMATION OR WRITTEN TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED TO BE AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER. (THE FOREGOING LEGEND HAS BEEN AFFIXED PURSUANT TO U.S. TREASURY REGULATIONS GOVERNING TAX PRACTICE.)

**IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE PHONE (202) 463-2400 AS SOON AS POSSIBLE.**

DC1 30189168.1 / 24134-000016

SEYFARTH SHAW LLP
ATTORNEYS

815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006-4004
202-463-2400
fax 202-828-5393
www.seyfarth.com

Writer's direct phone
(202) 828-5359

Writer's e-mail
gbateman@seyfarth.com

WASHINGTON, D.C. · BRUSSELS · SAN FRANCISCO · SACRAMENTO · NEW YORK · LOS ANGELES · HOUSTON · CHICAGO · BOSTON · ATLANTA

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GAO PROTECTIVE ORDER**

February 28, 2007

**VIA FACSIMILE 202-512-9749**
**AND U.S. MAIL**

Mary G. Curcio, Esq.
Senior Attorney
Procurement Law Division
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Re: B-29674.15; Comments of Olympus Building Services, Inc. On The Agency Report On Olympus' Second Supplemental Protest, And Comments On The Agency's Clarification Of The Record.

Dear Ms. Curcio:

Olympus Building Services, Inc. ("Olympus") hereby submits its Comments on the Agency Report on Olympus' Second Supplemental Protest, and its Comments on the Defense Intelligence Agency's ("DIA" or "agency") attempt to clarify the record in this case in response to GAO's February 23, 2007 request for further information.

The Agency Report ("AR") has failed to address the merits of Olympus' Second Supplemental Protest. Moreover, the agency's attempt to clarify the record in this case has only made the record worse. GAO cannot allow DIA's procurement action to stand.

## I. Comments On The Agency Report On Olympus' Second Supplemental Protest

### A. Olympus Is An Interested Party And Thus Has Standing To File Its Second Supplemental Protest.

In the Agency Report on Olympus' Second Supplemental Protest, DIA for the first time contends that Olympus is not an interested party in these protests because it is not in line for award. DIA claims that Olympus is not in line for award because Olympus included security escorts in its staffing plan for this fixed-price performance-based contract. AR, Tab 42, pp. 2-3. Olympus plainly set forth in its technical and price proposals that its staffing plan called for the use of some lower-priced non-cleared janitorial employees who would be accompanied by security escorts while working at DIA's secure facilities. See AR, Tab 41, pp. 9, 11, 15, 17, 21, 23, 27, 30, and 33. Thus, Olympus' inclusion of security escorts in its staffing plan should have been apparent to both the agency Technical Evaluation Board ("TEB") and the Contracting Officer/Source Selection Authority ("SSA"), both of whom gave Olympus "Excellent" ratings for its technical proposal. Thus, it is surprising that at this late date, DIA has for the first time argues that Olympus' inclusion of security escorts in its proposal renders Olympus ineligible for award.

Contrary to DIA's eleventh-hour assertion, the Solicitation does not prohibit offerors from including security escorts in their staffing plans. In one of DIA's few citations to the record in these protests, DIA cites a Solicitation provision that cautions offerors that if they provide security escorts they must do so "at no additional cost to the Government," beyond the fixed-price they offer. AR, Tab 42, p. 3. However, DIA mischaracterizes this provision to be an outright prohibition against including in the offerors' fixed-price calculations the cost of providing security escorts.

The referenced Solicitation provision is in the "Personnel" portion of Section 1.0, entitled "Overall Objectives." It states that the offeror is responsible for providing security escorts, and may

not charge the Government extra, beyond its proposed fixed price, for any security escorts it provides.

> The DIAC is a high security facility and all direct employees assigned to the DIAC must meet the investigative requirement for a Top Secret [sic] with access to Special Compartmented Information (TS-SCI). Any employee or subcontractor without the TS-SCI clearance must be escorted at all times by authorized escorts and will have no access to certain areas. The contractor is responsible for all escorts at no additional cost to the Government.

AR, Tab 3, pg. 6 (emphasis added). This Solicitation provision clearly states that the Government will not pay any additional sums for these escorts beyond the final firm-fixed price proposed by the successful offeror. This provision does not in any way restrict offerors' staffing plan in this fixed-price performance-based procurement. Once the offeror has submitted a firm-fixed price for the work, it is bound by that price, and cannot charge the Government more for any security escorts needed to perform work in DIA's secure environment.

Furthermore, DIA's eleventh-hour attempt to question the inclusion of costs for security guards in Olympus' price proposal flies in the face of the TEB's and SSA's own conclusions that Olympus' technical proposal (including its staffing plan) merited an "Excellent" rating, and that Olympus' price proposal is reasonable and realistic. AR, Tab 31, unnumbered p. 5; Tab 32, 13.

DIA is grasping at straws when it attempts to distort the meaning and application of this Solicitation provision absent anything in the record to indicate that either the TEB or the SSA even considered this non-issue. Olympus is therefore an interested party under the terms of the bid protest regulations set forth at 4 C.F.R. § 21.0(a), in that Olympus is an offeror "whose direct economic interest would be affected by the award of a contract or by the failure to award a contract," and therefore has standing to file its protests.

SEYFARTH ATTORNEYS SHAW LLP



B. **Olympus' Second Supplemental Protest Is Timely.**

1. **Olympus Could Not Have Identified The Error In The SSA's Price Analysis Until The Agency Provided The Pricing Proposals To The Parties.**

DIA next contends that Olympus' protest ground regarding the agency's mistaken analysis of the offeror's manpower proposals is untimely because these protest grounds are based on information that the agency disclosed to Olympus in the agency's January 29, 2007 Agency Report on Olympus' initial protest. AR, Tab 42, p. 4. As discussed in detail in Olympus' previous protest filings, DIA compared the manpower each offeror proposed as a discriminator in the best value decision, specifically the fact that Rowe ostensibly provided [redacted] AR, Tab 32, pp. 14-15. However, because the offerors' detailed staffing plans could only be discerned from the offerors' price proposals, Olympus could not possibly have discovered the SSA's admitted mistakes in evaluating the staffing information contained in offerors' price proposals until DIA provided the price proposals to the parties on February 14, 2007. See, Tabs, 40 and 41. The SSA herself cites information in Rowe's price proposal to explain the mistakes she has made (and continues to make) in comparing the manpower offered by Rowe and Olympus. See, e.g, AR, Tab 42, pp. 4-5. Therefore, there is no merit to DIA's argument that Olympus' Second Supplemental Protest is untimely.

2. **Olympus Could Not Have Known That The Record Was Devoid Of Documents Supporting The Agency's Mistaken Price Analysis Until The Agency Failed To Produce Them.**

In an "Alice In Wonderland" argument, DIA next contends that Olympus' protest ground regarding the absence of a reasonable record in this case is untimely because "Protester should have known of the absence of any documents based on the documents that were produced with the AR on

January 29, 2007." AR, Tab 41, p. 4. DIA seems to be arguing here that Olympus should have been clairvoyant in identifying the absence of documents the agency "didn't provide." This argument is particularly disingenuous in a case where the agency has disclosed documents in the record in a piece-meal fashion over a two-month period, contrary to the request for the expeditious resolution of bid protests established by the Competition in Contracting Act of 1984 and implemented by GAO's bid protest regulations. See 31 U.S.C. § 3554 (1988).

The incomplete and disorganized condition of the record has been an issue in this case from the outset, as the agency has continued to search for relevant records. For example, Olympus has made repeated requests to agency counsel for clarification on the content of the document that the agency purported to be Rowe's final technical proposal; DIA submitted one version with the Agency Report on January 29, 2007, Rowe itself submitted a second version, and the agency later resubmitted a third version. (See, e-mail messages dated February 9, 2007 from LTC March, and from K. Weckstein regarding identification of a complete version of Rowe's final proposal.) Similarly, in the Agency Report on Olympus First Supplemental Protest, the agency cavalierly noted that, notwithstanding the agency's confusion over what constituted Rowe's final proposal, "it is obvious that whatever the TEB evaluated satisfied them to the extent that they rated Rowe as Excellent." AR, Tab 38, p. 3.

Finally, as recently as last week, GAO has recognized the agency's piece-meal disclosure of documents in this case when GAO itself requested that DIA clarify the record on material aspects of this procurement. After the agency's piece-meal production of documents, and its continued replacement of documents that contain errors with later versions, the agency cannot now fault

Olympus for not raising the issue of the incompleteness of the record earlier, because the record in this case has continued to emerge.

C. **The Agency's Most Recent Attempt To Explain Its Price Analysis Is Unintelligible.**

On pages 4 and 5 of the Agency Report on Olympus' Second Supplemental Protest, DIA attempts to respond to Olympus' contention that there are material errors in the agency's price analysis and in the SSD with regard to the SSA's manpower analysis. AR, Tab 41, pp. 4-5. DIA's most recent attempts to explain the SSA's manpower analysis is breath-taking in its obscurity. In response to Olympus' contention that the SSA mistakenly concluded that Rowe offered 56 employees versus the 51 allegedly proposed by Olympus, the Contracting Officer explains:

[redacted]

* The Contracting Officer's response to the clarification questions are contained below in the legal memorandum, however, in the Contracting Officer's statement response 1(f) was before the section where the Contracting Officer addressed the second supplemental protest issue regarding the FTEs.

AR, Tab 42, p. 5 (emphasis added). From the above, the Contracting Officer somehow then concludes that "Though there was an error, the error was in the Protester's favor. In the source

SEYFARTH ATTORNEYS SHAW LLP



selection decision, Protester was at a deficit of only five FTEs as opposed to 12 and-a-half FTEs."[1] Id.

The Contracting Officer's latest attempt to compare Rowe's and Olympus' manpower proposals is still incorrect. As explained in Olympus' Second Supplemental protest, Rowe has [redacted], Second Supplemental Protest, p. 5. Thus, despite the agency's attempt to explain otherwise, the Contracting Officer's analysis of the offerors' manpower proposals is still wrong. Accordingly, it cannot form the basis for a rational best value decision in this $20 million procurement.

**D. The Agency Has Not Demonstrated That The Record In This Case Is Adequate To Allow GAO To Determine Whether The Award To Rowe Is Reasonable.**

Finally, Olympus has argued, in the alternative, that even if the agency had not made numerous material errors in performing the price analysis and best value decision, there is not a sufficient record in this case to allow GAO to determine whether the award to Rowe is reasonable.[2] DIA dismisses this argument out of hand by claiming that documentation of the agency's analysis is "not that important."

[redacted]

---

[1] Despite no mention of the concept of FTEs anywhere in the agency's record prior to its February 27, 2007 submission to GAO, the Contracting Officer appears to now have recognized that it is not possible to compare offerors' manpower proposals without reference to FTEs. However, the Contracting Officer does not indicate the measure of an FTE she is using in her computations (e.g., 2000 hours or 2080 hours). Nor does the Contracting Office address the need to compare both Olympus' and Rowe's manpower proposals based upon a <u>common</u> FTE measure, i.e. either 2000 hours, or 2080 hours. <u>See</u>, Olympus' Second Supplemental Protest, pp. 4-5.

[2] Without explanation, the agency misconstrues "arguing in the alternative" as an admission that DIA's price analysis and best value decision are reasonable.

[redacted]

AR, Tab 42, p. 6 (emphasis added). We disagree: the documentation of the actual analysis the agency used to arrive at the award decision "is that important." Biospherics Incorporated, B-278508.4, .5, .6, 98-2 CPD ¶ 96; see also, the cases cited in Olympus' Second Supplemental Protest at p. 9. Moreover, if documentation of the agency's analysis that supported the award decision were "not that important," there would be no role for GAO in the bid protest process, because GAO would have nothing to review to determine whether the award decision is reasonable. Id.

Furthermore, DIA engages in circular reasoning when it asserts that [redacted] the source selection decision provides GAO adequate documentation to determine that the source selection decision is reasonable." AR, Tab 42, p. 6. DIA's assumption here begs the question: Is the agency's determination that Rowe actually pr[redacted] Olympus accurate? GAO must determine whether there is a basis in the record for the agency to have concluded that Rowe actually [redacted]han Olympus. In order to do this, GAO must have a record to review. GAO cannot make a determination regarding the reasonableness of the agency's action based upon an assumption about the reasonableness of the agency's action.

In sum, GAO has given the agency an opportunity to support its award decision by clarifying the record. DIA has responded in essence by saying "trust us, the record in this case is not that important."

## II. Olympus' Comments On The Agency's Attempt To Clarify The Record.

### A. GAO May Consider The Agency's Post-Award Clarifications, But It Must Give Greater Weight To The Procurement Record Prior To Award.

GAO has requested that DIA clarify and explain the record with regard to its decision to select Rowe for award. It is well-established that GAO may consider the agency's post-award explanations of its actions, however, GAO must accord greater weight to the agency's contemporaneous record in the procurement. Boeing Sikorsky Aircraft Support, B-277,263, B-277263.2, B-277263.3, 97-2 CPD P 91 ("While we consider the entire record, including statements and arguments made in response to a protest in determining whether an agency's source selection decision is supportable, we accord greater weight to contemporaneous source selection materials rather than judgments, such as the selection official's reevaluation here, made in response to protest contentions.")

In Boeing Sikorsky, the agency performed a post-protest reevaluation of proposals, and although the protester's scores increased in certain respects, the agency stated that the award decision was still proper. GAO disagreed, finding that the protester was prejudiced by a series of errors the agency committed during the initial evaluation of proposals. GAO concluded that it was required to give lesser weight to the agency's post-award explanations regarding errors the agency made prior to award.

> The lesser weight that we accord these post-protest documents reflects the concern that, because they constitute reevaluations and redeterminations prepared in the heat of an adversarial process, they

> may not represent the fair and considered judgment of the agency, which is a prerequisite of a rational evaluation and source selection process.

Id., (emphasis added). Accordingly, while GAO may consider the agency's attempt to clarify the record in this case, GAO must give greater weight to the agency's record in the procurement leading up to the award.

**B. DIA's Responses To GAO's Request For Clarification Have Revealed Additional Agency Mistakes In This Procurement.**

Following are Olympus' brief comments on the agency's responses to GAO's requests for clarification.

**QUESTION 1 – Rowe's Final Proposal Revision (FPR).**

GAO has requested clarification on how the agency made sense of Rowe's FPR, i.e. Final Proposal Revision, which consisted of a table of contents without page numbers, unnumbered replacement pages, and partially blank pages. DIA has responded that it read Rowe's "FPR replacement pages in conjunction with the FPR as one complete document." AR, Tab 42, p. 6. The meaning of this statement remains unclear.

Further, DIA suggests that there are at least two ways to interpret Rowe's replacement of a page in its initial proposal that id[redacted]tified in a list labeled from "a to z") with a blank replacement page containing only the letters "a to r."

> [redacted] My common sense is that ROWE would mention if there are any changes to the initial offer, and they did not. Also, the CO did not address the issue in the discussion letter. My judgment was that there is no change from the initial proposal.

AR, Tab 42, unnumbered p. 7 (emphasis added). The Contracting Officer admits that Rowe's FPR is ambiguous at best, but there is nothing in the record to indicate that either the TEB or the SSA identified this ambiguity or raised it during discussions. Without discerning Rowe's intent in its proposal on this point, Rowe will not be bound to provide any specific number of cleared personnel in performing the contract. Cyber Digital, Inc., B-270,107, 96-1 CPD P 20 (the agency was left with an incomplete offer that did not allow the agency to reasonably assume that Cyber Digital's BAFO committed it to every CLIN in the RFP's pricing schedule; Marylou's Transportation Service, B-261,695, 95-2 CPD P 154 (affirming the agency's rejection of the protester's partial BAFO because the agency could not reasonably determine that the offeror was not offering to meet all of the requirements of the scope of work and therefore was technically unacceptable).

Finally, GAO has requested that DIA identify the Security Awareness Plan, referenced in the agency evaluation documents, that Rowe purportedly submitted in its FPR. In response, DIA confirms that Rowe submitted "39 pages" addressing "an annual security awareness briefing, terrorism, a refresher security briefing, and a DoD self-inspection handbook for contractors." AR, Tab 42, p. 8. Further, DIA confirms that the security forms mentioned by the TEB are in fact standard DoD forms. Id. Both the enumerated documents and the DoD forms are publicly available documents that can be copied directly from the DoD website. The agency's clarification confirms that Rowe has not provided a Security Awareness Plan as part of its FPR, it has merely provided the Government with copies of the Government's own documents. Thus, the TEB's

conclusion that Rowe's technical proposal deserved an "Excellent" rating, in part because Rowe's proposal included a security awareness plan, is simply in error. AR, Tab 26, p. 7/8.[3]

**QUESTION 2 – The Agency's Price Analysis.**

In the SSD, the SSA referred to performing price analysis and to determining the prices offered were realistic. GAO requested that the agency explain the price analysis that was performed, and by whom, and to explain how the SSA determined that the offerors' prices were realistic. In response, DIA confirms that no price analysis was performed, and that there are no documents in the record to support the SSA's determination that the offerors' prices were realistic. AR, Tab 42, p. 8.

**QUESTION 3 – The Agency's Past Performance Analysis.**

GAO sought clarification on the actual number of Olympus past performance references that the agency considered (two, or three as noted in the SSD). Olympus has repeatedly questioned the agency regarding the number or past performance references for Olympus the agency considered, and the source for a negative past performance comment on Olympus' management personnel in the TEB evaluation. Tab 32, p. 9. By e-mail message dated January 29, 2007, Olympus first questioned agency counsel regarding whether DIA considered two or three past performance references for Olympus because the Agency Report in Olympus' initial protest contained only two past performance evaluations for Olympus. Agency counsel responded as follows:

> Reference the Past Performance questionnaires of Olympus, there are only two, not three as stated in the KO Statement and PNM. <u>There were actually three, but two of them were duplicates. The duplicate was the better one, so in the evaluation, Olympus got credit for the better questionnaire twice.</u>

[3] A further gap in the record is the absence of page 8 in Tab 26, which is the "Overall Rating Management Area" page in the TEB's evaluation of Rowe.

Id. (emphasis added). Olympus believed agency counsel's response, and did not pursue the matter of the missing past performance evaluation any further. Olympus was shocked to learn nearly a month later, on February 27, 2007, that agency counsel's statement was not true. In its response to GAO's request for clarification, DIA for the first time revealed that the agency had, in fact, considered three past performance evaluations for Olympus, and that none of them were duplicates. The third past performance evaluation that the SSA had considered contained an adverse management reference which the SSA referenced in the December 2006 SSD. However, this past performance reference was for another unidentified offeror—it was not for Olympus.

> As aforementioned, there was one wrong past performance questionnaire which does not belong to Olympus' file. I did not look at the offeror's name when I reviewed [sic]. I realized the mistake after the initial PNM and I removed this questionnaire from the file; however, the comment from this questionnaire was carried over to the December 2006 PNM by mistake. Despite this fact, it was clear from my narrative on page 13 of the PNM t[redacted]s the deciding factor in assigning Olympus a "Good" rating instead of "Excellent." Additionally, this comment concerning the discarded questionnaire was not a factor in the tradeoff analysis. To further minimize the impact of the statement from the discarded questionnaire, I specifically found during my contemporaneous review that, had Olympus received an "Excellent" for past performance, it still would not have been a best value due to its higher price."

AR, Tab 42, pp. 9-10. Olympus has been severely prejudiced by agency counsel's incorrect statement regarding the "duplicate" past performance evaluations, because Olympus relied on agency counsel's statement in not further pursuing the issue of the third past performance evaluation in its protests.

The Contracting Officer's admission of yet another mistake in the evaluation and SSD is also alarming for several other reasons. First, the SSA's statement that [redacted], not this

mistaken adverse past performance reference, was the determinative factor in downgrading Olympus from an "Excellent" past performance rati[redacted]' is simply not credible. The SSA apparently considered the adverse comment in the third past performance evaluation important enough to include it in the SSD pertaining to Olympus' past performance.

> **Olympus** - The Government received three (3) Past Performance questionnaires pertaining to this offeror. Two of those three were submitted with co[redacted]

AR, Tab 32, p. 13 (emphasis added). If the SSA did not think this was an important comment, she would not have included it in the SSD.

Second, the SSA's mistaken inclusion of a past performance reference in Olympus' file that pertained to another offeror raises questions about the integrity of the agency's past performance evaluation of the other unidentified offeror. The SSA's rating for the other offeror should have reflected this adverse past performance reference, but apparently did not reference it because it was in the wrong file. The SSA has made those two mistakes in the past performance evaluation, and may have made others. This calls into question the integrity of the SSA's past performance evaluation of all offerors in this procurement.

Finally, in response to GAO's questions regarding the SSA's past performance evaluation, GAO asked the SSA whether the SSA correctly understood th[redacted]esponse, the Contracting Officer makes the incredible statement that Olympus deserves a "Good" overall past performance rating, rather than an "Excellent" rating regardless of whet[redacted]. AR, Tab 42, p. 9. She then denies that she

believed that the Government is [redacted] Olympus, but does not explain her reference to [redacted] discussing this issue in the Agency Report on Olympus' First Supplemental Protest. AR, Tab 39, p.2.

In sum, there is nothing the SSA can do to explain the many mistakes she has made in performing the past performance evaluation in this procurement. Her lame suggestion that, regardless of her mistakes, the award to Rowe was nevertheless justified only highlights the irrationality of her award decision.

**QUESTION 4 – The Evaluations On Which The SSA Based Her Award Decision.**

GAO requested that the Contracting Officer clarify which technical evaluation documents in the record the SSA used in the source selection decision. In response, the SSA claims that she used the most recent TEB evaluations at Tabs 26 and 27 in the Agency Report, and the technical evaluation consensus document at Tab 31. However, she asserts that "I made my own Source Selection Authority's independent judgment as shown in the Source Selection Decision." This statement directly contradicts a statement that the SSA made earlier to the effect that she relied exclusively on the findings of the TEB and did not make an independent assessment as required in FAR §15.308 when she selected Rowe for award.

> Rowe submitted their final proposal in accordance with the discussion letter dated 08 Nov 2005. The final proposal was reviewed by the Technical Evaluators, who found that proposal addressed all issues. Therefore, as the Source Selection Authority, I determine [sic] that Rowe's final proposal was complete, coherent and responsive.

AR, Tab 39, p. 1. These are not the words of an SSA who made an "independent assessment" of the proposal that offered the best value to the Government when she selected Rowe for award. These are the words of an SSA who has blindly adopted, as her own, the views and opinions of

others. When she has attempted to exercise independent judgment, as in her many attempts to perform the manpower analysis, she has made repeated mistakes.

**III. Conclusion**

The record in this $20 million procurement is the worst record we have seen in more than 25 years of procurement law practice. It reveals the agency's utter disdain for the competitive procurement process that GAO is charged with upholding. What there is of the record contains multiple, material errors in the technical, price, and past performance evaluations—errors that the Contracting Officer/SSA continues to make as she attempts to explain her previous errors to GAO, digging herself an ever-deeper hole. Following is only a partial summary of the agency's most egregious mistakes:

1. DIA's evaluation of the offeror's staffing plan, which was a discriminator in the best value decision, was, and continues to be, a moving target [redacted] It depends upon which of the SSA's statements you read. Neither of these numbers are supported in the record, and neither are correct. Furthermore, the SSA does not even attempt to explain how she mistakenly determined that Olympus offered onl[redacted]mployees.

2. DIA's past performance evaluation of Olympus is so compromised, no amount of post-hoc explanation can save it. The number of past performance references for Olympus also has been a moving target. DIA first said there were only two references, and that the agency had considered the better reference twice. Now, for the first time in these protests, DIA admits that there were actually three past performance references for Olympus, the third one containing an adverse statement about another contractor that the SSA attributed to Olympus. DIA's statement that this adverse information did not color the agency's past performance evaluation of Olympus is simply

not credible, because it was important enough information for the SSA to include in the December 2006 SSD. Nor is the SSA's statement that she "knew full wel[redacted] was not from the Government, because as recently as February 24, 2007, when she noted with regard to Olympus that "the Government does not issue a cure notice unless a major problem carries on for a long time." AR, Tab 39, p. 2.

3. DIA believes that the documentary record of its evaluation in this case is "not that important." DIA has little regard for the record of its procurement actions. In place of an adequate record, DIA urges GAO to simply trust the SSA's unsupported, and often erroneous statements in the SSD. Without a shred of legal support, DIA posits that the SSD, in and of itself, should be sufficient documentation for GAO to review to determine that the agency acted reasonably. We understand the agency's desire to complete this nearly two-year procurement effort which has involved 15 bid protests, however, GAO cannot allow this deeply flawed procurement decision to stand. GAO must sustain Olympus' protests and should direct a contract award to Olympus, who has been severely prejudiced by many errors the agency has made in its technical, past performance and price evaluations, and in the best value decision. In the alternative, GAO should direct DIA to appoint a new TEB and a new SSA who are capable of performing a rational evaluation of offerors'