# Exhibit 1

xxx

PROTECTED/CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH US COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

PROTECTED/CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH US COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

April 28, 2006

Guy A. Torres
Contracting Officer
Defense Intelligence Agency
Office of the Acquisition Executive
Building 6000, Bolling Air Force Base
Washington, D.C. 20340-5100

Re: <u>Solicitation HHM402-05-R-0017</u>

Dear Mr. Torres:

The Defense Intelligence Agency ("DIA") has provided us with redacted copies of protests, dated April 6 and 20, 2006, filed by The Ravens Group, Inc. ("Ravens"). Those letters include numerous false allegations about Rowe Contracting Services, Inc. ("Rowe"). The purpose of this letter is to set forth facts that respond to Ravens' allegations. As noted below, I am signing this letter in front of a notary and subject to penalties of perjury. Also, I am available to speak to you or anyone from your Office if you require any additional information regarding this matter.

I understand that the first two protests of Ravens have been dismissed and I expect that the third protest also will be dismissed. Still, because Ravens has made false accusations about my integrity and that of Rowe, I believe that it is necessary to establish the actual facts. Rowe has been providing quality services for 26 years. It has established an excellent reputation and record of performance. It would be wrong to let Ravens' false accusations go unanswered.

As I noted in my letter of April 26, 2006 to you, DIA awarded a contract to Rowe under Solicitation HHM402-05-R-0017 on March 23, 2006. The contract was

to cooperate with the incoming contractor to assure that there is a smooth transition and no disruption to services. Also, in custodial services, it is standard, at least initially, for most of the janitors to transfer from the incumbent contractor to the new contractor. That obviously is in the interest of all parties. The incumbent has lost the contract. It either has to lay off the employees, find new work for them that they are willing to accept, and/or make severance payments to the employees. The employees themselves generally want to continue working their same jobs at the same job site. The Government wants to make sure the services continue without interruption. And, no one wants to lay off large numbers of employees. To the extent that the new contractor is willing to hire some or all of the employees of the incumbent and the employees are willing to go to work for the new contractor, it makes perfect sense for the employees to transition to the new contractor.

Here, because there were only seven business days between the time of award and the start of the new contract, there was very little time for transition. Ravens, Rowe and DIA all recognized this and I believe that all parties worked in good faith to facilitate the transition.

Upon notice of award on March 23, 2006, Rowe promptly began plans to commence work. This included making arrangements to deliver approximately $100,000 of new equipment along with an initial delivery of $15,000 of supplies to the DIA building at which Rowe would be performing the contract. Rowe arranged to have the equipment and supplies delivered on Monday, April 3, 2006 between 6:30 a.m. and 9:00 a.m.

On March 27, 2006, I and Robert Duncan, Rowe's Regional Manager, met with you, Juanita Jones and Mary Hennigan at DIA Building 6000. We met at 9:00 a.m. and spoke for approximately 20 to 30 minutes in the main Lobby. Ms. Hennigan then took me and Mr. Duncan to the DIA cafeteria, where we were introduced with Milton of Ravens. I do not know Milton's last name. I understood that Milton was running the job for Ravens. Ms. Hennigan asked Milton for a smooth transition and to provide me with as much information as possible. Milton asked me what Rowe required. I said that Rowe needed current work schedules and a roster of Ravens' employees working on the job, social security numbers, clearance levels and work hours. Milton said that would be no problem. I then asked when I could get the information. Milton said in a day or two. Milton also asked me not to contact employees while they were working, but said that I could talk to the employees while they were on their breaks. Ms. Hennigan agreed to that as well. I said that I would be sitting at the table in the DIA cafeteria for a bit longer. The above conversations and statements of Milton took place in front of Ms. Hennigan, Mr. Duncan and me.

Shortly after the conversation with Milton ended, employees of Ravens came to the cafeteria to speak with me and Mr. Duncan. During that time, Wendy Scott and Ernest Fields came to the cafeteria and introduced themselves to me. I spoke to Ms. Scott and Mr. Fields separately. They each told me that they were making $60,000 per year. I told them that Rowe would have only one project manager for the job, but that the other could be a day supervisor. I also said that Rowe would pay them $60,000 per year. I told Ms. Scott and Mr. Fields that Milton had told me he would get me the

schedules and roster of Ravens' employees. Ms. Scott said that she would talk to Milton and that if it was okay with him, she would get me the employee information the next day.

About 30 employees of Ravens spoke with me and Mr. Duncan at the DIA cafeteria between approximately 9:00 a.m. and 12:30 a.m. on Monday, March 27, 2006. The employees, including Ms. Scott and Mr. Fields, indicated that they wanted to and would become employees of Rowe.

Mr. Duncan and I left the cafeteria at about 12:30 pm on March 27, 2006 to speak with Ms. Hennigan. We spoke with Ms. Hennigan for approximately 15 minutes during which time we told Ms. Hennigan that equipment and supplies for Rowe to perform the contract would be delivered on Monday, April 3, 2006 between 6:30 a.m. and 9:00 a.m. Mr. Duncan and I then left DIA Building 6000.

On March 28, 2006 at approximately 8:30 a.m., Mr. Duncan and I returned to DIA Building 6000. We met with Ms. Hennigan and one other DIA employee and started a walking tour of the building. As part of that tour, we went to the basement where we met with Wendy Scott. Ms. Scott advised me, in the presence of Ms. Hennigan, the other DIA employee and Mr. Duncan that she had the information. I told Ms. Scott that I would see her after I had finished our tour. At approximately 10:00 to 10:30 a.m., Mr. Duncan and I went to find Ms. Scott. We found her in the lobby of DIA Building 6000 on our way out of the building. At that time, Ms. Scott gave me two yellow folders which contained the Ravens' roster of employees and schedules.

I planned to leave Washington, D.C. on Wednesday, March 29, 2006 and return to Rowe's offices in Mandeville, La. I also planned to return to Washington, D.C. on Sunday, April 2, 2006 to make sure that the contract started smoothly. This left Ms. Scott to start putting together necessary paper work, personnel files, and new employee schedules on April 1, 2006. To create goodwill and to make sure that the new contract got off on the right foot, Mr. Duncan and I returned to DIA Building 6000 on March 29, 2006 at approximately 8:15 a.m. We were checked into the building by Ms. Hennigan who brought us to meet with Ms. Scott and Mr. Fields. I then met with Mr. Fields and Ms. Scott in the presence of Mr. Duncan. I gave Mr. Fields and Ms. Scott each a $500 signing bonus. I then told Mr. Fields and Ms. Scott that I would see them on Monday at 5:00 a.m. I then left DIA Building 6000. I returned to Mandeville the afternoon of Wednesday, March 29, 2006.

Between Tuesday, March 28, 2006 and Friday, March 31, 2006, Rowe continued to make preparations to begin performance of the contract on April 1, 2006. Among other things, after I received the employee roster from Ms. Scott on March 28, 2006, Rowe used that information to verify whether the employees had the security clearances and the level of clearance that each employees had. Rowe obtained that information from JPAS, which all contractors are authorized to use with the proper authorization and validations. Rowe used its authorization to access JPAS.

The information that Ravens, through Ms. Scott, gave me on March 28, 2006 contained information on 70 Ravens employees. These include the employees who I had met with on March 27, 2006 and had agreed to start work for Rowe on April

1, 2006. Between March 29, 2006 and March 31, 2006, Rowe used JPAS to attempt to verify security clearances. Rowe only was able to confirm that 14 of the employees had appropriate clearances. Ravens had provided Rowe with insufficient information for the other 56 employees. As of March 31, 2006, with the job scheduled to transfer to Rowe the next day, Rowe obtained ownership of these thru JPAS and that the 14 employees were now Rowe employees.

Later on Friday, March 31, 2006, DIA notified Rowe that DIA had received a protest. In its letter, DIA also advised Rowe that a contract performance stay was in place. DIA advised Rowe that it should cease all preparations to begin performance of the contract, which contract was set to begin the following day on April 1, 2006. Upon receipt of the notice of the bid protest on March 31, 2006, Rowe stopped its preparation to begin performance. Among other things, Rowe stopped activity on JPAS regarding the janitorial employees. This left the 14 employees being shown as working for Rowe.

On April 3, 2006, Mr. Duncan and I went to DIA Building 6000 to arrange to divert the Rowe supplies and equipment that was scheduled to arrive that day. In connection with our visit, Ms. Hennigan signed us in. I advised Ms. Hennigan that I was diverting the supplies and equipment. I was able to stop the equipment shipment at the front gate of the base.

While I was at the DIA building on April 3, 2006, I saw and spoke to Wendy Scott at the escalator for about one to two minutes. Ms. Scott seemed upset. I advised Ms. Scott that Rowe would be back in as soon as the protest was over.

On or about April 5 and 6, 2006, Ms. Scott called me several times. She told me she was unhappy with Ravens. She said that Ravens had fired Mr. Fields. She said that she was working 14-16 hour days. I told Ms. Scott to hang in there.

I spoke to Ms. Scott again on April 7, 2006. She said that she was under a lot of stress and that she was thinking of quitting Ravens. I told Ms. Scott that she should stay with Ravens. Ms. Scott was going to work as Rowe's initial Project Manager for the job and I wanted there to be a smooth transition from Ravens to Rowe when the job did transfer to Rowe.

On or about April 5 or 6, 2006, Ernest Fields called me. I returned his call and spoke with him on April 7, 2006. Mr. Fields told me he had been fired. He asked if I could use him on any job in Washington, D.C. He said he was thinking of going to Mississippi. He also said that Ms. Scott had told Ravens that I had given her $500 for information. I said that was not true and that the money was a good faith payment to get the Project Manager signed up for Rowe. Mr. Fields said that he knew that.

I never paid Mr. Fields or Ms. Scott for information about Ravens. Ms. Scott gave me the employee information, with Ravens' authorization (from Milton), on March 28, 2006. I gave Ms. Scott and Mr. Fields $500 each on March 29, 2006 to make sure that two of Rowe's new, key employees would start and keep the job running smoothly on April 1, 2006 when I would not be in Washington, D.C.

Ravens also suggests that I somehow had confidential information about Ravens because I said that Rowe had won the contract because its price was

$1,500,000 (or $3,000,000) lower than Ravens' price. I do not know what Ravens' price was for the work. I do believe that Rowe's price was substantially lower than Ravens' price. I base that on public information. In DIA's letter of June 27, 2005, DIA notified all offerors that the contract initially had been awarded to Ravens at the price of $21,731,005.09. That price was considerably higher than what the contract price should be and was considerably higher than Rowe's winning bid.

I hope that this information is helpful to you in determining that Ravens' allegations are completely frivolous and that Rowe is a responsible offeror.

I certify under penalty of perjury that the above statement is true.

Scott E Rowe
Scott Rowe

State of Louisiana :
Parish
County of St. Tammany : ss.

I certify that Scott E. Rowe appeared before me on the 2nd day of May, 2006 and executed the aforementioned statement dated April 28, 2006.

Sworn to before me and subscribed in my presence this 2nd day of May, 2006.

(SEAL)

Notary Public Bar# 20176

My commission expires: at death

cc: Kenneth B. Weckstein