# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (Bid Protest)

THE RAVENS GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES et al.

Defendant.

CFC No. 07-243
Judge Baskir

# PLAINTIFF'S OPPOSITION TO INTERVENOR ROWE CONTRACTI SERVICES, INC.'S MOTION FOR RULE 11 SANCTIONS [PUBLIC VERSION]

Daryle A. Jordan
Patrick Henry LLP
7619 Little River Turnpike
Suite 340
Annandale, Virginia 22003
703.256.7754
703.256.7883 (Facsimile)
djordan@patrickhenry.net
Counsel for Plaintiff

DATED: June 8, 2007

[redacted]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Bid Protest)

| | | |
|---|---|---|
| THE RAVENS GROUP, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | CFC No. 07-243 |
| | ) | Judge Baskir |
| THE UNITED STATES *et al.* | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION**
**TO INTERVENOR ROWE CONTRACTING**
**SERVICES, INC.'S MOTION FOR RULE 11 SANCTIONS**
**[PUBLIC VERSION]**

**COMES NOW** Plaintiff, The Ravens Group, Inc. ("The Ravens Group"), by and through the undersigned counsel, pursuant to the Fed Rules of Civil Procedure and the Rules of this Court, and files Plaintiff's Opposition to Intervenor Rowe Contracting Services, Inc.'s Motion for 11 Sanctions. We oppose and ask the Court to deny Intervenor's moti

**STATEMENT OF THE ISSUES**

- Is there a basis in law and in fact for the Court to review whether D abused its discretion when it failed to address The Ravens Group's allegations that Rowe engaged in unfair business practices?

- Is there a basis in law and in fact for the Court to review whether D acted unreasonably in its multiple awards of this procurement?

- Is there a basis in law and in fact for the Court to review DIA's brea of the duty of good faith?

- Is there a basis in law and in fact for the Court to review whether D failure to provide notices prejudiced The Ravens Group?

- Is there a basis in law and in fact for the Court to review NOSLOT's eligibility to protest the original contract award to The Ravens Grou

- Is there a basis in law and in fact for the Court to review whether Plaintiff is entitled to judgment under the totality of the circumstanc

## I.

## INTRODUCTION

Initially, we remind the Court that Plaintiff has withdrawn its contention that Intervenor improperly obtained The Ravens Group's contract price. As discussed in Plaintiff's Opposition to Defendant's ar Intervenor Rowe Contracting Services, Inc.'s ("Rowe" or "Intervenor") Motions to Dismiss and for Judgment Upon the Administrative Record, our May 23, 2007, letter to Intervenor (see Appendix, Exhibit 1), we acknowledge that Intervenor provided The Ravens Group credible evidence (via its June 14, 2006, letter and enclosure) that the Defense Intelligence Agency ("DIA") released The Ravens Group's contract pric We also notified Intervenor of our intent to combine our discussions regarding Count I and Count V of the Complaint.

II.

## STATEMENT OF THE CASE

The case concerns DIA's attempt over a period of almost two (2) years to award a contract for janitorial and custodial services to be performed at DIA's facility located at Bolling Air Force Base.

After nearly two (2) years, four (4) contract awards to three (3) different contractors, fifteen (15) bid protests by four (4) different contractors, including one by Intervenor Rowe, issuance of three (3) notices of corrective action, and DIA's three attempts to correct errors source selection process, this procurement action is still unresolved.

Intervenor has asked the Court to sanction The Ravens Group a its counsel pursuant to the Court's authority under Rule 11 of the Rule the Court of Federal Claims ("RCFC") ("Rule 11" or the "Rule"). Intervenor's request is unfounded. The standards applicable to Intervenor's motion are as follows:

"Rule 11 sanctions are warranted only when 'it appears that a pleading has been interposed for an improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by exi law [or a good faith argument for the extension, modification, or revers

existing law] (emphasis added).'" Herbert Judin v. United States, 34 Fe Cl. 483 (Dec. 8, 1995).

Courts should "avoid the wisdom of hindsight and are to test the signer's conduct by inquiring what was reasonable to believe at the tim the pleading was submitted. Laborers Local 938 Joint Health & Welfar Trust Fund, *et al*. v. B.R. Starnes Company of Florida, *et al*., 827 F.2d 1454, 1458 (11th Cir. 1987). The Rule is not intended to chill an attorne enthusiasm or creativity in pursuing factual or legal theories. See Fed. Civ. P. Rule 11 Advisory Notes (LEXIS 2007).

The Rule also provides "protection against sanctions if the offenc contentions are withdrawn or corrected after a potential violation is call to the attention of the party. See Fed. R. Civ. P. Rule 11 Advisory Note (discussing 1993 Amendments) (LEXIS 2007).

Moreover, the Rule's certification represents only that "there is (c likely will be) 'evidentiary support' for the allegation, not that the party v prevail" regarding a particular fact. Id. The "extent to which a litigant h . . . found **some** support for its theories even in minority opinions, in lav review articles, or through consultation with other attorneys should cert be taken into account . . . (emphasis added), [and] . . . arguments for a change of law are not required to be specifically so identified"). Id.

The Court is authorized to review DIA's multiple abuses of discre

and errors as summarized below.

- Counts I and V—DIA abused its discretion when it failed to investig allegations that Rowe had employed unfair business tactics.
- Count II—DIA acted unreasonably in its multiple awards of this procurement.
- Count III—DIA breached its duty to conduct the procurement in goo faith.
- Count IV—DIA's failure to provide notices to The Ravens Group, prejudiced The Ravens Group.
- Count VI—NOSLOT's protest was *void ab inicio*.
- Count VII—The Ravens Group is entitled to judgment under the tota of the circumstances.

There is no evidence that this protest was filed to delay Rowe's commencement of performance or for any other improper purpose. W this protest was filed April 18, 2007, Rowe's performance was suspend as a result of the "automatic stay" triggered by the GAO protest filed by Olympus Contracting Services, Inc. The anticipated due date for GAO decision was May 31, 2007. See Olympus Request for Reconsideratio AR1311, AR1318. Indeed, Intervenor's request is unfounded in law an fact and should be denied.

# III.

# DIA ABUSED ITS DISCRETION AND FAILED TO PROTECT THE INTEGRITY OF THE PROCUREMENT SYSTEM BY INVESTIGATING CLAIMS OF UNFAIR BUSINESS PRACTICES

"Procurement officers **must act** to prevent even an appearance o impropriety in order to meet FAR requirements of 'safeguarding the interests of the United States in its contractual relationships,' 48 C.F.R 1.602-2 (2000), and ensuring that 'contractors receive impartial, fair, ar equitable treatment,' *id.* § 1.602-2(b)(2000) (emphasis added)." See R Flammann GmbH v. United States, 339 F.3d 1320, 1324, *citing* NKF Engineering, Inc. v. United States, 9 Cl. Ct. 585, 805 F.2d 372, 374 (Fe Cir. 1986). See also Federal Acquisition Regulation ("FAR") § 1.602-2 (contracting officers responsible for "safeguarding the interests of the United States in its contractual relationships"); FAR § 1.602-2(b) (contracting officers must "ensure that contractors receive impartial, fai and equitable treatment"). The Court has authority to review DIA's bre of this duty.

## A. DIA Had a Duty to Investigate Serious Documented Allegatio of Unfair Business Practices Asserted by The Ravens Group

Under the Court's holding and rationale in Compliance Corporatic United States, 22 Cl. Ct. (Dec. 12, 1990) and NKF Engineering, *supra*.

DIA abused its discretion and acted arbitrarily and unreasonably when failed to investigate The Ravens Group's claims that Rowe engaged in unfair business practices to obtain its March 2006 contract award.

In Compliance, plaintiff—Compliance challenged the Navy contracting officer's decision to disqualify Compliance from the bidding process based on a Navy investigation that concluded that Compliance had attempted to obtain or did obtain proprietary information about the incumbent contractor's bid proposal. Id. at 194-96. The Navy investiga had been triggered by allegations from the incumbent contractor. Id. a 194. The General Accounting Office ("GAO")[1] sustained the Navy contracting officer's decision to disqualify Compliance, and Complianc filed a protest in this Court. Id.

In its complaint and protest, Compliance alleged, among other th that the contracting officer's decision to disqualify it lacked a rational ba Id. at 197. Compliance argued that there was no express statute or regulation that authorized the government to disqualify a contractor ba on allegations that the contractor employed unfair business tactics. Id. Compliance also referred the Court to a long line of GAO precedent, w Compliance asserted precluded government intervention of a dispute

[1] The agency is now referred to as the Government Accountability Office.

between contractors that did not involve a government official. Id. Specifically, Compliance argued that "industrial espionage" involving tw contractors without improper government action cannot be the sole bas for disqualifying a bidder to protect the integrity of the procurement process. Id. at 201.

In its review of the protest, the Court acknowledged that the Comptroller General "has often held, . . . that allegations of the use by bidder of proprietary information improperly gained from another bidde dispute between private parties that does not affect the propriety of the procurement, and is not a dispute for the Comptroller General to resolv Id. at 202.

The Court stated, however, that it "views with disfavor the type of conduct alleged here, which [the] plaintiff itself characterizes as 'indust espionage.'" Moreover, said the Court, "when one bidder **attempts** to obtain, **or does obtain**, vital bid information, such as the bid proposal, employee data, from a competing bidder, **then the integrity of the procurement system is at risk** (emphasis added)." Id. at 203.

The Court declared that "one of the contracting officer's duties in protecting the integrity of the procurement process is to ensure that ea bid is fairly and honestly considered, which cannot be done unless eac

bid is fairly and honestly prepared." Id. Thus, concluded the Court, allowing bidders to underbid their competitors by means of 'industrial espionage" falls within the realm of conduct that impugns the integrity of the procurement, and which is the type of conduct **the contracting officer has a right and a duty to deter** (emphasis added)." Id.

The Court held that actual or attempted "'industrial espionage' ... ... outside the realm of normal business practices." Id. Therefore, the contracting officer acted appropriately in disqualifying Compliance to preserve and protect the integrity of the procurement process. Id.

Like the protest in Compliance, the protest in NKF Engineering centered around the contracting officer's decision to disqualify the plaintiff for an alleged "unfair competitive advantage." Id. In this case, the alleged "unfair competitive" advantage was the intended awardee's hiring of the contracting officer's technical representative who had assisted the contracting officer in the solicitation and award process. Id. at 588.

The Court acknowledged that it was aware of "no rule of law which explicitly" authorized a contracting officer to disqualify a contractor who received inside information. Id. at 592. Notwithstanding the Court's acknowledgement of the absence of explicit authority for the actions taken by the contracting officer, the Court concluded that "the contracting

officer's responsibility of 'safeguarding the interests of the United State its contractual relationships', is sufficient to support the exercise of authority that was asserted." Id. The court based its decision among c considerations, on "the overriding importance of the Government's nee insure full and fair competition in the conduct of its procurements." Id. The Court also ruled that actual impropriety need not be shown. Id. at

Thus, under the holding and rationale of Compliance and NKF Engineering, "actual or attempted 'industrial espionage'" is beyond the scope of normal business practices, and the contracting officer has the **authority** and the **duty** to discourage, prevent, and address such practices, including, where appropriate, ordering the disqualification of suspected offending contractor. Compliance at 204; NKF Engineering 593.

## B. DIA Abused its Discretion When it Failed to Investigate The Ravens Group's Claims of Unfair Business Practices

In Compliance and NKF Engineering, the Court confirmed the procuring agency's **authority** and **duty** to protect the integrity of the procurement system, as well as the Court's own authority to review the reasonableness of the procuring agency's use of its discretion when

confronted with allegations of unfair business practices that threaten th integrity of the procurement system.

In this case, it is not the reasonableness of the contracting officer's/agency's action that is challenged, but rather, the reasonablen and rationality of the contracting officer's failure to act when presented substantial, documented evidence of unfair business practices.

The Ravens Group first notified DIA in April 2006, of its concern t Rowe had engaged in unfair business practices to win award of the DI janitorial contract in March 2006. The evidence upon which The Raver Group relied for its contention, were statements made by Scott Rowe, Rowe's own President.

In written and signed witness statements, two (2) senior Ravens Group officials, J. Jeff Robertson, The Ravens Group's Executive Vice President and Milton Grant, The Ravens Group's Facilities Manageme Director, described in-person discussions they had with Mr. Rowe, in w Mr. Rowe detailed how he had obtained confidential and proprietary information about The Ravens Group that he used to enhance the best final proposal Rowe submitted resulting in the March 2006 contract aw to Rowe. See Appendix Exhibits 2, 3, and 4; see also AR1056, AR105 and AR1059.

In one of his written statements, Mr. Grant recalled that Ms. Hennigan had introduced him to Mr. Rowe. See Appendix, Exhibit 2; AR1057. Notably, this is consistent with Mr. Rowe's recollection in his sworn statement. See Appendix, Exhibit 5. Mr. Rowe introduced hims as Rowe's president. He told Mr. Grant that Rowe had bid "about $3,000,000 overall less than" The Ravens Group. This is also consiste with Mr. Rowe's sworn statement. It is undisputed that Rowe's winning contract price in the amount of [redacted] was approximately $3,000,000 less than The Ravens Group's contract price in the amoun [redacted]

Thus, Mr. Grant's recollection that Mr. Rowe admitted to having Ravens Group's contract price is supported by the evidence and corroborated by Mr. Rowe's own sworn statement. What Mr. Grant an one else at The Ravens Group knew at the time of Mr. Grant's discuss with Mr. Rowe was that DIA had released The Ravens Group's contrac price to Rowe.

Mr. Rowe also boasted that he had obtained information from Mr Verlene Cameron, the previous contractor's Project Manager. In Mr. Rowe's words, he had Ms. Cameron "in his pocket feeding him information." See Appendix, Exhibit 2; AR1057. Mr. Rowe also stated

only reason he did not win the original bid was because The Ravens G submitted a work schedule and he did not." Appendix, Exhibits 2 and 4 AR1056, AR1057. Since information regarding The Ravens Group's technical proposal, including its staffing methodology, was confidential information and closely held by company officials, there were only two ways Mr. Rowe could have obtained that information. Either he saw th proposal or talked to someone who had.

In Mr. Grant's account of his discussion with Mr. Rowe, it is clear Mr. Rowe is discussing information regarding The Ravens Group that h obtained between NOSLOT's protest of The Ravens Group's original contract award and Rowe's submission of a revised proposal in connec with the corrective action DIA took in response to NOSLOT's protest of Ravens Group's original contract award.

In GAO's May 19, 2006, decision, however, GAO misinterpreted Grant's statements as alleging that Mr. Rowe obtained information regarding The Ravens Group's proposal following the parties' submiss of revised proposals.

Close review of Mr. Rowe's alleged statements, however, makes clear that the alleged statements concerned information that Rowe received after the original award to The Ravens Group but before

submission of revised proposals leading to the contract award to Rowe March 2006.

As noted above, according to Mr. Grant, Mr. Rowe admitted that only reason [Rowe] did not win the original bid was because The Raven Group submitted a work schedule and he did not." See Appendix, Exh 2; AR189, AR1056. In another written witness statement, dated June 2006, Jeff Robertson, Executive Vice President of The Ravens Group, a witness and participant to the discussions with Mr. Rowe, clarified tha Mr. Rowe's statement concerned information he received about The Ravens Group and used to enhance Rowe's proposal following DIA's attempted corrective action following the original award to The Ravens Group. GAO, however, declined to consider this clarification on the me when it issued its July 14, 2006, decision in response to The Ravens Group's Request for Reconsideration. See AR241-42, fn 2.

Therefore, contrary to Intervenor's contentions, it is not true that there is no credible evidence of Rowe's unfair business practices. GA misinterpreted evidence and declined to consider other evidence. This Court has authority to review GAO's determination for reasonableness See Chas H. Tompkins Co. v. United States, 43 Fed. Cl. 716, 719 (199

(GAO decision is an advisory decision upon which Court may rely to th extent it is reasonable and persuasive in light of administrative record).

According to Mr. Robertson, Mr. Rowe admitted to "having information [regarding Ravens Group's proposal] prior to the best and f offer submitted by Rowe in response to DIA's request for a best and fir offer following DIA's agreement to take corrective action based on NOSLOT's protest." See generally Appendix, Exhibits 3 and 4; AR228 AR1056.

In addition to the above, Mr. Grant recalled in a separate written signed statement, how, on April 3, 2006, Ernest Fields, a Ravens Grou manager, had informed him [Mr. Grant] that Rowe had made cash payments to Mr. Fields and Wendy Scott, another Ravens Group mana for information regarding The Ravens Group's Contract. See Appendi Exhibit 6; AR1058.

Subsequently, on April 14, 2006, Monica Belanger, another Rave Group employee complained to Ravens Group officials that someone h tampered with her security record located on the Joint Personnel Adjudication System ("JPAS") and transferred her employment status f Ravens Group employee to Rowe employee. AR193. This both surpri and concerned Ms. Belanger because she had never worked for Rowe

did not give anyone permission to change her employment status. Id. investigation into Ms. Belanger's concerns revealed that all of The Rav Group's personnel had been transferred to Rowe without The Ravens Group's knowledge or approval. Id.

Intervenor mischaracterized our contentions when it incorrectly concluded that The Ravens Group proffered the information about Row cash payments to Ravens Group managers, and its tampering with the JPAS system, as direct evidence that Rowe had improperly obtained a used Ravens Group confidential and proprietary information to enhanc Rowe's proposal leading to its March 2006 contract award. This information was not proffered as evidence of Rowe's acquisition and us Ravens Group confidential and proprietary information to win the Marcl 2006 contract award. Rather, this information was proffered to demonstrate a pattern of questionable conduct by Rowe to gain a competitive advantage and its proclivity to engage in questionable business practices. This pattern of behavior could also be deemed as circumstantial evidence of Rowe's acquisition and use of confidential and/or proprietary information belonging to The Ravens Group.

The Ravens Group also complained about alleged Rowe miscon directly to DIA contracting officials, in two (2) letters, one dated May 5,

2006, to Guy Torres, the Contracting Officer (see Appendix, Exhibit 7), another dated June 14, 2006, to Mark Bogart, the Chief of Acquisition ( Appendix, Exhibit 8). In both instances, The Ravens Group directed D attention to this potentially serious problem and asked for DIA to interv Notwithstanding The Ravens Group's plea for assistance, DIA did not respond to either communication.

Indeed there is no evidence in the record that DIA ever responde The Ravens Group's concerns or that it took any action whatsoever to address the serious allegations of unfair business practices that directl questioned the integrity of the procurement and award to Rowe.

Rowe's assertion in its Motion to Supplement the Administrative Record, that Mr. Rowe's April 28, 2006, statement was "part of the rec considered by Defendant [DIA] in making the decisions that are the sub of Plaintiff's Complaint" is not supported by the record. First, it is clear from Mr. Rowe's statement, that he provided it on his own volition and in response to any investigation or request by DIA. The statement doe not indicate anywhere that it was prepared pursuant to a request for information from DIA.

Further, although Mr. Rowe makes himself "available" to speak w DIA officials, there is no evidence in the record that anyone from DIA h

any further discussions with Mr. Rowe about this issue. DIA certainly never had any discussions with The Ravens Group, its officials or employees about the allegations.

Given the evidence produced by The Ravens Group and the seri charges it raised regarding the integrity of the procurement, DIA had a to investigate. See Compliance, *supra*. at 203 (contracting officer has to protect integrity of the procurement process); see also FAR § 1.602- FAR § 1.602-2(b). It is apparent, however, that in this case, DIA took r steps to address the serious issues presented by The Ravens Group. Thus, the Court "must determine whether that decision was the result c considered process rather than an arbitrary and capricious choice." C Government Travel, Inc. v. United States, 53 Fed. Cl. 580, 590 (2002).

Based on the above, there is a basis in law and in fact for the Co to review Counts I and V of the Complaint.

## IV.

## DIA'S AWARD DECISION TO ROWE WAS IRRATIONAL AND IS NOT SUPPORTED BY THE RECORD

DIA's contract award decision to Rowe was irrational and is not supported by the Administrative Record. As detailed below, the recorc shows: (1) that The Ravens Group's technical proposal was superior tc

Rowe's proposal; (2) DIA irrationally upgraded Rowe's past performanc (3) DIA's irrational upgrade of Rowe's technical proposal and past performance rating resulted in a defective cost/price-technical evaluati and prejudiced The Ravens Group; (4) DIA's December 2006 contract award to Rowe was unreasonable; and (5) DIA's original contract awar The Ravens Group was proper. The Court is empowered to review the contentions.

Intervenor's contention that the Complaint lacks reasonable investigation is also puzzling in light of the great lengths to which Intev and DIA went to deny The Ravens Group the opportunity to review the agency record. See Rowe Letter, dated January 18, 2007, AR1065, AR1079-81 ("Ravens request for documents should be denied"); DIA Counsel's Letter, dated October 4, 2006, AR253-54 ("we [DIA] do not p to file a formal agency report unless so directed by the GAO").

GAO never ordered DIA to produce an agency report and The Ravens Group was denied an opportunity to review evidence pertinent its protests.

**A. The Ravens Group's Technical Proposal was Superior to Ro**

The Record shows that The Ravens Group's technical proposal v superior to Rowe's proposal; thus, DIA's determination that Rowe

presented the "best value" to the government, was irrational and not supported or supportable by the evidence in the Administrative Record

The report of the Technical Evaluation Panel ("TEP") clearly show that The Ravens Group's technical approach was superior to Rowe's proposal. See AR896 (TEP Evaluation of Best & Final Offers for the D Custodial Contract). The TEP report stated as follows regarding The Ravens Group's technical proposal:

[redacted]

See AR898.

By contrast, the TEP report criticized Rowe's technical proposal. First, the TEP questioned whether Rowe's technical proposal was even responsive. The TEP report stated: [redacted] The TEP next describe Rowe's technical proposal as a [redacted] The TEP stated pertinent part: as follows:

[redacted]

(emphasis added) Id.

Thus, by contrast to its review of The Ravens Group's technical proposal, the TEP report made several stinging criticisms of Rowe's technical proposal.

Accordingly, the TEP report does not support the conclusion that Rowe's technical proposal was [redacted] as compared to The Rav Group's technical proposal, which also received an [redacted] ratin but none of the criticisms directed at Rowe's proposal. See AR895, AR898.

The Source Selection Decision ("SSD") also does not provide support for the proposition that DIA properly rated Rowes and The Rav Group's technical proposals as [redacted] The SSD ranks both technical proposals as [redacted] but provides no explanation for tl

comparable rankings in light of the seriously negative criticisms of Row technical proposal. See AR901 – AR917. See Computer Science Co v. United States, 51 Fed. Cl. 297, 308 (courts and GAO have held that agency's source selection decision is invalid when the underlying evaluation record does not support it).

B. **DIA Irrationally Raised Rowe's Past Performance Rating**

Similarly, DIA irrationally raised Rowe's past performance rating [redacted] to match the [redacted] rating earned by The Ravens Group. The SSD states that The Ravens Group earned its "Excellent" performance rating based on [redacted] past performance questionnai both of which rated The Ravens Group as [redacted] See AR913. Notably, the record does not include the past performance questionnai for The Ravens Group.

The SSD notes that one of the past performance questionnaires Rowe rated Rowe as [redacted] but incorrectly stated that the o questionnaire for Rowe rated the company's past performance as [redacted] AR913. In fact, the DEA Fort Worth Alliance Airport Facility rated Rowe as between [redacted] O nineteen (19) past performance evaluation factors rated, only ten of the factors were rated as [redacted] Five were deemed not applicable

and therefore not rated, [redacted] were rated [redacted] and one facto was rated [redacted] AR872 - AR875.

Rowe's past performance questionnaires were clearly inferior to T Ravens Group, which received all [redacted] ratings—no [redacted] no [redacted] ratings. The record does not reflect a rational basis for D to award Rowe the same [redacted] past performance rating achie by The Ravens Group. See Computer Science Corp., *supra*.; see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (proper focus of Court's scrutiny is the agency's articulated rationale for the decision, and the administrative record underlying it).

**C. DIA's Irrational Upgrade of Rowe's Technical Proposal and Past Performance Rating Prejudiced The Ravens Group**

DIA's irrational upgrade of Rowe's technical proposal and past performance evaluation to [redacted] resulted in an improper and invalid cost/price-technical evaluation.

The Solicitation provided for cost/price-technical analysis under F § 15.101-1, "to determine the best value to the Government." FAR § 15.101-1 states in pertinent part:

> (c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced

> proposal. The perceived benefits of the higher priced proposal shall merit additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

The Evaluation Plan of the Solicitation notified the offerors that D considered non-price factors to be more important than price, as follow

> ( c) Relative weight. Non-price (Technical and Past Performance), when combined, are more important than price. Of the non-price factors, technical is more important than Past Performance. The importance of price in the evaluation for award will increase as the relative differences in non-price factors of offerors decreases

Solicitation, p. 40, AR475.

In this case, the cost/price-technical tradeoff analysis was severe flawed because it was based on DIA's unreasonable technical and pas performance evaluation of Rowe. See Gemmo Impianti SpA, B-29042 2002 CPD ¶ 146 (Navy's source selection decision was unreasonable when the Navy's evaluation supporting the best value decision contain material defects under two of the three technical factors, and the trade analysis was based on an erroneous assumption about relative price difference"); Bendix Oceanics, Inc., B-252235.3, 92-2 CPD ¶ 54 (impro evaluation of technical proposals requires Navy to conduct new cost/technical tradeoff based on new technical evaluation).

**D. DIA's December 2006 Award to Rowe Within 30 Days of its Execution of Option Year II of The Ravens Group's Contract was Unreasonable**

Under the circumstances of this case, DIA's decision to award a contract to Rowe within 30 days of executing Option Year II of The Rav Group's contract for identical services, was unreasonable.

In November 2006, when DIA executed Option Year II of The Ra Group's Contract, it had already made an original contract award to Th Ravens Group, terminated it for convenience, reinstated it, terminated again and reinstated it again. By letter, dated October 12, 2006, DIA notified The Ravens Group of its decision to rescind its second convenience termination of The Ravens Group's Contract, and further stated "The current contract remains in effect until **further notice**." (emphasis added)

DIA's next communication with The Ravens Group regarding the Contract was in November 2006, when DIA executed "Option Period II October 2006 through 30 October 2007)" of the Contract.

DIA knew or should have known at the time it executed Option Y II, that it was continuing to evaluate Rowe's and the other offerors' proposals and that it would be making another award decision within d of its execution of Option Year II to The Ravens Group. Notwithstandir

its superior knowledge, however, DIA did not advise The Ravens Grou its continued evaluation of other offerors or of its intent to make a contr award (and potentially terminate for convenience The Ravens Group's Contract) within a few days of the execution of Option Year II.

DIA's failure to provide The Ravens Group any notice of its inten award of the contract in December was particularly unreasonable giver fact of DIA's notices to Rowe (see October 24, 2006, letter and enclosu AR373 – AR3750, and Olympus (see October 25, 2006, letter and enclosure, AR414 – AR416). DIA notified Rowe and Olympus, but not Ravens Group of its continued review and evaluation of proposals. Un these circumstances, DIA's actions were unreasonable.

Moreover, at the time DIA awarded Option Year II to The Ravens Group, it was not under any pressure or compulsion to do so. Thus, th clear indication to The Ravens Group upon which it reasonably relied v that the execution of Option Year II constituted DIA's final award decisi regarding this procurement.

**E. DIA's Original Contract Award to The Ravens Group was Pro**

Generally, the procuring agency's authority and discretion to terminate a contract for convenience is not reviewable under protest procedures. GAO, however, has determined that under some

circumstances, a bid protest may permit review of an agency's actions connection with its decision to terminate a contract for convenience.

Where, as here, the "contracting agency's action [to terminate a contract for convenience] is based upon the determination that the con was improperly awarded, GAO has held that it would review the validity the procedures leading to the award to the terminated contractor." See Government Associates, B-240682.5, 93-2 CPD ¶ 215 (Oct. 12, 1993). Thus, it is not the termination for convenience itself that is challenged, rather, whether the agency made a rationale and reasonable decision i awarding the contract in the first place.

Moreover, even in those cases, where GAO determines that the initial award was improper, GAO must make a further finding regarding "whether the corrective action taken is sufficient to protect the integrity the competitive procurement system." See Allied Trailer Sales & Renta B-224816.2, 86-2 CPD ¶ 522 (Nov. 5, 1986); O.K. Tool & Die Co., B-219806, 85-2 CPD ¶ 398 (Oct. 9, 1985).

On June 28, 2005, DIA awarded the Contract to The Ravens Gro on the basis that award to The Ravens Group represented the "best va to the government. Since that time, DIA has produced no evidence or information, and there is none in this record that refutes the validity of t

original award decision. Further, even if there were information in the Record demonstrating that the original award to The Ravens Group wa flawed, the corrective action DIA has taken has been totally inadequat protect the integrity of the procurement system.

## V.

## UNDER THE CIRCUMSTANCES OF THIS CASE, THE COURT I AUTHORIZED TO REVIEW WHETHER DIA'S MULTIPLE ERRORS CONSTITUTE A BREACH OF ITS DUTY OF GOOD FAITH AND FAIR DEALING

"When a government official acts under a duty to employ discreti granted formally by law, regulation, or contract, and a lack of good faith alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption. Instead, this **may be inferred from a lack of substanti evidence, gross error, or the like** (emphasis added). TECOM, Inc. v United States, 66 Fed. Cl. 736,769 (2005). DIA has committed gross errors in its handling of this procurement action that individually and collectively arise to the level of bad faith.

In TECOM, the contractor sued the Air Force for breach of a term the contract requiring additional compensation to perform work deferre an out-going contractor. Id. The plaintiff alleged a "breach of the

government's duty of good faith." Id. at 757. In response, the governm argued that the "presumptions of regularity and good faith conduct app here, raising the plaintiff's evidentiary burden to clear and convincing p of a breach of these duties." Id.

The Court in TECOM discussed the presumption of good faith on part of government officials and reviewed the history of the presumptio noted that the Supreme Court has been less willing to presume good fa on the part of government actors. See TECOM at 761.

The Court also discussed the origin of the "irrefragable" proof standard upon which Intervenor relies in its brief. The Court of Appeals the Federal Circuit changed this standard to "clear and convincing" in it decision in AM-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). The Federal Circuit also stated in Am-Pr "that the 'well-nigh irrefragable' or 'clear evidence to the contrary' stand meant 'clear and convincing proof' when the presumption is invoked in situation where a government official allegedly engaged in fraud or in s other quasi-criminal wrongdoing."

The Court concluded that:

> When a government official acts under a duty to employ discretion, . . . clear and convincing evidence is not needed to rebut the presumption.

> Instead, this **may be inferred from a lack of substantial evidence, gross error, or the like**. And when the government actions . . . alleged are . ... actions that might be taken by a party to a contract, **the presumption of good faith has no application** (emphasis added).

TECOM at 769.

Thus, "well-nigh irrefragable proof" is not required to rebut the presumption of good faith on the part of government officials. Under th rationale of TECOM, DIA's substantial gross errors may be deemed as faith.

## A. DIA Failed to Notify The Ravens Group of the Release of Its Contract Price to the Public

It is clear that DIA provided all of the offerors in the competitive ra with The Ravens Group's Contract price following the original award to Ravens Group in June 2005. DIA, however, did not timely notify The Ravens Group of NOSLOT's protest and did not notify The Ravens Gro that it had released The Ravens Group's Contract price. See Appendi Joe N. Ballard Sworn Declaration, Exhibit 9.

Significantly, the email and Contract Modification 0005, DIA provi to The Ravens Group in August 2005, over a month following NOSLOT protest, and after DIA agreed to take corrective action, did not alert The Ravens Group that DIA would also re-evaluate price proposals. This is

significant because DIA also did not notify The Ravens Group that it ha already provided all of the other offerors The Ravens Group Contract p Indeed, DIA never notified The Ravens Group that it had provided it's Contract price to Rowe and the other offerors. See generally Appendix Exhibit 9 ("DIA never informed The Ravens Group or me of the release our Contract price").

As it turned out, this omission was extremely prejudicial to The Ravens Group because it allowed the other offerors to adjust their price proposals with the released Ravens Group contract price as a clear tar By contrast, The Ravens Group did not have the other offerors' prices a did not know that they had its contract price.

When Mr. Rowe told Ravens Group officials in March 2006, that Rowe had reduced its price based on its knowledge of The Ravens Group's proposal, his statement was accurate. What neither Rowe nor Ravens Group official knew at the time was that DIA had provided The Ravens Group's contract price to the other offerors without notifying Th Ravens Group.

Further, when DIA requested revised proposals from the offerors the competitive range, all of the offerors possessed The Ravens Group contract price. As we know, price became the determining factor in the

award of this procurement. Thus, The Ravens Group was at a severe competitive disadvantage when it revised its technical proposal, but no price proposal.

If DIA had merely notified The Ravens Group of the release of Th Ravens Group's contract price, The Ravens Group would at least have an opportunity to re-assess and perhaps revise its own contract price. DIA's failure to provide this critical information was in bad faith and lack any rational basis. Precision Pine & Timber, Inc. v. United States, 62 F Cl. 635, 652 (government has obligation of good faith and fair dealing); SECURENET Co. Ltd v. United States, 72 Fed. Cl. 800, 806 (2006) (co can set aside agency action determined to be arbitrary, capricious, or a abuse of discretion).

## B. DIA's Contract Award to Rowe in December 2006 also Constituted Bad Faith

Likewise, DIA's award of a contract under this Solicitation in December 2006 within thirty (30) days of its execution of Option Year II The Ravens Group's Contract, constituted bad faith.

As discussed above, DIA executed Option Year II of the Contract November 2006 without any reservation or notice to The Ravens Group that DIA was continuing to review the proposals of other offerors relativ

an award of this procurement. Notwithstanding DIA's notice to other offerors, notably Rowe and Olympus, that it was continuing to review th proposals, DIA provided no such notice to The Ravens Group.

**C. Cumulative Errors by DIA Constitutes Bad Faith**

In TECOM, the Court established that an allegation of bad faith tl does not "sink to the level of fraud or quasi-criminal wrongdoing," does require "clear and convincing evidence," but rather, "may be inferred fr lack of substantial evidence, gross error, or the like." TECOM, *supra*. a 769.

In this case, DIA clearly has made many substantial errors in the conduct of this procurement. Among other errors, DIA grossly mishan its receipt of information regarding alleged unfair business practices by of the offerors; it mis-evaluated proposals; failed to cure defective evaluations during corrective action; and inexplicably failed to provide T Ravens Group important notices, including some required by regulatio See discussion below. Thus, under the rationale of TECOM, DIA's act constitute bad faith.

## VI.

## DIA'S FAILURE TO PROVIDE IMPORTANT NOTICES TO THE RAVENS GROUP WAS AN ABUSE OF DISCRETION AND SUBSTANTIALLY PREJUDICED THE RAVENS GROUP

Throughout this procurement, DIA has failed to provide timely notifications of its actions to The Ravens Group. Contrary to Defendar and Intervenor's view, however, DIA's failure to provide timely and adequate notice at least in some instances, severely prejudiced The Ravens Group.

### A. DIA's Failure to Notify The Ravens Group of NOSLOT's Prote of the Original Award to The Ravens Group

FAR § 33.104 (a)(2) states that "Immediately after receipt of the GAO's written notice that a protest has been filed, the agency shall giv notice of the protest to the contractor if the award has been made."

In this case, the first notice that DIA provided The Ravens Group NOSLOT's protest, was August 11, 2005. Of course, this was over a month following NOSLOT's protest and after DIA had already decided take corrective action.

Defendant and Intervenor suggest that the required notice is only perfunctory, and DIA's failure to provide the FAR required notice did no

prejudice The Ravens Group in any manner. Nothing could be further the truth.

The purpose of the notice requirement is to provide the apparent awardee an opportunity to intervene into a protest, and independently assess the protest, and its potential impact on the contract award. It al provides the apparent awardee an early opportunity to protect its intere during the early procedural aspects of the protest, and otherwise take action to secure its award. When, as in this case, the notice is untimel the apparent awardee misses an important opportunity to protect its property interest in the contract.

In this instance, DIA's failure to provide The Ravens Group timely notification of NOSLOT's protest deprived The Ravens Group of the opportunity intervene and assist DIA in the protection of its property rig right Rowe has taken advantage of throughout The Ravens Group's protests.

If DIA had properly notified The Ravens Group and The Ravens Group had had an opportunity to intervene and review the protest, it mi have apprised DIA of aspects of the case that could have allowed DIA summarily resolve the protest without taking corrective action. In additi The Ravens Group and NOSLOT may have been able to negotiate a

resolution allowing for withdrawal of NOSLOT's protest and resolution the final award with The Ravens Group.

Regrettably, we will never know what, if any, contribution The Ra Group would have been able to make the resolve this procurement act in June 2005 because DIA failed to provide The Ravens Group timely notice of NOSLOT's protest.

**B. DIA's Failure to Notify The Ravens Group of the Public Relea of its Contract Price Was Unreasonable and a Clear Abuse o DIA's Discretion**

As noted above, DIA's failure to timely and adequately notify The Ravens Group of its release of The Ravens Group Contract price resul in a substantial competitive disadvantage to The Ravens Group vis-à-v the other offerors. There is no justification for DIA's failure to advise Tl Ravens Group of the release of its price proposal. DIA's failure to prov notice to The Ravens Group of the release of its contract price was unreasonable and an abuse of DIA's discretion.

**C. DIA also Failed to Notify The Ravens Group of Corrective Ac**

In addition to the above, DIA failed to notify The Ravens Group o continued corrective action during the period between October 2006 ar December 2006 even though DIA notified other offerors of its continue corrective action and review of proposals. This is especially striking si

The Ravens Group was in the competitive range and the incumbent contractor.

VII.

**NOSLOT WAS NOT ELIGIBLE FOR CONTRACT AWARD AT THE TIME OF ITS PROTEST AND THEREFORE WAS NOT AN TERESTED PARTY ELIGIBLE TO PROTEST THE AWARD TO THE RAVENS GROUP**

NOSLOT was not an interested party to protest the original awar The Ravens Group in June 2005. Indeed, NOSLOT was clearly not eli for award, a fact DIA should have known. Thus, the Court should deer NOSLOT's protest of DIA's original award to The Ravens Group *void a initio*.

The Comptroller General (GAO) has authority only to decide prot submitted by an "interested party." 31 U.S.C. § 3553 (a). An intereste party is defined as "an actual or prospective bidder or offeror whose di economic interest would be affected by the award of the contract or by failure to award the contract." See 31 U.S.C. § 3551(2). Contractors are not eligible for award do not have a direct economic interest in con award. Therefore, they are not interested parties and have no standin protest. See Admiral Towing and Barge Co., B-29284, B-291849.2, 20 Comp. Gen. Proc. Dec. ¶ 164 (March 6, 2003) (GAO will not consider

protest where business is "ineligible for award and is thus not an intere party that would be affected by the resolution of these issues"); PhilCo Corp., B-212490.2, 83-2 CPD ¶ 567 (Nov. 15, 1983) ("PhilCon was ineligible for award and, therefore, not an 'interested' party under our B Protest Procedures").

According to DIA's Memorandum at AR907, NOSLOT did not possess a required facility clearance at or before the time it filed its pro against the original award to The Ravens Group in June 2005. The So Selection Decision, signed by the Contracting Officer on December 15, 2006, stated at AR907, "I subsequently learned NOSLOT failed to poss the required facility clearance (the DD 254 Contractor Facility Specifica Clarification) that was a part of the Solicitation. According to the Defe Security System's records, NOSLOT's facility clearance expired in 199

The possession of a facility clearance was a critical factor in the award and performance of this procurement. If DIA had been careful a diligent in its review and evaluation of the proposals, it surely would ha discovered this defect in NOSLOT's proposal before December 2006, a year and a half following the original submission of proposals.

Intervenor's argument that DIA could have taken corrective actio with or "without" a protest is irrelevant. According to DIA it took correc action pursuant to NOSLOT's protest.

Similarly, Intervenor's argument that because DIA determined th corrective action was required, it should not be stuck with its bad decis is without merit. First, there is no evidence anywhere in the record tha decision to award the Contract to The Ravens Group was a "bad" decis According to the AR, DIA rated The Ravens Group's proposal as "excellent" in every regard. More importantly, if, as DIA asserts, the corrective action it agreed to take in July 2005 was a result of NOSLO protest, DIA would not have had the occasion to take such corrective action but for NOSLOT's invalid protest.

## VIII.

## UNDER THE TOTALITY OF THE CIRCUMSTANCES, THE COURT IS ENTITLED TO REVIEW WHETHER JUSTICE REQUIRES CANCELLATION OF THIS PROCUREMENT AND COMMENCEMENT OF A NEW PROCUREMENT ACTION

The "totality of the circumstances" is a standard with which the C is familiar. The Court has applied the standard in a variety of situation including Albert L. De Graffenried v. United States, 29 Fed. Cl. 384, 39 (Oct. 1993), a patent case, where the court, *citing* Essex Electro

Engineers, Inc. v. United States, 757 F.2d 247,252-54 (Fed. Cir. 1985) stated "the reasonableness of the government's position is evaluated c the totality of the circumstances, and the government has the burden to demonstrate that its position was reasonable." See also Gargoyles, Inc and Pro-Tech, Inc. v. United States, 45 Fed. Cl. 139, 146, 147 (Oct. 19 (under totality of the circumstances, "position can be substantially justif even though it may have taken an unreasonable stance during an individual phase of the dispute"); Cherry Hill Sand & Gravel Co., v. Unit States, 8 Cl. Ct. 757 (contract provision unreasonable given the totality the circumstances).

Thus, there are instances where an individual error, omission, oversight, defect, or factor may not by itself establish sufficient grounds overturning the decision of the procuring agency. Where, however, as this case, the procurement action is plagued by multiple errors, oversig and defects, we believe the Court may exercise its authority to evaluate cumulative weight of the errors, oversights, and defects, to determine whether the decision of the procuring agency was reasonably justified.

This single procurement action has lasted nearly two (2) years ar resulted in four (4) "best value" contract award decisions of the very sa procurement to three (3) different contractors, fifteen (15) protests befo

GAO by four (4) contractors, including one by Intervenor, at least three terminations for convenience of a contract awarded pursuant to this procurement and at least two (2) revocations of a termination for convenience in this procurement, at least three "corrective action" notic and at least three (3) attempts at corrective action.

In addition, there is clear evidence that DIA failed to take any act regarding The Ravens Group's allegations (supported by evidence) of unfair business practices related to this procurement. Moreover, DIA inexplicably failed on multiple occasions to provide notices to The Rave Group. Further, determinations DIA made in its award decision cannot discerned from the record. For these reasons, among others, the total the circumstances and the integrity of the procurement system require cancellation of this procurement action and commencement of a new procurement action to satisfy this requirement.

## IX.

## THE CAUSES OF ACTION IN THE COMPLAINT ARE ALSO SUPPORTED BY EVIDENCE

Intervenor's assertion that the Complaint has no factual basis is a unfounded. See generally previous discussion. Intervenor suggests th

the Complaint lacks any factual basis because GAO has already revie and issued decisions challenging The Ravens Group's facts.

As discussed above, GAO did not review on the merit some of t critical facts proffered by The Ravens Group, and misinterpreted other facts. Moreover, the Court is empowered to review the underlying rec including the determinations made by GAO to determine the reasonableness of the underlying actions. See 31 U.S.C. § 3556 (GA has authority to review procurement protests but such review does not exclude judicial review); see also Chas. H. Tompkins supra at 719. (C not bound by GAO determination).

Intervenor lists a number of phrases (in bullet form) for the proposition that facts in the Complaint are false. Intervenor's assertio however, misstate and mischaracterize the Complaint. Following are specific responses to Intervenor's alleged factual defects. The respon correspond to Intervenor's contentions.

- This is merely a re-hash of the assertions Intervenor mad Section IB of its brief. Any suggestion that The Ravens Group is attempting to mislead is refuted in paragraphs 7 the Complaint, which clearly states that "DIA has awarde (2) option periods of the Contract . . . based on its determination, as required by Federal Acquisition Regula Subpart 17.207, that the award of those options . . . represented the most advantageous method of fulfilling t

Government's need." See Complaint, ¶ 7; see also Complaint, ¶¶ 13, 29, and 42.

- This inadvertent misstatement is not evidence of an intent deceive or that the Complaint is frivolous.

- See Appendix, Exhibit 1, and Plaintiff's Opposition to Defendant's and Intervenor's Motions to Dismiss and for Judgment upon the Administrative Record (Plaintiff withdr contention that Rowe improperly obtained The Ravens Group's price proposal), p. 2.

- With the exception of Intervenor's June 14, 2006, letter, th was no evidence at the time of the filing of the Complaint contradicted the written witness statements of Ravens Gr officials. GAO misinterpreted the evidence and its decisio not evidence. The critical information regarding Rowe's u business practices were Mr. Rowe's own admissions. Th Ravens Group's officials who made the statements stand their statements. The only other way to have tested their statements would have been through an interview of Mr. Rowe, the only other person present during the alleged discussions.

- The allegations—that Rowe made cash payments to Rave Group managers, and tampered with Ravens Group's personnel record on the JPAS—were provided to demonstrate Rowe's proclivity to engage in questionable business practices, and as circumstantial evidence that Rowe's unfair business practices resulted in the March 20 contract award to Rowe.

- Lieutenant General (Retired) Joe Ballard stands by his January 24, 2007, sworn affidavit. See AR1110. Under t bid protest rules, if DIA maintained that the notice was delivered to The Ravens Group on December 19, 2006, w it did and does, The Ravens Group did not have an opportunity to request a debrief, and was compelled to file

protest late in the afternoon on December 29, 2006, at th
beginning of a long New Years' holiday.

Intervenor's bullet points only reiterate arguments it asserted ear in its brief, and do not show that The Ravens Group lacks evidentiary support for the Complaint or that the Complaint is frivolous.

**A. The Ravens Group Provided Multiple Written Witness Statements to DIA Regarding Rowe's Unfair Busine Practices**

As discussed above, The Ravens Group provided multiple writte witness statements to support its claims, including the written witness statements of two (2) senior Ravens Group officials

In response to Intervenor's suggestion that The Ravens Group's written witness statements are wholly unreliable on the ground of hear we note that The Ravens Group's statements based on the direct discussions with Mr. Rowe are admissions and therefore not hearsay.

**B. The Assertions and Inferences in the Complaint are Justified and Reasonable**

In this section, Rowe again re-hashes its contention that The Ra Group manipulated facts by referring to the execution of the two (2) op periods as "awards" of the option periods.

First, whether Option Year II was awarded or executed, DIA acte unreasonably when it "awarded" or "executed" Option Year II with The

Ravens Group in November without any notice of its continued review other offerors, and then awarded the contract to another contractor 30 days later.

Moreover, contrary to Intervenor's suggestion, the phrase "awarc option" is not an uncommon phrase in bid protest discussions. See Charles J. Merlo, Inc., B-277384, 97-2 CPD ¶ 39 ("funding would be unavailable to award the option); Winfield Mnfg. Co., Inc., B-218537, 8 CPD ¶ 679 (DLA could not award 8(a) contract.... unless... contracting agency negotiates the price at which an 8(a) option is awarded"); Gultc Industries, Inc. et al., B-203265, 82-2 CPD ¶ 59 ("option as awarded requires delivery at an accelerated rate").

### C. Ravens Stands by Its Statement that It Did not Receive Notic the December Award to Rowe until December 29, 2006

As noted above, General Ballard stands by his sworn statement he personally advised DIA on multiple occasions not to use the 202 pre facsimile number to fax official documents to The Ravens Group.

As a result of DIA's decision to fax the December 19th notice to th 202 prefix, The Ravens Group did not receive the notice until the aftern of December 29, 2006, making it impossible to request a debrief withou waiving The Ravens Group's right to protest altogether.

**D. The Ravens Group has produced substantial evidence of Un Business Practices by Rowe**

Based on the discussion above, Counts I and V of the Complaint clearly are not frivolous.

**E. NOSLOT Was Not Eligible to Receive an Award When it Filed Protest in June 2005**

The Administrative Record provides definitive proof that NOSLOT was not eligible for a contract award when it filed its protest of the origi award to The Ravens Group in June 2005. See AR907.

## X.

## THERE IS NO EVIDENCE THAT THE RAVENS GROUP HAS PRESENTED THIS COMPLAINT FOR AN IMPROPER PURPOSE

Based on the above discussion, there is no evidence that the Complaint in this Protest was filed for an improper purpose.

## XI.

## CONCLUSION

Based on the above, Intervenor's motion for sanctions under Rul is unfounded, and should be denied.

Respectfully submitted,

Date: June 8, 2007

By: /s/ Daryle A. Jordan

Daryle A. Jordan

Patrick Henry LLP
7619 Little River Turnpike
Suite 340
Annandale, Virginia 22003
703.256.7754
703.256.7883 (fax)
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June 2007, I caused a copy the foregoing Plaintiff's Opposition to Intervenor Rowe Contracting Services, Inc.'s Motion for Rule 11 Sanctions and Appendix to be filed electronically. I understand that the notice will be sent by the Court's electronic filing system to the following individuals through the Court's system:

Counsel for the United States, Roger Hipp, Esq., United States Department of Justice, Civil Division, Commercial Litigation Branch, 1100 L Street, N.W., Room 12072, Washington, DC 20530, Telephone No. (202) 305-3091, Facsimile No. (202) 514-8640, and

Counsel for Intervenor Rowe Contracting Services, Inc., Kenneth B. Weckstein, Epstein Becker & Green, P.C., 1227 25th Street, N.W. Suite 700, Washington, D.C. 20037-1156, Telephone No. (202) 861-1860, Facsimile No. (202) 861-3560.

/s/ Daryle A. Jordan

Daryle A. Jordan