**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Bid Protest)**

| | | |
|---|---|---|
| THE RAVENS GROUP, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | CFC No. 07-243 |
| | ) | Judge Baskir |
| THE UNITED STATES et al. | ) | |
| Defendant. | ) | |

# APPENDIX TO PLAINTIFF'S OPPOSITION TO INTERVENOR ROWE CONTRACTING SERVICES, INC.'S MOTION FOR RULE 11 SANCTIONS [PUBLIC VERSION]

Daryle A. Jordan
Patrick Henry LLP
7619 Little River Turnpike
Suite 340
Annandale, Virginia 22003
703.256.7754
703.256.7883 (Facsimile)
djordan@patrickhenry.net
Counsel for Plaintiff

DATED: June 8, 2007

[redacted]

# Table of Contents

**Exhibits:**

Raven's Group response to
Rule 11 Notice..................................................Exhibit 1

Statement of Milton J. Grant III, Director of
Facilities Management and Security with
The Ravens Group, Inc.....................................Exhibit 2

Statement of J. Jeff Robertson, Director of
Facilities Management and Security with
The Ravens Group, Inc., dated
April 6, 2006....................................................Exhibit 3

Statement of J. Jeff Robertson dated June 1,2006..............Exhibit 4

Statement of Scott Rowe to Guy Torres,
Contracting Officer, Defense Intelligence
Agency, dated April 28, 2006................................Exhibit 5

Statement of Milton J. Grant III......................................Exhibit 6

Joe N. Ballard response to May 4, 2006 letter
from Guy A. Torres regarding DIA
Corrective Action Pursuant to GAO
Protest No. B-296741.3.....................................Exhibit 7

LTG (Ret) Joe N. Ballard Request for Assistance
Regarding Contract No. HHM40206C0026
to Mark Bogart, Chief of Acquisition with the
Defense Intelligence Agency..............................Exhibit 8

Sworn Declaration of Joe N. Ballard.............................Exhibit 9

# EXHIBIT 1

PATRICK HENRY LLP
attorneys and counselors at law

**VA Office**

7619 Little River Turnpike
Suite 340
Annandale, VA 22003
Tel: 703.256.7754
Fax: 703.256.7883
Toll Free: 866.816.0140

RICHARD E. PATRICK
*admitted in VA, DC*

MAYNARD M. HENRY, SR.
*admitted in VA, DC, PA, MI*

SHARON I. THEODORE-LEWIS
*admitted in MD, DC, NY, OH*

DARYLE A. JORDAN
*admitted in VA, DC, PA*

KIMBERLY J. PHILIPS
*admitted in VA, DC*

CHRISTOPHER L. MCEVILLEY
*admitted in NY, NJ*

**Of Counsel**

KAREN P. CLEAVER-BASCOMBE
*admitted in MD, DC, GA*

HOWARD G. COOLEY
*admitted in VA*

MALIK N. DRAKE
*admitted in VA, DC*
*USPTO Registration*

LAWRENCE B. MANLEY
*admitted in MD, DC*

ETHEL MITCHELL
*admitted in MD, DC, TX*
*US Virgin Islands, Ghana*

YUVORA NONG
*admitted in VA, DC, FL*

MARYLAND OFFICE

5900 Princess Garden Parkway
Suite 640
Lanham, MD 20706
Tel: 240.296.3488
Fax: 240.296.3487

NEW YORK OFFICE

330 Madison Avenue
Sixth Floor
New York, NY 10017
Toll Free: 866.816.0140

May 23, 2007

**Via U.S. Mail, Facsimile & Email**
Mr. Kenneth B. Weckstein, Esquire
Epstein Becker & Green, P.C.
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037-1175

**Re:** ***The Ravens Group, Inc. vs. Unites States***
**Response to Rule 11 Notice**

Dear Mr. Weckstein:

We have reviewed your letter and Rule 11 notice, dated May 4, 2007, as well as the Motion for Sanctions and Memorandum of Law in Support thereof.

Pursuant to our review, we determined that your June 14, 2006, letter did enclose a June 27, 2005, letter from DIA. DIA's June 27, 2005, letter indicates that Rowe received information regarding The Ravens Group's contract price from the government; and, therefore, did not employ improper business practices to receive that information. Our inclusion of this assertion in the Complaint was inadvertent. Accordingly, we hereby notify you, that we no longer contend that Rowe improperly obtained The Ravens Group's contract price, and will no longer assert this position in this litigation. We will notify the Court of our decision not to pursue this position. Contrary to your assertion, however, DIA did not notify (and has never notified) The Ravens Group of the release of its contract price.

In addition, in future proceedings, we will combine our discussion of Counts I and V, since both counts assert essentially the same facts and theory.

The remaining issues in your letter and Rule 11 motion are merely disagreements with The Ravens Group regarding interpretation of the law and the evidence, which do not constitute improper purpose or a frivolous action on our part. Accordingly, this will also put you on notice, that if you pursue the Rule 11 motion and are not successful, we will ask for fees and expenses.

Sincerely,

Daryle A. Jordan

EXHIBIT
1

# EXHIBIT 2

The Ravens GROUP INC. We Can Do That!

# S-W-O-R-N S-T-A-T-E-M-E-N-T

This statement reflects a conversation that took place on Monday, March 27, 2006, inside the Defense Intelligence Agency (DIA) at Bolling Air Force Base in Washington, DC. I, Milton James Grant III (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), was introduced to Scott E. Rowe, of Rowe Contracting Services Inc., by The Ravens Group's Contracting Offices Technical Representative (COTR) Ms. Mary Hennigan. Scott introduced himself as the company's president. Scott and I talked about the fact that he was being awarded the custodial contract we currently possessed as a result of an earlier protest lodged by an unknown company. Scott then stated that he had bid about $3,000,000.00 overall less than we did for the contract, and the only reason he did not win the original bid was because The Ravens Group submitted a work schedule and he did not. I told Scott I understood his position and that business is business. Scott began to tell me how he had Mrs. Verlene Cameron (The previous company's Project Manager) in his pocket feeding him information. Scott then stated he knew of our company in great detail. He stated that initially he thought of protesting the original contract but decided against it not wanting to incur what he felt would have been unnecessary legal fees. He stated he received a phone call some six months later inviting him to submit his bid again if he was still interested in the contract. Scott stated that he bid about 1.5 million a year less than The Ravens Group did on the contract. The following week, on Monday, April 3, 2006, in the DIA cafeteria, in the presence of the company's Executive Vice President; Jeff Robertson, Scott again stated he had bid about 1.5 million a year less than The Ravens Group, and had also reviewed several of our employees via JPAS, the network for monitoring security clearances.

## E-N-D O-F S-T-A-T-E-M-E-N-T

Milton J. Grant III
Director
Facilities Management and Security
The Ravens Group Inc.
9901 Business Parkway
Suite H
Lanham, MD 20706
Tel: 301-577-8585
Fax: 301-577-9097

EXHIBIT
2

# EXHIBIT 3

The Ravens GROUP INC.
*We Can Do That!*

# SWORN STATEMENT

# OF

# J. JEFF ROBERTSON

On Monday, April 3, 2005 around 7:45 am while in the Defense Intelligence Agency (DIA) cafeteria, Milton Grant and I was approached by Scott Rowe, President of Rowe Contracting Services, and one of his project managers. Scott began to engage Milton and me in a conversation about the DIA custodial contract. During the conversation Scott informed us that during the initial bid The Ravens Group submitted a schedule whereas his company did not submit one. He told us that he received a phone call from DIA 6 months later requesting that he resubmit his bid. Scott went on to say that his bid was $1.5 million less than our quote.

I solemnly swear affirm and declare under penalties of perjury and upon personal knowledge that the foregoing is true and correct.

4/06/06
Date

J. Jeff Robertson
Executive Vice President



EXHIBIT 3

# EXHIBIT 4

The Ravens GROUP INC.
*We Can Do That!*

# SWORN STATEMENT

# OF

# J. JEFF ROBERTSON

On Monday, April 3, 2005 around 7:45 am while in the Defense Intelligence Agency (DIA) cafeteria, Milton Grant and I was approached by Scott Rowe, President of Rowe Contracting Services, and one of his project managers. Scott began to engage Milton and me in a conversation about the DIA custodial contract. During the conversation Mr. Rowe informed us that during the initial bid The Ravens Group submitted a schedule whereas his company did not submit one. This schedule was a key aspect of The Ravens Group's proposal, and as such, was carefully guarded information within the company. The only way Mr. Rowe could have known about our schedule was if he inspected our proposal, and we are certain that we did not authorize Mr. Rowe to review our technical proposal. Thus, any access he had to our technical proposal was unauthorized and improper. Mr. Rowe also stated that he knew this was the only reason Rowe did not win the original bid. He told us that he received a phone call from DIA 6 months after the original award to The Ravens Group requesting that he resubmit his bid. This would have been pursuant to the corrective action DIA agreed to take in response to the protest by NOSLOT. Mr. Rowe went on to say that Rowe's resubmitted bid was $1.5 million less than The Ravens Group's price. This statement suggested that Mr. Rowe had also seen our price proposal. Mr. Rowe admitted to having the above information prior to the best and final offer being submitted by Rowe in response to DIA's request for a best and final offer following DIA's agreement to take corrective action based on NOSLOT's protest. Mr. Rowe asserted that he won the award after corrective action because Rowe provided a work schedule based on the one that he had learned The Ravens Group had submitted. Furthermore, he submitted a lower quote then our quote since he was made aware of our numbers.

I solemnly swear affirm and declare under penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_/01/06 [signature]
Date

J. Jeff Robertson
Executive Vice President

5901 Business Parkway • Suite H • Lanham, MD 20706 • 301-577-3585 voice • 301-577-9097 fax
1101 Pennsylvania Ave, NW • 6th Floor • Washington, DC 20004 • 202-756-4556 voice
www.theravensgroup.com

EXHIBIT 4

# EXHIBIT 5

PROTECTED/CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH US COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

April 28, 2006

Guy A. Torres
Contracting Officer
Defense Intelligence Agency
Office of the Acquisition Executive
Building 6000, Bolling Air Force Base
Washington, D.C. 20340-5100

Re: Solicitation HHM402-05-R-0017

Dear Mr. Torres:

The Defense Intelligence Agency ("DIA") has provided us with redacted copies of protests, dated April 6 and 20, 2006, filed by The Ravens Group, Inc. ("Ravens"). Those letters include numerous false allegations about Rowe Contracting Services, Inc. ("Rowe"). The purpose of this letter is to set forth facts that respond to Ravens' allegations. As noted below, I am signing this letter in front of a notary and subject to penalties of perjury. Also, I am available to speak to you or anyone from your Office if you require any additional information regarding this matter.

I understand that the first two protests of Ravens have been dismissed and I expect that the third protest also will be dismissed. Still, because Ravens has made false accusations about my integrity and that of Rowe, I believe that it is necessary to establish the actual facts. Rowe has been providing quality services for 26 years. It has established an excellent reputation and record of performance. It would be wrong to let Ravens' false accusations go unanswered.

EXHIBIT 5

As I noted in my letter of April 26, 2006 to you, DIA awarded a contract to Rowe under Solicitation HHM402-05-R-0017 on March 23, 2006. The contract was

Case 1:07-cv-00243-LMB Document 16-2 *SEALED* Filed 05/18/2007 Page 3 of 9



to cooperate with the incoming contractor to assure that there is a smooth transition and no disruption to services. Also, in custodial services, it is standard, at least initially, for most of the janitors to transfer from the incumbent contractor to the new contractor. That obviously is in the interest of all parties. The incumbent has lost the contract. It either has to lay off the employees, find new work for them that they are willing to accept, and/or make severance payments to the employees. The employees themselves generally want to continue working their same jobs at the same job site. The Government wants to make sure the services continue without interruption. And, no one wants to lay off large numbers of employees. To the extent that the new contractor is willing to hire some or all of the employees of the incumbent and the employees are willing to go to work for the new contractor, it makes perfect sense for the employees to transition to the new contractor.

Here, because there were only seven business days between the time of award and the start of the new contract, there was very little time for transition. Ravens, Rowe and DIA all recognized this and I believe that all parties worked in good faith to facilitate the transition.

Upon notice of award on March 23, 2006, Rowe promptly began plans to commence work. This included making arrangements to deliver approximately $100,000 of new equipment along with an initial delivery of $15,000 of supplies to the DIA building at which Rowe would be performing the contract. Rowe arranged to have the equipment and supplies delivered on Monday, April 3, 2006 between 6:30 a.m. and 9:00 a.m.

Case 1:07-cv-00243-LMB Document 16-2 *SEALED* Filed 05/18/2007 Page 4 of 9



On March 27, 2006, I and Robert Duncan, Rowe's Regional Manager, met with you, Juanita Jones and Mary Hennigan at DIA Building 6000. We met at 9:00 a.m. and spoke for approximately 20 to 30 minutes in the main Lobby. Ms. Hennigan then took me and Mr. Duncan to the DIA cafeteria, where we were introduced with Milton of Ravens. I do not know Milton's last name. I understood that Milton was running the job for Ravens. Ms. Hennigan asked Milton for a smooth transition and to provide me with as much information as possible. Milton asked me what Rowe required. I said that Rowe needed current work schedules and a roster of Ravens' employees working on the job, social security numbers, clearance levels and work hours. Milton said that would be no problem. I then asked when I could get the information. Milton said in a day or two. Milton also asked me not to contact employees while they were working, but said that I could talk to the employees while they were on their breaks. Ms. Hennigan agreed to that as well. I said that I would be sitting at the table in the DIA cafeteria for a bit longer. The above conversations and statements of Milton took place in front of Ms. Hennigan, Mr. Duncan and me.

Shortly after the conversation with Milton ended, employees of Ravens came to the cafeteria to speak with me and Mr. Duncan. During that time, Wendy Scott and Ernest Fields came to the cafeteria and introduced themselves to me. I spoke to Ms. Scott and Mr. Fields separately. They each told me that they were making $60,000 per year. I told them that Rowe would have only one project manager for the job, but that the other could be a day supervisor. I also said that Rowe would pay them $60,000 per year. I told Ms. Scott and Mr. Fields that Milton had told me he would get me the

Case 1:07-cv-00243-LMB Document 16-2 *SEALED* Filed 05/18/2007 Page 5 of 9



schedules and roster of Ravens' employees. Ms. Scott said that she would talk to Milton and that if it was okay with him, she would get me the employee information the next day.

About 30 employees of Ravens spoke with me and Mr. Duncan at the DIA cafeteria between approximately 9:00 a.m. and 12:30 a.m. on Monday, March 27, 2006. The employees, including Ms. Scott and Mr. Fields, indicated that they wanted to and would become employees of Rowe.

Mr. Duncan and I left the cafeteria at about 12:30 pm on March 27, 2006 to speak with Ms. Hennigan. We spoke with Ms. Hennigan for approximately 15 minutes during which time we told Ms. Hennigan that equipment and supplies for Rowe to perform the contract would be delivered on Monday, April 3, 2006 between 6:30 a.m. and 9:00 a.m. Mr. Duncan and I then left DIA Building 6000.

On March 28, 2006 at approximately 8:30 a.m., Mr. Duncan and I returned to DIA Building 6000. We met with Ms. Hennigan and one other DIA employee and started a walking tour of the building. As part of that tour, we went to the basement where we met with Wendy Scott. Ms. Scott advised me, in the presence of Ms. Hennigan, the other DIA employee and Mr. Duncan that she had the information. I told Ms. Scott that I would see her after I had finished our tour. At approximately 10:00 to 10:30 a.m., Mr. Duncan and I went to find Ms. Scott. We found her in the lobby of DIA Building 6000 on our way out of the building. At that time, Ms. Scott gave me two yellow folders which contained the Ravens' roster of employees and schedules.

I planned to leave Washington, D.C. on Wednesday, March 29, 2006 and return to Rowe's offices in Mandeville, La. I also planned to return to Washington, D.C. on Sunday, April 2, 2006 to make sure that the contract started smoothly. This left Ms. Scott to start putting together necessary paper work, personnel files, and new employee schedules on April 1, 2006. To create goodwill and to make sure that the new contract got off on the right foot, Mr. Duncan and I returned to DIA Building 6000 on March 29, 2006 at approximately 8:15 a.m. We were checked into the building by Ms. Hennigan who brought us to meet with Ms. Scott and Mr. Fields. I then met with Mr. Fields and Ms. Scott in the presence of Mr. Duncan. I gave Mr. Fields and Ms. Scott each a $500 signing bonus. I then told Mr. Fields and Ms. Scott that I would see them on Monday at 5:00 a.m. I then left DIA Building 6000. I returned to Mandeville the afternoon of Wednesday, March 29, 2006.

Between Tuesday, March 28, 2006 and Friday, March 31, 2006, Rowe continued to make preparations to begin performance of the contract on April 1, 2006. Among other things, after I received the employee roster from Ms. Scott on March 28, 2006, Rowe used that information to verify whether the employees had the security clearances and the level of clearance that each employees had. Rowe obtained that information from JPAS, which all contractors are authorized to use with the proper authorization and validations. Rowe used its authorization to access JPAS.

The information that Ravens, through Ms. Scott, gave me on March 28, 2006 contained information on 70 Ravens employees. These include the employees who I had met with on March 27, 2006 and had agreed to start work for Rowe on April

Case 1:07-cv-00243-LMB Document 16-2 *SEALED* Filed 05/18/2007 Page 7 of 9



1, 2006. Between March 29, 2006 and March 31, 2006, Rowe used JPAS to attempt to verify security clearances. Rowe only was able to confirm that 14 of the employees had appropriate clearances. Ravens had provided Rowe with insufficient information for the other 56 employees. As of March 31, 2006, with the job scheduled to transfer to Rowe the next day, Rowe obtained ownership of these thru JPAS and that the 14 employees were now Rowe employees.

Later on Friday, March 31, 2006, DIA notified Rowe that DIA had received a protest. In its letter, DIA also advised Rowe that a contract performance stay was in place. DIA advised Rowe that it should cease all preparations to begin performance of the contract, which contract was set to begin the following day on April 1, 2006. Upon receipt of the notice of the bid protest on March 31, 2006, Rowe stopped its preparation to begin performance. Among other things, Rowe stopped activity on JPAS regarding the janitorial employees. This left the 14 employees being shown as working for Rowe.

On April 3, 2006, Mr. Duncan and I went to DIA Building 6000 to arrange to divert the Rowe supplies and equipment that was scheduled to arrive that day. In connection with our visit, Ms. Hennigan signed us in. I advised Ms. Hennigan that I was diverting the supplies and equipment. I was able to stop the equipment shipment at the front gate of the base.

While I was at the DIA building on April 3, 2006, I saw and spoke to Wendy Scott at the escalator for about one to two minutes. Ms. Scott seemed upset. I advised Ms. Scott that Rowe would be back in as soon as the protest was over.

On or about April 5 and 6, 2006, Ms. Scott called me several times. She told me she was unhappy with Ravens. She said that Ravens had fired Mr. Fields. She said that she was working 14-16 hour days. I told Ms. Scott to hang in there.

I spoke to Ms. Scott again on April 7, 2006. She said that she was under a lot of stress and that she was thinking of quitting Ravens. I told Ms. Scott that she should stay with Ravens. Ms. Scott was going to work as Rowe's initial Project Manager for the job and I wanted there to be a smooth transition from Ravens to Rowe when the job did transfer to Rowe.

On or about April 5 or 6, 2006, Ernest Fields called me. I returned his call and spoke with him on April 7, 2006. Mr. Fields told me he had been fired. He asked if I could use him on any job in Washington, D.C. He said he was thinking of going to Mississippi. He also said that Ms. Scott had told Ravens that I had given her $500 for information. I said that was not true and that the money was a good faith payment to get the Project Manager signed up for Rowe. Mr. Fields said that he knew that.

I never paid Mr. Fields or Ms. Scott for information about Ravens. Ms. Scott gave me the employee information, with Ravens' authorization (from Milton), on March 28, 2006. I gave Ms. Scott and Mr. Fields $500 each on March 29, 2006 to make sure that two of Rowe's new, key employees would start and keep the job running smoothly on April 1, 2006 when I would not be in Washington, D.C.

Ravens also suggests that I somehow had confidential information about Ravens because I said that Rowe had won the contract because its price was

$1,500,000 (or $3,000,000) lower than Ravens' price. I do not know what Ravens' price was for the work. I do believe that Rowe's price was substantially lower than Ravens' price. I base that on public information. In DIA's letter of June 27, 2005, DIA notified all offerors that the contract initially had been awarded to Ravens at the price of $21,731,005.09. That price was considerably higher than what the contract price should be and was considerably higher than Rowe's winning bid.

I hope that this information is helpful to you in determining that Ravens' allegations are completely frivolous and that Rowe is a responsible offeror.

I certify under penalty of perjury that the above statement is true.

Scott E Rowe
Scott Rowe

State of Louisiana :
Parish
County of St. Tammany : ss.

I certify that Scott E. Rowe appeared before me on the 2nd day of May, 2006 and executed the aforementioned statement dated April 28, 2006.

Sworn to before me and subscribed in my presence this 2nd day of May, 2006.

(SEAL)

Notary Public
Bar # 20176

My commission expires: at death

cc: Kenneth B. Weckstein

# EXHIBIT 6

The Ravens GROUP INC.
*We Can Do That!*

# S-W-O-R-N S-T-A-T-E-M-E-N-T

This statement reflects a conversation that began on Monday, April 3, 2006, at my residence; 4720 Lauriefrost Court, Alexandria, Virginia. I, Milton James Grant III (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), had engaged in a conversation with Ernest L. Fields, a recently terminated employee of The Ravens Group. I asked Ernest to confirm a rumor I heard involving him and Wendy Scott; the current Project Manager for the custodial contract at DIA both receiving cash payment in the amount of $500.00 each from Scott Rowe, President of Rowe Contracting Services Inc., in exchange for information on Ravens Group employees and the working and scheduling of the contract effort. Ernest stated that both he and Wendy Scott did in fact receive the $500.00 each from Scott Rowe in exchange for help and information to transition the contract from The Ravens Group to Rowe Contracting Services. According to Ernest Fields, this transaction took place on Tuesday, March 28, 2006 for Wendy Scott and on Wednesday, March 29, 2006 for him. The following day, on Tuesday, April 4, 2006 in my office at the company headquarters at 9901 Business Parkway, Lanham, Maryland 20706, Ernest repeated words to the same stating that Scott Rowe gave him and Wendy Scott $500.00 each in exchange for help and information. Ernest stated he returned his money to Scott in fear of being set up.

# E-N-D O-F S-T-A-T-E-M-E-N-T

Milton J. Grant III
Director
Facilities Management and Security
The Ravens Group Inc.
9901 Business Parkway
Suite H
Lanham, MD 20706
Tel: 301-577-8585
Fax: 301-577-9097
Cell: 703-965-6594

EXHIBIT
6

# EXHIBIT 7

The Ravens GROUP INC.
We Can Do That!

May 5, 2006

**Via U.S. Mail and Facisimile**
Mr. Guy A. Torres
Contracting Officer
Virginia Contracting Activity
Bolling Air Force Base
200 MacDill Boulevard—Building 6000
Washington, D.C. 20340-5100

Re: **DIA Corrective Action Pursuant to GAO Protest No. B-296741.3**

Dear Mr. Torres:

This responds to your letter, dated May 4, 2006, and requests clarification of the corrective action you agreed to take in response to our above-referenced protest.

Your letter states that there will be a "new source selection and new source selection decisio but that there will not be a new evaluation. How can there be a new source selection decision witho a new evaluation? In addition, your letter states that the "new source selection will be based on the current evaluation of all offerors' final proposals." We interpret this provision to mean that The Ravens Group would be allowed to revise our proposal for this requirement. In our April 6, 2006, Protest letter, our April 20th supplement to that protest, and our April 21st letter to you, we notified y of compelling and credible evidence we had obtained, including sworn statements, that Rowe Contracting Services, Inc. ("Rowe") had paid for and obtained confidential and proprietary informat regarding our proposal. Thus, it is essential that you allow us, at a minimum, to revise our proposal. To deny us an opportunity to revise our proposal would place this company at a severe competitive disadvantage in the "new source selection" process, and render the "corrective action" you promisec take meaningless. It is undisputable that the integrity of our proposal has been compromised by Rowe's improper, unethical, and potentially unlawful business practices. **Your refusal to honor o valid request to revise our proposal, would leave us no choice but to file another protest to protect our rights.**

Relatedly, we have not heard from you regarding our request for you to disqualify Rowe fro further participation in this procurement action based on its unethical and unfair business practices. We raised serious concerns regarding Rowe's business practices as well as its potential breach of security. We are surprised and concerned that the Defense Intelligence Agency has not acted on our request or contacted us to investigate these serious charges.

We request your response to our request for clarification by close of business Wednesday, M 10, 2006, so we will have adequate time to determine whether we will have to file another protest.

Sincerely,

Joe N. Ballard
President

EXHIBIT
7

# EXHIBIT 8

THE RAVENS GROUP INC.
9901 Business Parkway Suite H
Lanham, Maryland 20706

June 14, 2006

Via U.S. Mail and Facismile
Mr. Mark Bogart
Chief of Acquisition
Defense Intelligence Agency
The Pentagon—AE-Building 6000
Washington, D.C. 20340

Re: Request For Assistance Regarding Contract No. HHM40206C0026

Dear Mr. Bogart:

The Ravens Group, Inc., a Service-Disabled, Veteran Owned Small Business, is the incumbent contractor for Contract No. HHM40206C0026 (the "Contract"), a Defense Intelligence Agency ("DIA") custodial/janitorial contract. We are writing to request your immediate intervention and assistance regarding the Contracting Officer for this procurement, Guy Torres' refusal to address serious concerns we have raised regarding the administration of our Contract. We have attempted to address our concerns with Mr. Torres; however, he has failed to respond to our numerous communications. Thus, as stated below, and detailed in the enclosed "Summary of Concerns," your immediate intervention is required. Among other concerns, Mr. Torres:

1. allowed Rowe Contracting Services, Inc. ("Rowe"), a competitor, unsupervised physical access to The Ravens Group's work area, and its confidential and proprietary information;
2. allowed Rowe access to private information regarding our employees;
3. allowed Rowe to tamper with our security clearance;
4. failed to investigate well-documented evidence of unfair, unethical, and potentially unlawful business practices of Rowe directly related to our performance of the Contract;
5. allowed other contracting officials under his supervision to make false, unverified, and damaging statements to third parties regarding our performance; and
6. without justification, failed to pay The Ravens Group for services performed in April and May 2006.

Mr. Torres' failure to properly administer the Contract and his refusal to respond to our legitimate concerns violate well-established government-wide policies in support of small businesses, including President Bush's Executive Order 13170, which expressly requires all Federal agencies to assist Service-Disabled Veteran Owned Small businesses.

We thank you in advance for your prompt attention to this matter of critical importance to this small business.

Sincerely,

EXHIBIT
8

THE RAVENS GROUP INC.
9901 Business Parkway Suite H
Lanham, Maryland 20706

## SUMMARY OF CONCERNS

### I. BACKGROUND

#### A. Original Contract Award to The Ravens Group

DIA issued RFP No. HHM402-05-R-0017 on April 14, 2005. The RFP solicited proposals to perform janitorial/custodial services at DIA's facility located on Bolling Air Force Base. The Ravens Group was awarded the "Contract" on June 28, 2005, and began performance of the Contract on or about July 1, 2005.

#### B. NOSLOT Protest

On August 30, 2005, DIA notified The Ravens Group, that on June 29, 2005, one day following award of the Contract to The Ravens Group, NOSLOT ("NOSLOT Protest"), one of the offerors, had protested the award of the Contract to The Ravens Group. The protest was ultimately dismissed based on DIA's agreement to take corrective action.[1]

On March 23, 2006, nine (9) months following the original contract award to The Ravens Group, DIA notified The Ravens Group that it had completed the corrective action, and had decided to revoke award to The Ravens Group and re-award the procurement to Rowe.

#### C. The Ravens Group's First Protest

On March 27, 2006, The Ravens Group filed a protest in response to DIA's March 23rd notice that it was revoking the Contract award to The Ravens Group. GAO dismissed this protest April 6, 2006, based on DIA's agreement to take corrective action.

Between March 27, 2006, and April 3, 2006, the following occurred: 1) DIA allowed Scott Rowe, President of Rowe and his representatives access to The Ravens Group's offices and personnel located at DIA's secured facility; 2) several Ravens Group's managers working at the DIA facility admitted that they had accepted significant cash payments from Rowe to provide Rowe with information regarding The Ravens Group; 3) Mr. Rowe admitted that he had previously obtained confidential and proprietary information regarding The Ravens Group, which Rowe used to revise its proposal in response to the corrective action DIA took pursuant to the NOSLOT Protest; and 4) Rowe accessed private information regarding Ravens Group employees that it used to tamper with The Ravens Group's security clearance files located on the Joint Personnel Adjudication System ("JPAS").

---

[1] The corrective action DIA took included re-evaluation of the proposals, including the opportunity for offerors to submit revised proposals.

## II. THE CONTRACTING OFFICER'S REFUSAL TO ADDRESS OUR CONCERNS

### A. Additional Protests Filed by The Ravens Group

Based on the above concerns and others that subsequently learned about, we filed two (2) more protest actions, and asked the General Accountability Office ("GAO") to disqualify Rowe from further participation in this procurement.

In a bid protest letter, dated April 6, 2006, as supplemented on April 20, 2006, we notified Mr. Torres about Rowe's serious misconduct discussed above, including Rowe's unethical and potentially unlawful acquisition and use of confidential information regarding The Ravens Group, and Rowe's unauthorized acquisition of private information concerning Ravens Group's personnel and its use of this information to tamper with the security clearances of our employees—potentially a serious security breach.

Thus, the April 6th and 20th letters contained credible evidence of misconduct and a breach of security that required DIA's investigation and review independent of the protest proceedings.

Notwithstanding the serious nature of the concerns, Mr. Torres **did not** investigate our claims; nor did he report the alleged security breach to the appropriate DIA security official for his/her review or investigation.

### B. Additional Letters to the Contracting Officer

In a May 5, 2006, letter, we again asked Mr. Torres to investigate Rowe's improper, unethical, and potentially unlawful business practices and the undisputed evidence that Rowe had tampered with our employees' security clearances. Mr. Torres **has not** responded to our May 5th letter.

In an earlier letter dated March 29, 2006, we advised Mr. Torres of our receipt of information that Mary Hennigan, the COTR, had provided inaccurate and damaging assessments of The Ravens Group's performance to other agencies with which The Ravens Group had submitted proposals. Ms. Hennigan's negative and untrue assessment of our performance was particularly troubling because DIA officials, including Ms. Hennigan had advised us that our work was outstanding. Indeed, we have not been notified of any deficiency with our work during the entire period of performance. In our March 29th letter, we asked Mr. Torres to intervene to halt the dissemination of unverified and damaging information regarding our performance. Mr. Torres never responded to this letter.

## III. DIA'S REFUSAL TO PAY THE RAVENS GROUP FOR WORK PERFORMED AND ACCEPTED BY DIA

Recently, we have made numerous attempts to contact Mr. Torres regarding DIA's failure to process our invoices and pay us in a timely manner. In particular, DIA has not paid The Ravens Group for work we performed and that DIA accepted in April and May 2006. The amount overdue exceeds $1.2 million, and has severely damaged the cash flow of this small business.

Failure to pay the last two invoices submitted by The Ravens Group compels me to ask the following questions. Is this failure to pay the invoices retribution or punishment to financially harm The Ravens Group due to the current protest?

## IV. CONCLUSION

We relied upon DIA to protect our confidential and proprietary information within its control. We relied upon DIA to be a fair and impartial representative of the Government. DIA, however, allowed our competitor to enter our work space on DIA's facility, which access our competitor used to bribe our personnel and obtain our confidential and proprietary information. The Contracting Officer has ignored the well-documented and credible evidence of the unethical and/or unlawful acquisition of our confidential information and the use of that information to competitively disadvantage The Ravens Group.

The Contracting Officer also has ignored our request for payment and our request that contracting officials under his supervision refrain from distributing false and damaging information regarding our performance.

Thus, given the serious nature of our concerns and the Contracting Officer's apparent refusal to communicate with us, your immediate intervention and assistance is critical.

# EXHIBIT 9

SWORN DECLARATION

0 F

Joe N. Ballard

I, Joe N. Ballard, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a witness over the age of twenty-one (21) and have personal knowledge of the facts stated herein.

2. This sworn declaration is being filed in connection with The Ravens Group, Inc.'s Complaint and Protest currently pending at the U.S. Court of Federal Claims, styled The Ravens Group, Inc. v United States, Case No. 07-243C, protesting the Defense Intelligence Agency's ("DIA") December 19, 2006, award of a contract to Rowe Contracting Services, Inc. ("Rowe") under DIA Solicitation No. HHM402-05-R-0017.

3. I am the President and Chief Executive Officer of The Ravens Group, Inc.

4. I have reviewed and am familiar with Rowe's June 14, 2006, letter (through its counsel), and its enclosure (a letter from DIA to Rowe, dated June 27, 2005). The June 27, 2005, letter from DIA to Rowe disclosed the total price of the contract awarded to The Ravens Group by DIA on or about June 28, 2005.

5. DIA did not advise me or anyone at The Ravens Group of its release of The Ravens Group's contract price in June 2005 prior to or after it awarded the Contract to The Ravens Group. DIA has never advised The Ravens Group of the release of this information. The Ravens Group's first and only notice of DIA's release of our Contract price was Rowe's June 14, 2006, letter enclosing the June 27, 2005, letter from DIA.

6. Following the original award of the Contract to The Ravens Group on or about June 28, 2005, NOSLOT filed a bid protest. In response to NOSLOT's protest, DIA agreed to take corrective action and subsequently asked The Ravens Group, Rowe, and other offerors to submit new best and final offers. DIA never, however, advised The Ravens Group of the release of our Contract price to the other offerors.

7. Because DIA never informed The Ravens Group or me of the release of our Contract price, we were not aware that the other offerors possessed our Contract price at the time DIA requested the revised proposals. The fact that all of the other offerors possessed The Ravens Group's Contract price without our knowledge, placed The Ravens Group at a substantial competitive disadvantage when we prepared and submitted our revised proposals. If we had known of DIA's release of The Ravens Group's Contract price to the other offerors before we submitted our revised proposal on or about November 29, 2005, we would have revised our

EXHIBIT 9

price proposal to be more competitive.

8. I also learned from Rowe via a letter dated January 18, 2007, that DIA through its counsel notified Rowe and another contractor, Olympus Building Services, Inc. of its intent to take corrective action in October 24, 2006. DIA did not notify The Ravens Group of its intent even though The Ravens Group was one of the proposals in the competitive range that DIA was continuing to review for contract award. Specifically, I was not aware of DIA's continued corrective action when DIA executed Option Year II of the Contract in November 2006.

In accordance with 28 U.S.C. § 1746, I solemnly swear affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

May 22, 2007
Date

Joe N. Ballard