# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (Bid Protest)

| | |
|---|---|
| The Ravens Group, Inc.,<br>Plaintiff,<br>v.<br>United States,<br>Defendant,<br>and<br>Rowe Contracting Services, Inc.,<br>Third party/Intervenor. | CFC No. 07-243<br>Judge Baskir |

**APPENDIX TO INTERVENOR ROWE CONTRACTING SERVICES, INC.'S REPLY AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Kenneth B. Weckstein
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037
(202) 861-1860
(202) 861-3560 (fax)
kweckstein@ebglaw.com

Counsel for Intervenor

Date: June 6, 2007

# Table of Contents

**Exhibits:**

Sworn Statement from Scott Rowe
to Guy A Torres, Contracting Officer,
Defense Intelligence Agency,
dated April 28, 2006 .......... Exhibit 1

Letter from Scott E. Rowe to Guy Torres,
Contracting Officer,
Virginia Contracting Activity,
Dated April 26, 2006 .......... Exhibit 2

## Authorities:

### United States Code

28 U.S.C. § 1491……………………………………………..........................Tab A

41 U.S.C. § 605(a)………………………………………………………Tab B

### Federal Acquisition Regulation ("FAR")

FAR § 15.506……………………………………………………………Tab C

# EXHIBIT 1

April 28, 2006

Guy A. Torres
Contracting Officer
Defense Intelligence Agency
Office of the Acquisition Executive
Building 6000, Bolling Air Force Base
Washington, D.C. 20340-5100

Re: Solicitation HHM402-05-R-0017

Dear Mr. Torres:

The Defense Intelligence Agency ("DIA") has provided us with redacted copies of protests, dated April 6 and 20, 2006, filed by The Ravens Group, Inc. ("Ravens"). Those letters include numerous false allegations about Rowe Contracting Services, Inc. ("Rowe"). The purpose of this letter is to set forth facts that respond to Ravens' allegations. As noted below, I am signing this letter in front of a notary and subject to penalties of perjury. Also, I am available to speak to you or anyone from your Office if you require any additional information regarding this matter.

I understand that the first two protests of Ravens have been dismissed and I expect that the third protest also will be dismissed. Still, because Ravens has made false accusations about my integrity and that of Rowe, I believe that it is necessary to establish the actual facts. Rowe has been providing quality services for 26 years. It has established an excellent reputation and record of performance. It would be wrong to let Ravens' false accusations go unanswered.

As I noted in my letter of April 26, 2006 to you, DIA awarded a contract to Rowe under Solicitation HHM402-05-R-0017 on March 23, 2006. The contract was

to cooperate with the incoming contractor to assure that there is a smooth transition and no disruption to services. Also, in custodial services, it is standard, at least initially, for most of the janitors to transfer from the incumbent contractor to the new contractor. That obviously is in the interest of all parties. The incumbent has lost the contract. It either has to lay off the employees, find new work for them that they are willing to accept, and/or make severance payments to the employees. The employees themselves generally want to continue working their same jobs at the same job site. The Government wants to make sure the services continue without interruption. And, no one wants to lay off large numbers of employees. To the extent that the new contractor is willing to hire some or all of the employees of the incumbent and the employees are willing to go to work for the new contractor, it makes perfect sense for the employees to transition to the new contractor.

Here, because there were only seven business days between the time of award and the start of the new contract, there was very little time for transition. Ravens, Rowe and DIA all recognized this and I believe that all parties worked in good faith to facilitate the transition.

Upon notice of award on March 23, 2006, Rowe promptly began plans to commence work. This included making arrangements to deliver approximately $100,000 of new equipment along with an initial delivery of $15,000 of supplies to the DIA building at which Rowe would be performing the contract. Rowe arranged to have the equipment and supplies delivered on Monday, April 3, 2006 between 6:30 a.m. and 9:00 a.m.

On March 27, 2006, I and Robert Duncan, Rowe's Regional Manager, met with you, Juanita Jones and Mary Hennigan at DIA Building 6000. We met at 9:00 a.m. and spoke for approximately 20 to 30 minutes in the main Lobby. Ms. Hennigan then took me and Mr. Duncan to the DIA cafeteria, where we were introduced with Milton of Ravens. I do not know Milton's last name. I understood that Milton was running the job for Ravens. Ms. Hennigan asked Milton for a smooth transition and to provide me with as much information as possible. Milton asked me what Rowe required. I said that Rowe needed current work schedules and a roster of Ravens' employees working on the job, social security numbers, clearance levels and work hours. Milton said that would be no problem. I then asked when I could get the information. Milton said in a day or two. Milton also asked me not to contact employees while they were working, but said that I could talk to the employees while they were on their breaks. Ms. Hennigan agreed to that as well. I said that I would be sitting at the table in the DIA cafeteria for a bit longer. The above conversations and statements of Milton took place in front of Ms. Hennigan, Mr. Duncan and me.

Shortly after the conversation with Milton ended, employees of Ravens came to the cafeteria to speak with me and Mr. Duncan. During that time, Wendy Scott and Ernest Fields came to the cafeteria and introduced themselves to me. I spoke to Ms. Scott and Mr. Fields separately. They each told me that they were making $60,000 per year. I told them that Rowe would have only one project manager for the job, but that the other could be a day supervisor. I also said that Rowe would pay them $60,000 per year. I told Ms. Scott and Mr. Fields that Milton had told me he would get me the

schedules and roster of Ravens' employees. Ms. Scott said that she would talk to Milton and that if it was okay with him, she would get me the employee information the next day.

About 30 employees of Ravens spoke with me and Mr. Duncan at the DIA cafeteria between approximately 9:00 a.m. and 12:30 a.m. on Monday, March 27, 2006. The employees, including Ms. Scott and Mr. Fields, indicated that they wanted to and would become employees of Rowe.

Mr. Duncan and I left the cafeteria at about 12:30 pm on March 27, 2006 to speak with Ms. Hennigan. We spoke with Ms. Hennigan for approximately 15 minutes during which time we told Ms. Hennigan that equipment and supplies for Rowe to perform the contract would be delivered on Monday, April 3, 2006 between 6:30 a.m. and 9:00 a.m. Mr. Duncan and I then left DIA Building 6000.

On March 28, 2006 at approximately 8:30 a.m., Mr. Duncan and I returned to DIA Building 6000. We met with Ms. Hennigan and one other DIA employee and started a walking tour of the building. As part of that tour, we went to the basement where we met with Wendy Scott. Ms. Scott advised me, in the presence of Ms. Hennigan, the other DIA employee and Mr. Duncan that she had the information. I told Ms. Scott that I would see her after I had finished our tour. At approximately 10:00 to 10:30 a.m., Mr. Duncan and I went to find Ms. Scott. We found her in the lobby of DIA Building 6000 on our way out of the building. At that time, Ms. Scott gave me two yellow folders which contained the Ravens' roster of employees and schedules.

I planned to leave Washington, D.C. on Wednesday, March 29, 2006 and return to Rowe's offices in Mandeville, La. I also planned to return to Washington, D.C. on Sunday, April 2, 2006 to make sure that the contract started smoothly. This left Ms. Scott to start putting together necessary paper work, personnel files, and new employee schedules on April 1, 2006. To create goodwill and to make sure that the new contract got off on the right foot, Mr. Duncan and I returned to DIA Building 6000 on March 29, 2006 at approximately 8:15 a.m. We were checked into the building by Ms. Hennigan who brought us to meet with Ms. Scott and Mr. Fields. I then met with Mr. Fields and Ms. Scott in the presence of Mr. Duncan. I gave Mr. Fields and Ms. Scott each a $500 signing bonus. I then told Mr. Fields and Ms. Scott that I would see them on Monday at 5:00 a.m. I then left DIA Building 6000. I returned to Mandeville the afternoon of Wednesday, March 29, 2006.

Between Tuesday, March 28, 2006 and Friday, March 31, 2006, Rowe continued to make preparations to begin performance of the contract on April 1, 2006. Among other things, after I received the employee roster from Ms. Scott on March 28, 2006, Rowe used that information to verify whether the employees had the security clearances and the level of clearance that each employees had. Rowe obtained that information from JPAS, which all contractors are authorized to use with the proper authorization and validations. Rowe used its authorization to access JPAS.

The information that Ravens, through Ms. Scott, gave me on March 28, 2006 contained information on 70 Ravens employees. These include the employees who I had met with on March 27, 2006 and had agreed to start work for Rowe on April

1, 2006. Between March 29, 2006 and March 31, 2006, Rowe used JPAS to attempt to verify security clearances. Rowe only was able to confirm that 14 of the employees had appropriate clearances. Ravens had provided Rowe with insufficient information for the other 56 employees. As of March 31, 2006, with the job scheduled to transfer to Rowe the next day, Rowe obtained ownership of these thru JPAS and that the 14 employees were now Rowe employees.

Later on Friday, March 31, 2006, DIA notified Rowe that DIA had received a protest. In its letter, DIA also advised Rowe that a contract performance stay was in place. DIA advised Rowe that it should cease all preparations to begin performance of the contract, which contract was set to begin the following day on April 1, 2006. Upon receipt of the notice of the bid protest on March 31, 2006, Rowe stopped its preparation to begin performance. Among other things, Rowe stopped activity on JPAS regarding the janitorial employees. This left the 14 employees being shown as working for Rowe.

On April 3, 2006, Mr. Duncan and I went to DIA Building 6000 to arrange to divert the Rowe supplies and equipment that was scheduled to arrive that day. In connection with our visit, Ms. Hennigan signed us in. I advised Ms. Hennigan that I was diverting the supplies and equipment. I was able to stop the equipment shipment at the front gate of the base.

While I was at the DIA building on April 3, 2006, I saw and spoke to Wendy Scott at the escalator for about one to two minutes. Ms. Scott seemed upset. I advised Ms. Scott that Rowe would be back in as soon as the protest was over.

On or about April 5 and 6, 2006, Ms. Scott called me several times. She told me she was unhappy with Ravens. She said that Ravens had fired Mr. Fields. She said that she was working 14-16 hour days. I told Ms. Scott to hang in there.

I spoke to Ms. Scott again on April 7, 2006. She said that she was under a lot of stress and that she was thinking of quitting Ravens. I told Ms. Scott that she should stay with Ravens. Ms. Scott was going to work as Rowe's initial Project Manager for the job and I wanted there to be a smooth transition from Ravens to Rowe when the job did transfer to Rowe.

On or about April 5 or 6, 2006, Ernest Fields called me. I returned his call and spoke with him on April 7, 2006. Mr. Fields told me he had been fired. He asked if I could use him on any job in Washington, D.C. He said he was thinking of going to Mississippi. He also said that Ms. Scott had told Ravens that I had given her $500 for information. I said that was not true and that the money was a good faith payment to get the Project Manager signed up for Rowe. Mr. Fields said that he knew that.

I never paid Mr. Fields or Ms. Scott for information about Ravens. Ms. Scott gave me the employee information, with Ravens' authorization (from Milton), on March 28, 2006. I gave Ms. Scott and Mr. Fields $500 each on March 29, 2006 to make sure that two of Rowe's new, key employees would start and keep the job running smoothly on April 1, 2006 when I would not be in Washington, D.C.

Ravens also suggests that I somehow had confidential information about Ravens because I said that Rowe had won the contract because its price was

$1,500,000 (or $3,000,000) lower than Ravens' price. I do not know what Ravens' price was for the work. I do believe that Rowe's price was substantially lower than Ravens' price. I base that on public information. In DIA's letter of June 27, 2005, DIA notified all offerors that the contract initially had been awarded to Ravens at the price of $21,731,005.09. That price was considerably higher than what the contract price should be and was considerably higher than Rowe's winning bid.

I hope that this information is helpful to you in determining that Ravens' allegations are completely frivolous and that Rowe is a responsible offeror.

I certify under penalty of perjury that the above statement is true.

Scott E Rowe
Scott Rowe

State of Louisiana :
Parish
County of St. Tammany : ss.

I certify that Scott E. Rowe appeared before me on the 2nd day of May, 2006 and executed the aforementioned statement dated April 28, 2006.

Sworn to before me and subscribed in my presence this 2nd day of May, 2006.

(SEAL)

Notary Public Bar # 20176

My commission expires: at death

cc: Kenneth B. Weckstein

# EXHIBIT 2

**Rowe Contracting Service, Inc.**
**5150 Hwy. 22, Suite C-11**
**Mandeville, La. 70471**

PHONE 985 845 2217
FAX 985 845 2337
EMAIL. rowecont@bellsouth.net

**26 April 2006**

**Virginia Contracting Activity**
**AE2B2**
**Building 6000**
**Bolling, AFB, D.C. 20340-5100**

FYI JUE this is from the co. that won the custodial K under protest Guy

**Attn: Mr. Guy Torres, Contracting Officer**

**Reference: HHM402-05-R-0017**

**Mr. Torres:**

As you know, on March 23, 2006, the Defense Intelligence Agency (DIA) awarded the referenced contract to Rowe Contracting Services, Inc. (Rowe) with a start date of April 1, 2006. On March 27, 2006, Mary Hennigan of DIA introduced Scott Rowe to Milton of The Ravens Group, Inc. (Ravens). Ravens was the incumbent contractor. Ms. Hennigan asked Ravens to cooperate in the transition of the contract to Rowe. Milton agreed to do so. Subsequently, numerous employees of Ravens met with Mr. Rowe and Mr. Duncan of Rowe to apply for jobs with Rowe under the new contract scheduled to start on April 1, 2006. Rowe agreed to retain the employees. Ravens also gave Rowe a roster of employees, on March 28, 2006, so that Rowe could verify security clearance levels and complete the process of transferring employees to Rowe. As soon as Rowe received that roster it went on the JPAS website to verify the clearance levels of the employees that it would be taking over and to show that the employees would be employees of Rowe. Since the contract was to start on April 1, 2006, Rowe had very little time to perform its verifications and make the necessary changes. As of Friday, March 31, 2006, Rowe had accomplished the changes for 14 of the employees--who were to start work for Rowe the following day. On that same date, DIA notified Rowe that a protest had been filed and that Rowe was required to stop all work. In response, Rowe stopped work. That included stopping the review of security clearance information and changes to employment status for the employees that were scheduled to go to work for Rowe the next day. Rowe stopped all use of the JPAS system with respect to this contract. This resulted in the 14 employees who had been converted to Rowe employees for the start of the contract continuing to be listed as Rowe employees. Please advise us whether we can go back into the JPAS system and convert the 14 employees back to Ravens employees until such time as DIA completes its corrective action in response to Ravens' protest.

Finally, Ravens has made numerous false accusations about Rowe's integrity. Rowe intends to respond to those false accusations in separate correspondence.

Thank you for your prompt attention to this matter

Rowe Contracting Services, Inc

Scott E. Rowe
President

# TAB A

MS

one which read: "COURT OF CLAIMS"; substituted the item relating to section 1499 for one which read: "1499. Penalties imposed against contractors under eight-hour law"; and deleted items relating to sections 1504 and 1506, which read: "1504. Tort claims" and "1506. Transfer to cure defect of jurisdiction".

Act Sept. 3, 1982, P. L. 97-248, Title IV, § 402(c)(18)(B), 96 Stat. 669, amended the analysis of this chapter by adding the item relating to section 1508.

**1984.** Act July 18, 1984, P. L. 98-369, Division A, Title VII, Subtitle A, § 714(g)(3), 98 Stat. 962 (applicable to any claim for refund or credit filed after 7/18/84, as provided by § 714(g)(4) of such Act, which appears as 28 USCS § 1509 note), amended the analysis of this chapter by adding the item relating to section 1509.

**1992.** Act Oct. 29, 1992, P. L. 102-572, Title IX, § 902(a)(1), 106 Stat. 4516, amended the chapter heading by substituting "UNITED STATES COURT OF FEDERAL CLAIMS" for "UNITED STATES CLAIMS COURT".

**Other provisions:**

**Applicability of amendment made by Act Sept. 3, 1982.** Act Sept. 3, 1982, P. L. 97-248, Title IV, § 407(a)(1), 96 Stat. 670, which appears as 26 USCS § 6221 note, provides in part that the amendment of the analysis of this chapter "shall apply to partnership taxable years beginning after the date of the enactment of this Act".

### CROSS REFERENCES

Organization of Court of Federal Claims, 28 USCS §§ 171 et seq.

Concurrent jurisdiction of district courts, 28 USCS § 1346.

Procedure in Court of Federal Claims, 28 USCS §§ 2501 et seq.

Court of Federal Claims, USCS Court of Federal Claims, Rules 1 et seq.

## § 1491. Claims against United States generally; actions involving Tennessee Valley Authority

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to

remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 [41 USCS § 609(a)(1)], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act [41 USCS § 605].

(b)(1) **[Caution: Subject to savings provisions, the jurisdiction of district courts of the United States over actions described in this paragraph terminated on January 1, 2001, as provided by § 12(d) and (e) of Act Oct. 19, 1996, P. L. 104-320, which appear as a note to this section.]** Both the Unites [United] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(c) Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action against, or founded on conduct of, the Tennessee Valley Authority, or to amend or modify the provisions of the Tennessee Valley Authority Act of 1933 [16 USCS §§ 831 et seq.] with respect to actions by or against the Authority.

(June 25, 1948, ch 646, § 1, 62 Stat. 940; July 28, 1953, ch 253, § 7, 67 Stat. 226; Sept. 3, 1954, ch 1263, § 44(a), 68 Stat. 1241; July 23, 1970, P. L. 91-350, § 1(b), 84 Stat. 449; Aug. 29, 1972, P. L. 92-415, § 1, 86 Stat. 652; Nov. 1, 1978, P. L. 95-563, § 14(i), 92 Stat. 2391; Oct. 10, 1980, P. L. 96-417, Title V, § 509, 94 Stat. 1743; April 2, 1982, P. L. 97-164, Title I, Part A, § 133(a), 96 Stat. 39; Oct. 29, 1992, P. L. 102-572, Title IX, §§ 902(a), 907(b)(1), 106 Stat. 4516, 4519; Oct. 19, 1996, P. L. 104-320, § 12(a), 110 Stat. 3874.)

# TAB B

d.b.a. Commercial Marine Services (1983, DOT CAB) 83-1 CCH BCA Dec ¶ 16232.

Board of contract appeals does not lose jurisdiction over contractor's appeal when Department of Justice files civil complaint in District Court against contractor seeking recovery under fraudulent claims provision of Contract Disputes Act of 1978 (41 USCS § 604) and civil penalties under False Claims Act (31 USCS §§ 3729–3733). Hardrives, Inc. (1991) 98 ID 23.

Board does not have jurisdiction to consider Government's claim under 41 USCS § 604 that it is entitled to award against contractor on basis of alleged misrepresentations of fact in connection with contractor's claims for cost of removing storage tanks. Appeal of Nat'l Constr. Co. (1999, PSBCA) 99-2 BCA ¶ 30509.

**3. —Suspension of board proceedings**

Proceedings before board will not be dismissed or suspended merely on government's allegation of fraudulent conduct by contractor; suspension of proceedings is warranted where government demonstrates that there is real possibility that fraud exists which is of such nature as to effectively preclude board from ascertaining facts and circumstances surrounding claim. Warren Beaves (1983, DOT CAB) 83-2 CCH BCA Dec ¶ 16648.

Pendency of civil fraud suit did not divest Board of jurisdiction requiring it to suspend its proceedings since Congress clearly foresaw that allegations of fraud would arise in government contract disputes, legislative history indicated Congressional intent that Board not be totally ousted of jurisdiction, and although board does not have jurisdiction to determine whether fraud exists, it has jurisdiction to make findings that falsification of documents has occurred. TDC Management Corp. (1989, DOT BCA) 90-1 BCA ¶ 22627.

**4. Statute of limitations**

For purposes of six-year statute of limitations in 41 USCS § 604, government claim arises no earlier than submission of contractor's certified claim under Contract Disputes Act, regardless of when conduct rendering contractor's claim false allegedly occurred. Jana, Inc. v United States (1995) 34 Fed Cl 447, 40 CCF ¶ 76862.

Six-year statute of limitations (41 USCS § 604) begins to run at earliest time that defendant could have been aware of alleged fraud; commission of misrepresentation or fraud does not actually occur until party being defrauded becomes aware of it. TS Infosystems v United States (1996) 36 Fed Cl 570, 41 CCF ¶ 77007 (criticized in Am. Heritage Bancorp v United States (2003) 56 Fed Cl 596).

**5. Remedies**

Remedies available under 41 USCS § 604 are cumulative and not alternative. UMC Elecs. Co. v United States (1999) 43 Fed Cl 776, affd (2001, CA FC) 249 F3d 1337.

Government's costs of review under 41 USCS § 604 can, if properly documented, include costs of review by contracting officer, Defense Contract Audit Agency and Department of Justice. UMC Elecs. Co. v United States (1999) 45 Fed Cl 507.

**6. Miscellaneous**

Fact that contractor's certification of claim pursuant to 41 USCS § 605 exceeds amount to which Board determines he is entitled does not subject him to liability under 41 USCS § 604, since § 604 requires proof of misrepresentation of fact or fraud as prerequisite to liability. Harnischfeger Corp. (1980, ASBCA) 80-2 CCH BCA Dec ¶ 14541.

Board has no authority to order contracting officer to pay money to contractor withheld because of alleged fraud. Fidelity Constr. Co., Inc. (1980, DOT CAB) 80-2 CCH BCA Dec ¶ 14819.

## § 605. Decision by contracting officer

**(a) Contractor claims.** All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim. The preceding sentence does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this Act. Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding. The authority of this subsection shall not

ar statute of limitations in
nent claim arises no earlier
ctor's certified claim under
egardless of when conduct
im false allegedly occurred.
s (1995) 34 Fed Cl 447, 40

nitations (41 USCS § 604)
time that defendant could
ged fraud; commission of
d does not actually occur
ed becomes aware of it. TS
ates (1996) 36 Fed Cl 570,
ized in Am. Heritage Ban-
03) 56 Fed Cl 596).

nder 41 USCS § 604 are
native. UMC Elecs. Co. v
Fed Cl 776, affd (2001, CA

of review under 41 USCS
ocumented, include costs of
ficer, Defense Contract Au-
ent of Justice. UMC Elecs.
9) 45 Fed Cl 507.

certification of claim pursu-
exceeds amount to which
ntitled does not subject him
SCS § 604, since § 604 re-
sentation of fact or fraud as
Harnischfeger Corp. (1980,
A Dec ¶ 14541.
to order contracting officer
ctor withheld because of al-
nstr. Co., Inc. (1980, DOT
Dec ¶ 14819.

the government re-
ed to the contracting
st a contractor relat-
contracting officer.
ng to a contract and
g to a contract shall
aim. The preceding
inst a contractor that
e contracting officer
rwise furnish a copy
the reasons for the
ights as provided in
f made, shall not be
subsection shall not



extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine. This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

**(b) Review; performance of contract pending appeal.** The contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this Act. Nothing in this Act shall prohibit executive agencies from including a clause in government contracts requiring that pending final decision of an appeal, action, or final settlement, a contractor shall proceed diligently with performance of the contract in accordance with the contracting officer's decision.

**(c) Amount of claim; certification; notification; time of issuance; presumption.** (1) A contracting officer shall issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

(2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $100,000—

(A) issue a decision; or

(B) notify the contractor of the time within which a decision will be issued.

(3) The decision of a contracting officer on submitted claims shall be issued within a reasonable time, in accordance with regulations promulgated by the agency, taking into account such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor.

(4) A contractor may request the tribunal concerned to direct a contracting officer to issue a decision in a specified period of time, as determined by the tribunal concerned, in the event of undue delay on the part of the contracting officer.

(5) Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this Act. However, in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer, the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer.

(6) The contracting officer shall have no obligation to render a final decision on any claim of more than $100,000 that is not certified in accordance with

paragraph (1) if, within 60 days after receipt of the claim, the contracting officer notifies the contractor in writing of the reasons why any attempted certification was found to be defective. A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim. Prior to the entry of a final judgment by a court or a decision by an agency board of contract appeals, the court or agency board shall require a defective certification to be corrected.

(7) The certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim.

**(d) Alternative means of dispute resolution.** Notwithstanding any other provision of this Act, a contractor and a contracting officer may use any alternative means of dispute resolution under subchapter IV of chapter 5 of title 5, United States Code [5 USCS §§ 571 et seq.], or other mutually agreeable procedures, for resolving claims. The contractor shall certify the claim when required to do so as provided under subsection (c)(1) or as otherwise required by law. All provisions of subchapter IV of chapter 5 of title 5, United States Code [5 USCS §§ 581 et seq.], shall apply to such alternative means of dispute resolution.

**(e) Termination of authority to engage in alternative means of dispute resolution; savings provisions.** In any case in which the contracting officer rejects a contractor's request for alternative dispute resolution proceedings, the contracting officer shall provide the contractor with a written explanation, citing one or more of the conditions in section 572(b) of title 5, United States Code, or such other specific reasons that alternative dispute resolution procedures are inappropriate for the resolution of the dispute. In any case in which a contractor rejects a request of an agency for alternative dispute resolution proceedings, the contractor shall inform the agency in writing of the contractor's specific reasons for rejecting the request.

(Nov. 1, 1978, P. L. 95-563, § 6, 92 Stat. 2384; Nov. 15, 1990, P. L. 101-552, § 6(a), 104 Stat. 2745; Oct. 29, 1992, P. L. 102-572, Title IX, § 907(a)(1), 106 Stat. 4518; Oct. 13, 1994, P. L. 103-355, Title II, Subtitle D, Part II, § 2351(a)(1), (b), (c), § 2352, 108 Stat. 3322; Feb. 10, 1996, P. L. 104-106, Div D, Title XLIII, Subtitle B, §§ 4321(a)(6), (7), 4322(b)(6), 110 Stat. 671, 677; Oct. 19, 1996, P. L. 104-320, § 6, 110 Stat. 3871; Nov. 18, 1997, P. L. 105-85, Div A, Title X, Subtitle G, § 1073(g)(3), 111 Stat. 1906.)

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

**References in text:**

"This Act," referred to in this section, is popularly known as the Contract Disputes Act of 1978, which appears generally as 41 USCS §§ 601 et seq. For full classification of such Act, consult USCS Tables volumes.

**Amendments:**

**1990.** Act Nov. 15, 1990 added subsecs. (d) and (e).

**1992.** Act Oct. 29, 1992 (effective and applicable as provided by § 907(a)(4) of such Act, which appears as a note to this section), in subsec. (c), in para. (1), deleted "and" following "belief,", and inserted ", and

# TAB C

award document includes information that is different than the signed proposal, as amended by the offeror's written correspondence, the first page shall include the contractor's agreement statement from Block 14 of the OF 307 and the signature of the contractor's authorized representative.

**15.505 Preaward debriefing of offerors.**

Offerors excluded from the competitive range or otherwise excluded from the competition before award may request a debriefing before award (10 U.S.C. 2305(b)(6)(A) and 41 U.S.C. 253b(f) - (h)).

(a)(1) The offeror may request a preaward debriefing by submitting a written request for debriefing to the contracting officer within 3 days after receipt of the notice of exclusion from the competition.

(2) At the offeror's request, this debriefing may be delayed until after award. If the debriefing is delayed until after award, it shall include all information normally provided in a postaward debriefing (see 15.506(d)). Debriefings delayed pursuant to this paragraph could affect the timeliness of any protest filed subsequent to the debriefing.

(3) If the offeror does not submit a timely request, the offeror need not be given either a preaward or a postaward debriefing. Offerors are entitled to no more than one debriefing for each proposal.

(b) The contracting officer shall make every effort to debrief the unsuccessful offeror as soon as practicable, but may refuse the request for a debriefing if, for compelling reasons, it is not in the best interests of the Government to conduct a debriefing at that time. The rationale for delaying the debriefing shall be documented in the contract file. If the contracting officer delays the debriefing, it shall be provided no later than the time postaward debriefings are provided under 15.506. In that event, the contracting officer shall include the information at 15.506(d) in the debriefing.

(c) Debriefings may be done orally, in writing, or by any other method acceptable to the contracting officer.

(d) The contracting officer should normally chair any debriefing session held. Individuals who conducted the evaluations shall provide support.

(e) At a minimum, preaward debriefings shall include—

(1) The agency's evaluation of significant elements in the offeror's proposal;

(2) A summary of the rationale for eliminating the offeror from the competition; and

(3) Reasonable responses to relevant questions about whether source selection procedures contained in the solicitation, applicable regulations, and other applicable authorities were followed in the process of eliminating the offeror from the competition.

(f) Preaward debriefings shall not disclose—

(1) The number of offerors;

(2) The identity of other offerors;

(3) The content of other offerors' proposals;

(4) The ranking of other offerors;

(5) The evaluation of other offerors; or

(6) Any of the information prohibited in 15.506(e).

(g) An official summary of the debriefing shall be included in the contract file.

**15.506 Postaward debriefing of offerors.**

(a)(1) An offeror, upon its written request received by the agency within 3 days after the date on which that offeror has received notification of contract award in accordance with 15.503(b), shall be debriefed and furnished the basis for the selection decision and contract award.

(2) To the maximum extent practicable, the debriefing should occur within 5 days after receipt of the written request. Offerors that requested a postaward debriefing in lieu of a preaward debriefing, or whose debriefing was delayed for compelling reasons beyond contract award, also should be debriefed within this time period.

(3) An offeror that was notified of exclusion from the competition (see 15.505(a)), but failed to submit a timely request, is not entitled to a debriefing.

(4)(i) Untimely debriefing requests may be accommodated.

(ii) Government accommodation of a request for delayed debriefing pursuant to 15.505(a)(2), or any untimely debriefing request, does not automatically extend the deadlines for filing protests. Debriefings delayed pursuant to 15.505(a)(2) could affect the timeliness of any protest filed subsequent to the debriefing.

(b) Debriefings of successful and unsuccessful offerors may be done orally, in writing, or by any other method acceptable to the contracting officer.

(c) The contracting officer should normally chair any debriefing session held. Individuals who conducted the evaluations shall provide support.

(d) At a minimum, the debriefing information shall include—

(1) The Government's evaluation of the significant weaknesses or deficiencies in the offeror's proposal, if applicable;

(2) The overall evaluated cost or price (including unit prices) and technical rating, if applicable, of the successful offeror and the debriefed offeror, and past performance information on the debriefed offeror;

(3) The overall ranking of all offerors, when any ranking was developed by the agency during the source selection;

(4) A summary of the rationale for award;

(5) For acquisitions of commercial items, the make and model of the item to be delivered by the successful offeror; and

(6) Reasonable responses to relevant questions about whether source selection procedures contained in the solicita-

tion, applicable regulations, and other applicable authorities were followed.

(e) The debriefing shall not include point-by-point comparisons of the debriefed offeror's proposal with those of other offerors. Moreover, the debriefing shall not reveal any information prohibited from disclosure by 24.202 or exempt from release under the Freedom of Information Act (5 U.S.C. 552) including—

(1) Trade secrets;

(2) Privileged or confidential manufacturing processes and techniques;

(3) Commercial and financial information that is privileged or confidential, including cost breakdowns, profit, indirect cost rates, and similar information; and

(4) The names of individuals providing reference information about an offeror's past performance.

(f) An official summary of the debriefing shall be included in the contract file.

### 15.507 Protests against award.

(a) Protests against award in negotiated acquisitions shall be handled in accordance with Part 33. Use of agency protest procedures that incorporate the alternative dispute resolution provisions of Executive Order 12979 is encouraged for both preaward and postaward protests.

(b) If a protest causes the agency, within 1 year of contract award, to—

(1) Issue a new solicitation on the protested contract award, the contracting officer shall provide the information in paragraph (c) of this section to all prospective offerors for the new solicitation; or

(2) Issue a new request for revised proposals on the protested contract award, the contracting officer shall provide the information in paragraph (c) of this section to offerors that were in the competitive range and are requested to submit revised proposals.

(c) The following information will be provided to appropriate parties:

(1) Information provided to unsuccessful offerors in any debriefings conducted on the original award regarding the successful offeror's proposal; and

(2) Other nonproprietary information that would have been provided to the original offerors.

### 15.508 Discovery of mistakes.

Mistakes in a contractor's proposal that are disclosed after award shall be processed substantially in accordance with the procedures for mistakes in bids at 14.407-4.

### 15.509 Forms.

Optional Form 307, Contract Award, Standard Form (SF) 26, Award/Contract, or SF 33, Solicitation, Offer and Award, may be used to award negotiated contracts in which the signature of both parties on a single document is appropriate. If these forms are not used, the award document shall incorporate the agreement and award language from the OF 307.