# In the United States Court of Federal Claims

Case No. 07-243C
(Filed: August 2, 2007)
TO BE PUBLISHED

| | |
|---|---|
| **THE RAVENS GROUP, INC.,** *Plaintiff,* v. **THE UNITED STATES OF AMERICA,** *Defendant.* | Bid protest; source selection criteria; corrective action; agency discretion; finding of responsibility, 48 C.F.R. 9.105-2(b); duty to investigate; exercise of options, 48 C.F.R. 17.207(c)(1); prejudice. |

***Daryle A. Jordan***, Patrick Henry LLP, Annandale, VA, Counsel of Record for Plaintiff.

***Roger A. Hipp***, Trial Attorney, Civil Division, Department of Justice, Washington, D.C., Counsel of Record for the Defendant. ***Peter D. Keisler***, Assistant Attorney General, ***Jeanne E. Davidson***, Director and ***Franklin E. White, Jr.***, Assistant Director, on the briefs.

***Kenneth B. Weckstein***, Epstein, Becker & Green, P.C., Washington, DC, Counsel of Record for Intervenor Rowe Contracting Services, Inc.

***Arielle Cohen***, law clerk.

## OPINION

**BASKIR, Judge.**

This is a bid protest case. The Ravens Group, Inc. ("Ravens") was initially awarded and is currently performing a contract for janitorial services for the Defense Intelligence Agency ("DIA") at its Bolling Air Force Base facility. Since the initial award, the contract has been the subject of more than a dozen protests to the Government Accountability Office ("GAO") and at least three rounds of corrective action and

subsequent re-award by the DIA. The most recent corrective action resulted in the award of the contract to Rowe Contracting Services, Inc. ("Rowe") in December 2006. Ravens seeks to continue performing under the contract and to enjoin DIA from awarding the contract to Rowe. Rowe is intervening in this case.

Ravens' claims have evolved since the original bid protest complaint was filed with this court. Ravens has apparently abandoned certain contentions and added others. Ravens' original claims were that Rowe engaged in unfair business practices (Counts I & V); DIA's award of the contract to Rowe was irrational (Count II); DIA breached its duty of good faith and fair dealing towards Ravens (Count III); DIA failed to comply with Federal Acquisition Regulations ("FAR") regarding notice to Ravens of bid protests and other events (Count IV); DIA acted improperly in disturbing the original contract award to Ravens (Count VI); and a final "Totality of the Circumstances" claim (Count VII). Ravens also added two claims in its opposition brief: DIA failed to adequately or appropriately respond to Ravens' allegations of Rowe's unfair business practices (new Count VIII); and DIA's technical and past performance ratings of Rowe were irrational (new Count IX).

The Government has moved to dismiss some of the claims and for judgment on the administrative record on the others. Rowe has submitted motions for complete dismissal and for judgment on the administrative record. Ravens has filed a cross-motion for judgment on the administrative record. We held oral argument on July 31, 2007. The Court ruled from the bench regarding all Counts. This Opinion confirms those rulings. **We DISMISS for lack of jurisdiction Counts I and V. We DISMISS for failure to state a claim Counts II, IV and VII and Count VI in part. Count III was CONCEDED at oral argument, and in any event should be dismissed for failure to state a claim. We hereby GRANT the Government's motion for judgment on the administrative record with regard to Counts VIII, IX and the remainder of Count VI. The Plaintiff's cross motion for judgment on the administrative record is DENIED.**

## I. Facts

### A. Initial Award to The Ravens Group

On April 14, 2005, the DIA issued a Request for Proposal ("RFP") for Contract No. HHM402-05-R-0017 ("Contract"). Administrative Record ("AR") at 35. The Contract was for janitorial services at DIA's Bolling Air Force Base facility. AR at 437. DIA received nine proposals in response to the RFP. AR at 35. NOSLOT Cleaning Services, Inc. ("NOSLOT"), Olympus Building Services, Inc. ("Olympus"), Rowe Contracting Services, Inc. ("Rowe"), and The Ravens Group, Inc. ("Ravens") were among the nine offerors. AR at 895. On June 17, 2005, DIA selected Ravens for award of the Contract. AR at 35. Ravens began performing the Contract on July 1, 2005. AR at 154.

Pursuant to the requirements of 48 C.F.R. § 15.503(b)(1)(iv), DIA disclosed Ravens' total proposed price in its June 27, 2005, award notification letter to disappointed offerors. AR at 233. The DIA also offered debriefings to disappointed offerors, pursuant to 48 C.F.R. § 15.506. *See e.g.* AR at 586.

B. First Round of Protests and Corrective Action

On June 29, 2005, NOSLOT filed a protest with GAO against award to Ravens. AR at 39-47. DIA sent an "override stay" to GAO on July 1, 2005, for continuation of Ravens' performance. AR at 229. However, DIA failed to notify Ravens of this protest, contrary to 48 C.F.R. § 33.104. AR at 229. GAO dismissed NOSLOT's protest on July 8, 2005, as premature because NOSLOT had not yet had its requested debriefing. AR at 74.

On July 12, 2005, after its required debriefing, NOSLOT again protested award to Ravens. AR 78-102. Olympus also filed a protest at this point, on July 19, 2005. AR at 1-13. On August 1, 2005, the DIA issued a notice of corrective action in response to the second NOSLOT protest. AR at 135. On August 2, 2005, the DIA issued a notice of corrective action in response to the Olympus protest. AR at 35. As a result of DIA's decision to take corrective action, GAO dismissed NOSLOT's second protest on August 4 and confirmed that Olympus had withdrawn its protest on August 8. AR at 140, 38. Again, DIA apparently failed to notify Ravens of these actions. Compl. ¶ 9.

In its corrective action, DIA first re-evaluated the nine original proposals and then invited final revised proposals ("FPRs") from the six offerors within the competitive range, including Ravens. AR at 35, 275. The offerors were given guidance on the weaknesses of their original proposals. *See e.g.* AR at 275 (re-evaluation letter to Ravens), AR at 654 (re-evaluation letter to Rowe). The submission deadline for the FPRs was November 22, 2005. *See, e.g.,* AR at 276. Pursuant to 48 C.F.R. 33.104(c)(2)(i), DIA elected to allow Ravens to continue performing services under the Contract during the corrective action. AR at 35, 65.

1. Technical Evaluation Panel and Source Selection Reports

The FPRs were evaluated under three factors: Technical, Past Performance, and Price, with an emphasis on non-price factors. AR at 475. "Non-price factors (Technical and Past Performance), when combined, are more important than Price. AR at 475. Of the non-price factors, Technical is more important than Past Performance." AR at 475. The basis of award was "to the responsible offeror whose offer, conforming to the solicitation, is determined to be the best overall value to the government, price and other factors considered." AR at 475.

In its evaluation of the FPRs submitted in the first round of corrective action, the Technical Evaluation Panel ("TEP") noted that all six bidders improved their proposals. AR at 897. TEP ranked the bidders on technical factors and noted that Ravens' ranking improved from sixth to third and that Rowe remained in second place. NOSLOT was ranked first. AR at 895.

The Source Selection Decision ("SSD") gives Rowe and Ravens the same overall rating of Excellent for Past Performance. AR at 913. Each was rated on the basis of two past performance questionnaires. Ravens received two identical ratings of Excellent. Rowe received one rating of Outstanding (better than Excellent) and one rating between Good and Excellent. AR at 913.

Ravens' proposed price was approximately $3.3 million higher than Rowe's, but Ravens proposed higher staffing levels. The SSD performed a tradeoff analysis and concluded that Rowe offered the best value:

> A comparison between Rowe and the other two offerors (D&A and Ravens Group) is also not difficult. Because Rowe has equivalent ratings to D&A and Ravens in both the Technical and Past Performance evaluation factors, Price again becomes the determinative factor. In this comparison, Rowe would present the better value than either D&A or Ravens Group because Rowe offers the lowest price for a comparable level of performance. . . . Although Ravens Group does propose to staff eight (8) more employees than Rowe, I do not believe the benefit of eight added employees warrants the steep price premium of $3.3M that Raven's proposal is offering. Consequently, I find that the savings of several million dollars between comparably rated offerors far outweighs any small advantage in the number of employees proposed by any particular offeror.

AR at 915.

C. <u>Second Award (to Rowe) and Second Round of Corrective Action</u>

On March 22, 2006, the Agency awarded the Contract to Rowe. AR at 163. Rowe's performance under the Contract was to begin on April 1, 2006. Intervenor's Motion to Supplement the Record, Exhibit 1 at 5, added to the Administrative Record by Order dated June 13, 2007. Hereinafter "Supp. AR"

On March 27, 2006, Ravens protested award to Rowe. AR at 151-60. The grounds of the protest appear to be comparable to Plaintiff's Counts II and VI ("irrational contract award" and notice deficiencies). AR at 151-152. On March 31, 2006, DIA

notified Rowe of Ravens' protest and the required stay of Rowe's performance. AR at 277. In response to the March 27, 2006 protest, DIA issued a notice of a second round of corrective action on April 3, 2006. AR at 163. The GAO dismissed the protest on April 6, 2006. AR at 177.

D. Ravens' Second and Supplemental Protests

On April 6, 2006, Ravens filed a second protest with the GAO. AR at 182-90. In this protest, Ravens first made its allegations of "unfair business practices" on the part of Rowe. Ravens made three allegations: 1) that Rowe learned of Ravens' price before submitting its (Rowe's) FPR; 2) that Rowe learned of and copied Ravens' "work schedule" before submitting its FPR; and 3) that Rowe made payments to two Ravens employees in exchange for information about Ravens Group. During the pendency of this case, Ravens has withdrawn its contention that Rowe's knowledge of Ravens' contract price was improperly obtained. Pl.'s Opp'n Br. at 2.

Ravens accompanied the April 6, 2006, protest with two documents labeled "Sworn Statement" and signed by Milton J. Grant III, Ravens' Director of Facilities Management and Security. The statements were Mr. Grant's report of conversations he had with Scott Rowe, the President of Rowe, on March 27 and April 3, 2006. AR at 189-190. According to Mr. Grant, Mr. Rowe claimed that Rowe won the award because it bid approximately $1.5 million less per year than Ravens and that the only reason Rowe hadn't won the original round of bidding was that Ravens provided a "work schedule" and Rowe did not. AR at 189.

Mr. Grant also asserted that Rowe made $500 payments to two Ravens employees "in exchange for information on Ravens Group employees and the working and scheduling of the contract effort." The payments were made on March 28 and March 29, 2006. AR at 190. The Parties agree that a third "Sworn Statement," from J. Jeff Robertson, Ravens' Executive Vice President, accompanied the April 6, 2006, protest, although it does not appear in that portion of the administrative record. Consol. Stmt. Of Uncontested Facts ("CSUF") at ¶20, AR at 182-90, 1059. Regardless of when precisely it entered the record, Mr. Robertson's statement makes the same allegations as Mr. Grant's.

On April 20, 2006, Ravens filed a supplement to its protest. AR at 192. The supplemental protest alleged that on April 14, 2006, Ravens became aware that Rowe had altered the records of Ravens' employees in the Joint Personnel Adjudication System ("JPAS") to reflect employment with Rowe instead of Ravens. AR at 193. JPAS is a database used by the Department of Defense to maintain information about the security clearances of employees and contractors. Ravens repeated its allegations of $500 payments and interference with JPAS records in a letter to DIA sent April 21, 2006, requesting that Rowe be disqualified from the bidding process. AR at 197.

Following the GAO protests of April 6 and April 20, DIA notified Rowe of Ravens' allegations and provided Rowe with redacted copies of the protests. Supp. AR Ex. 1at 1. In a sworn and notarized letter to DIA dated April 28, 2006, Mr. Rowe responded to the allegations. He attributed his knowledge of Ravens' contract price to DIA's June 27, 2005 award notification letter, which provided the winning bid price to all disappointed bidders. Mr. Rowe confirmed that $500 payments were made to two Ravens employees as signing bonuses to ensure a smooth transition when Rowe was supposed to start performance on April 1, 2006. Supp AR Ex. 1 at 8. Rowe's initial proposal contained a transition/retention plan that incorporated the use of sign-on bonuses. AR at 642-43. Finally, Mr. Rowe confirmed that employees with the proper security clearance had been transferred from Ravens to Rowe in JPAS. Employees frequently transfer from incumbent to incoming contractors. The employee records were transferred in preparation for Rowe's anticipated April 1 start date. Supp. AR Ex. 1 at 7. Mr. Rowe did not address the work schedule allegation in his April 28 letter. However, the Administrative Record shows that Rowe's initial proposal contained a work schedule (AR at 590, 612-17) and that Rowe's FPR did not contain revisions to that schedule (AR at 656-98).

On May 19, 2006, GAO dismissed Ravens' second protest. AR at 220-21. GAO determined that there was no demonstration of competitive prejudice to Ravens. AR at 221. Specifically, GAO found that "[p]roposals were submitted prior to the alleged actions about which Ravens complains, and DIA's proposed corrective action is limited to reconsidering its award decision based on the proposals as already submitted; DIA will not request new or revised proposals, and will not reevaluate the proposals but rather, will only review the evaluations that followed NOSLOT's protest and the award to Rowe, and make a new best value determination." AR at 221.

On June 1, 2006, Ravens submitted a Request for Reconsideration. Ravens submitted a fourth "Sworn Statement," also from Mr. Robertson, dated June 1, 2006, with its Request for Reconsideration. AR at 228. Mr. Robertson's second statement reports the same conversation as his first, with some additional detail. AR at 223. GAO denied the request, reiterating its determination that there was no competitive prejudice to Ravens. AR at 241-43. GAO found that Mr. Grant's and Mr. Robertson's statements did "not indicate that the Rowe official stated that its employees viewed Ravens's work schedule before, or even after, Rowe submitted its FPR, or stated that the firms' work schedule was based on Ravens's." AR at 243. GAO found that any payments made to Ravens employees occurred after award to Rowe and therefore could not have led to enhancements in Rowe's FPR. AR at 241-43. Specifically, GAO noted that "Ravens stated in its April 6 protest that its employees admitted that Rowe had paid them for information regarding Ravens's schedule and employees 'during the pendency of the Ravens Group's Protest.' Ravens's protests, as discussed above, were submitted after Rowe received the contract award and, therefore, after Rowe's FPR had been submitted." AR at 243.

E. Third Award (to NOSLOT) and Third Round of Corrective Action

On September 13, 2006, as a result of the corrective action described in the April 3, 2006 notice (the second round of corrective action), DIA awarded the Contract to NOSLOT. AR at 286. On September 15, 2006, DIA sent Ravens a termination for convenience letter. AR at 1119. Between September 23 and October 13, 2006, Ravens, Rowe and Olympus all protested the award to NOSLOT. AR at 246-252, 295-372, 386-404. One basis of the protests was a deficiency in NOSLOT's security clearance. AR at 319.

On October 24, 2006, DIA notified Rowe and Olympus of DIA's decision to take corrective action. *See* AR at 373-75 and AR at 414-16. DIA had "determined that the awardee, NOSLOT, does not currently possess the Top Secret (TS/SCI) security clearance required by paragraph 24 (Clause 52.999-4031d) of the Solicitation and Amendment 0002. AR at 375. In addition, according to the "Defense Security System's records, NOSLOT's facility clearance expired in 1999." AR at 907.

The Administrative Record does not reflect that DIA provided The Ravens Group the notice that it provided to Rowe and Olympus in October 2006. That notice did not allow, permit or require any offeror to take any action. *See, e.g.,* AR at 375. However, on October 12, 2006, DIA sent Ravens a letter rescinding the September 15 termination for convenience. The letter stated, "[t]his letter is to inform you that the termination for convenience letter dated September 15, 2006, for contract number HHM402-05-C-002 is hereby rescinded. The current contract remains in effect until further notice." AR at 1119.

After receiving notice of the DIA's intent to take corrective action, on November 13, 2006, GAO dismissed the protest filed by Olympus. AR at 419. On December 1 and 6, 2006, GAO dismissed the protests filed by Rowe and Ravens respectively. AR at 382 and 293.

F. Exercise of Options to Renew Ravens' Performance

The original Contract was for one year with the possibility of four one-year extensions. AR at 437-438. On December 20, 2005, while it was considering the FRPs submitted in the first round of corrective action, DIA executed the first option year of the Contract with Ravens, extending the Contract from Oct. 31, 2005 until Oct. 31, 2006. Compl. at ¶ 13. *See also* CSUF ¶ 6. On November 2, 2006, during the third round of corrective action, DIA executed the second option year. Compl. at ¶ 28. *See also* CSUF ¶ 6.

G. Fourth Award (to Rowe) and Ravens' Final GAO Protest

On December 19, 2006, as a result of the corrective action taken in October (the third round of corrective action), DIA awarded the Contract to Rowe. AR at 1055.

Disappointed offerors were notified by letter dated December 19, 2006. *See, e.g.,* AR at 1055.

On December 29, 2006, Ravens protested the selection of Rowe for award with GAO. AR at 1038-41. The protest asserted that DIA's award was in bad faith, due to Ravens' reliance on DIA's October 12, 2006, letter informing them that the Contract "remains in effect until further notice." AR at 1040, 1119. Ravens filed a supplemental protest on January 8, 2006. AR at 1042-59. The supplemental protest complained of various procedural defects in DIA's conduct of the third round of corrective action and asserted that award to Rowe was irrational. Ravens asserted that DIA's award to Rowe contradicted its determination through the exercise of the options that Ravens was the "most advantageous" choice. AR at 1045-47. Ravens also reiterated its "unfair business practices" allegations against Rowe. GAO dismissed the protests on March 15, 2007. AR at 1132-34.

Ravens complained in its December 29, 2006 and January 8, 2007 protests that it did not receive DIA's December 19th notice of award until December 29, 2006, because DIA sent the notice to a facsimile number that Ravens alleges it had advised DIA was an incorrect number. AR at 1041, 1045. GAO requested that Ravens refute receipt of the fax. CSUF ¶ 50. GAO found that "Ravens does not deny that the 202 area code number is under its control, and does not deny that the notice was received at that number on December 19." AR at 1132-34. GAO concluded that "Ravens's failure to monitor its fax machine does not excuse its failure to raise the issues in its supplemental protest within 10 days after December 19." AR at 1133.

On April 19, 2007, Ravens filed its complaint in this Court. Ravens is currently still performing janitorial services at the Bolling facility. Rowe was admitted as an intervenor. It has also filed a motion for sanctions under Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC") which we will address in separate proceedings.

## II. Discussion

### A. Standard of Review

In post-award bid protests brought pursuant to the 1996 revisions to the United States Court of Federal Claims Tucker Act jurisdiction, we must apply the standard of review for agency action established by the Administrative Procedure Act, §5 U.S.C. 706 (1994). See §28 U.S.C. 1491(b)(4). An agency procurement decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." §5 U.S.C. 706(2)(A). Whether agency action is arbitrary or capricious turns on whether: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement

decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974).

Absent evidence to the contrary, the court presumes the regularity of government action. See *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301-02 (1976) (holding that government officials are presumed to act in good faith). To rebut this presumption, a plaintiff must present "well-nigh [undeniable] proof" that the government acted in bad faith. *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 771 (1982).

The hurdle of establishing unreasonableness or abuse of discretion is also a high one. "[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotations omitted).

Similarly, not every violation of statue or regulation requires rejection of the agency's action. See *SMS Data Prods. Group, Inc. v. United States*, 900 F.2d 1553, 1557 (Fed.Cir.1990). The court will not overturn a contract award based on de minimis errors made during the procurement process. *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed.Cir.1994).

A protester must demonstrate the existence of a prejudicial error. *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 213 (2001) ("A bid protestor bears a heavy burden of showing [that] the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.") (internal quotations omitted). Prejudice enters the analysis of bid protest actions in two ways: it is both an element of standing and a prerequisite for injunctive relief. *Textron, Inc. v. United States*, 74 Fed.Cl. 277, 284 (Fed.Cl.,2006). The latter context is relevant to this case. Prejudice is a showing that "there was a 'substantial chance' [the protestor] would have received the contract award but for [the agency's] errors in the bid process." *Bannum Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (internal quotations omitted).

B. Ravens' Claims

Ravens' complaint contains seven counts – Counts I and V alleging "unfair business practices" by Rowe; Count II alleging "irrational contract award" by the DIA; Count III complaining of "DIA's breach of the implied duty of good faith and fair dealing;" Count IV complaining of DIA's "violation of FAR notification requirements;" Count VI asserting that DIA's "initial award to the Ravens Group was proper;" and finally Count VII based on the "totality of the circumstances." Ravens' claims have evolved since the original bid protest complaint was filed with this court. In its opposition brief,

Ravens apparently abandons Counts I and V and adds new counts which we have designated Counts VIII and IX. Respectively, the new counts allege that DIA had a duty, which it failed to fulfill, to investigate Ravens' allegations against Rowe, and that DIA gave irrationally high technical and past performance ratings to Rowe.

1. Counts I and V

We combine our discussion of Counts I and V of Ravens' Complaint. Both are subtitled "Unfair Business Practices." Compl. at p.12, 16. In its opposition to the dispositive motions filed by the Government and Rowe, Ravens acknowledged that the two Counts are essentially the same.

In its Complaint, Ravens originally asserted that Rowe improperly obtained Ravens' contract price and details about Ravens' technical proposal, paid Ravens' employees to obtain information, and tampered with Ravens' employee records in the Department of Defense's security clearance database. Compl. at ¶ 18-21. Ravens has since withdrawn its contention that Rowe's knowledge of Ravens' contract price was improperly obtained. Pl.'s Opp'n Br. at 2.

This Court has jurisdiction only over claims against the United States. *Matthews v. United States*, 72 Fed. Cl. 274, 279 (2006) (citing *Sherwood v. United States*, 312 U.S. 584, 588-89 (1941)). Therefore, to the extent that Counts I and V are directed solely against Rowe, they clearly must be dismissed. Ravens apparently concedes this jurisdictional defect raised by the Government and the Intervenor since it does not defend this point in its opposition brief. Pl.'s Opp'n Br. at 5-13.

2. Count II

Ravens' second count is titled "Irrational Contract Award." The essence of the count is that Ravens' receipt of the original award and the two options constituted determinations by DIA that Ravens represented the "best or most advantageous" contract award for the Government. Compl. at ¶ 42. Therefore, DIA's decision to award the Contract to Rowe in December 2006 was "inexplicable, irrational and unreasonable." Compl. at ¶ 47. Ravens provides very little beyond this, leaving us to construe its argument as best we can.

As presented in its complaint, the first part of Ravens' argument simply makes no sense. Ravens appears to be asserting that a contract award is inherently irrational if, after taking corrective action, the agency alters its determination of which proposal is the best choice. As the Government points out, corrective action by the agency would be utterly pointless if it could not result in alterations to the relative rankings of bidders. Def.'s Br. at 16.

As to the DIA's decision to exercise two option years under the contract, Ravens conflates the considerations relevant to exercising an option with the much more extensive considerations relevant to a contract award. The Federal Acquisition Regulations provide a few relevant sentences of guidance on the exercise of options. 48 C.F.R. 17.207(c) provides that a Contracting Officer may exercise an option only after "determining that . . . [t]he exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors . . .considered." The other factors "[s]hould take into account the Government's need for continuity of operations and potential costs of disrupting operations." Id. 17.207(e). In contrast, pages of regulation are devoted to source selection decisions and evaluation standards. *See e.g.* FAR Subparts 15.1, 15.3. Additional pages in the RFP are devoted to the selection criteria applicable to awarding the contract. AR at 475-477. DIA's decision to exercise the option years, particularly in the face of the drawn out dispute over the underlying contract, simply has no bearing on the rationality of its various decisions regarding the underlying award.

**In any event, at oral argument, the Plaintiff declined to argue that exercise of the option was the functional equivalent of a "best value" contract award. Instead, Counsel contended that his client relied upon the award of the option as evidence that the Contract was no longer in contention. Counsel could not specify how this "reliance" altered his client's circumstances or what prejudice his client suffered.**

With regard to Count II, Ravens fails to state a claim upon which relief can be granted. Therefore, it must be dismissed.

3. Count III

Ravens titles Count III "DIA's Breach of the Implied Duty of Good Faith and Fair Dealing." As in Count II, we are forced to fill in some logical gaps in Ravens' argument in order to understand and address it.

The count appears to be based on DIA's October 12, 2006, rescission of the September 15 termination for convenience and its statement in that letter that "[t]he current contract remains in effect until further notice." AR at 1119. Ravens asserts that 'further notice' was provided by DIA's exercise of the second option year on November 2, 2006. Compl at ¶ 50. "DIA did not advise The Ravens Group that it was continuing to re-evaluate other proposals, and specifically, never advised The Ravens Group of its intent to terminate The Ravens Group's Contract prior to the expiration of the second option period of the Contract." Compl. at ¶ 50.

If Ravens' argument is construed as an objection to DIA's termination or breach of the Contract before its expiration, this Court lacks jurisdiction. 28 U.S.C. § 1491(b) provides no jurisdiction for claims of wrongful termination or breach. *Data Monitor Systems, Inc. v. United States,* 74 Fed. Cl. 66 (2006). Claims for breach must be brought pursuant to the Contract Disputes Act (41 U.S.C. §§ 601-13). *Id. at* 71.

Alternatively, if Ravens' argument is construed as an objection to the award of the Contract to Rowe, it adds nothing to the arguments made in Count II: the original award of a contract or the exercise of an option cannot be construed to tie the hands of the Government in taking corrective action on the contract.

**In light of the Court's ruling on Count II at oral argument, the Plaintiff conceded Count III. Had Count III not been conceded, it would have to be dismissed for lack of jurisdiction or for failure to state a claim upon which relief can be granted.**

4. Count IV

Count IV is titled "Violation of FAR Notification Requirements." Ravens asserts that DIA failed to notify it of NOSLOT's June 29, 2005, protest, NOSLOT's "protest in September" and the October 24, 2006, decision to take corrective action (the third round of corrective action). Compl. at ¶ 62-64.

When basing a protest on the agency's violation of regulations, the plaintiff must demonstrate that the violation was significant and that it was prejudiced by the violation. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir.1999). Prejudice requires a showing that but for the violation, there was a "substantial chance" that the protestor would have received the contract award. *Id.; see also Bannum Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005). Ravens cannot demonstrate prejudice with regard to any of the alleged violations of notification requirements.

DIA's failure to notify Ravens of NOSLOT's June 29, 2005, protest did not create prejudice. GAO immediately dismissed the protest as premature because NOSLOT had not yet had its debriefing.

There was no protest filed by NOSLOT "in September." Presumably, Ravens is referring to NOSLOT's July 12, 2005, protest. That protest was dismissed pursuant to DIA's first decision to take corrective action. Ravens argues in its opposition brief that, given appropriate notice, it might have been able to negotiate a withdrawal of NOSLOT's protest before the DIA took corrective action, thereby preserving the original award of the Contract to Ravens. Pl.'s Opp'n Br. at 27.

This is not a credible argument for prejudice for two reasons. First, Olympus also filed a protest in July of 2005. Notice of NOSLOT's protest, and even a negotiated withdrawal of NOSLOT's protest would not have cleared Ravens' way to an undisputed contract award. Second, DIA has discretion to take corrective action with or without a pending meritorious bid protest (see discussion of Count VI, below). **Ravens did receive belated notice of the protests with its notice of the first round of corrective action, and participated by submitting its FRP along with the other five remaining bidders. Hence, Ravens was not prejudiced.**

Finally, DIA's failure to notify Ravens of its October 24, 2006, decision to take corrective action did not prejudice Ravens because the evaluation was based entirely on previously submitted proposals. AR at 416. No bidder had an opportunity to revise or alter its FRP. Had Ravens received timely notice, it could not have taken any action to alter results of the evaluation.

**Because Ravens fails to assert any circumstances amounting to prejudice within the meaning of *Bannum*, Count IV is dismissed for failure to state a claim.**

5. Count VI

Ravens' Count VI is titled "Initial Award to the Ravens Group was Proper." Insofar as it does not merely repeat the assertions of other counts, Count VI appears to be based on the premise that NOSLOT was ineligible to compete for the contract and therefore ineligible to protest the award. Therefore there was no justification for DIA's disturbing of the original award to Ravens.

This argument fails for three reasons. First, as noted above, Olympus also protested the initial award to Ravens. Ravens has made no assertions regarding Olympus' eligibility to file a protest. Even if NOSLOT's protest lacked merit, DIA's decision to take corrective action was therefore necessary to avoid reviving Olympus' protest at the GAO. **At oral argument, the Plaintiff stated that until it had access to the Administrative Record, it was unaware of the Olympus protest, which presumably furnished a basis – assuming one was needed – for the decision to take corrective action.**

Second, Contracting Officers are "entitled to broad discretion to take corrective action if they determine that such action is necessary to ensure fair and impartial competition." *Omega World Travel Inc., v. United States*, 54 Fed. Cl. 570, 574 (2002) (internal citations omitted). *See also Data Monitor Systems, Inc. v. United States*, 74 Fed. Cl. 66 (2006):

> [T]he government is not obliged to admit an error as a precondition to proposing corrective action, nor is it necessary for an agency to conclude that the protest is certain to be sustained before it may take corrective

> action; where the agency has reasonable concern that there were errors in the procurement, even if the protest could be denied, the GAO views it as within the agency's discretion to take the corrective action.

74 Fed. Cl. at 74 (internal quotations omitted).

Finally, of course, at the time of NOSLOT's initial protest, it was considered an eligible bidder. Ravens has not offered any legal or logical support for the proposition that NOSLOT's later disqualification relates back and nullifies actions taken by DIA and GAO.

**At oral argument, the Plaintiff insisted that the invalidity of the NOSLOT protest was not an essential element of its argument. Essentially, the Plaintiff made a "reverse protest" argument – because the initial award to Ravens was "proper," it was irrational for DIA to reopen the award. As discussed above, we think DIA's actions were well within its discretion. Furthermore, even if such a "reverse protest" argument could have been presented to the GAO, it should have been made not later than ten days after Ravens learned of the basis for the protest. *See Honeywell, Inc.* B- 231365, B- 231365.2, 88-2 CPD ¶ 550 (Comp. Gen. 1988); 4 C.F.R. 21.2(a)(2). At the latest, Ravens learned of the DIA's intention to take corrective action on August 30, 2005. *See* Compl. ¶ 11, AR at 229. Ravens first asserted the argument that the initial award was proper in its September 23, 2006, protest to GAO, more than a year later and after participating in two rounds of corrective action.**

These reasons make clear that Ravens' 'but-for' argument – but for the initial protest by NOSLOT, Ravens' award of the Contract would never have been disturbed – cannot stand. **Count VI is dismissed in part for failure to state a claim upon which relief can be granted. We grant judgment on the administrative record in favor of the Government for the remainder of Count VI.**

6. Count VII

Ravens closes its complaint with Count VII, based on the "Totality of the Circumstances." No arguments are advanced in Count VII that were not addressed in our discussion of the other counts. Therefore it can be dismissed as mere surplusage.

7. New Count VIII

The dismissal of Counts I and V does not completely do away with Ravens' claims based on Rowe's alleged misconduct. In its opposition and cross motion brief, Ravens recast Counts I and V as a totally new allegation against DIA. Pl.'s Opp'n Br. at 5-13. Ravens' argument now is that DIA had a duty to investigate Ravens' allegations of unfair practices by Rowe, which it failed to discharge, thereby tainting the integrity of

the procurement process. We are hard-pressed to find this duty to investigate claim in Ravens' original complaint. The only mention of the DIA in either Count I or V is the last sentence of Count V. After a recital of allegations against Rowe, Ravens states:

> DIA's actions were prejudicial to The Ravens Group, and The Ravens Group respectfully requests that the Court declare that DIA's actions are in violation of law and regulation and enjoin DIA from terminating The Ravens Group's Contract or from beginning or continuing performance of any other contract under [the solicitation].

Compl. at ¶ 73.

Ravens first raised its "duty to investigate" claim in its opposition and cross motion brief. Strictly speaking, Ravens should have moved for leave to amend its complaint to include this and the other new arguments made in its opposition brief. However, both the Government and Rowe took the opportunity to respond to Ravens' new arguments in their reply briefs and did not move the Court to require Ravens' to amend its complaint or to strike these allegations. RCFC 15(b) allows the Court to address issues not raised in the pleadings where they are tried by express or implied consent of the parties. RCFC 15(b).

In order to avoid unnecessary delay, we consider the arguments raised for the first time in the Plaintiff's opposition brief and addressed by the Government and Intervenor in their submissions.

a. Duty to Investigate

Ravens relies on *NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed. Cir. 1986) and *Compliance Corporation v. United States*, 22 Cl. Ct. 193 (1990) for its assertion that DIA had a duty to investigate Ravens' allegations of misconduct by Rowe. Pl.'s Opp'n Br. at 5-7. The cases fail to establish any such duty.

In *NKF Engineering*, a contractor challenged its disqualification from the bidding process for a contract to provide engineering services to the Navy. The Contracting Officer's technical representative, a civilian employee of the Navy, was hired by NKF after the initial bids were made. Afterwards, the bidders had the opportunity to revise their proposals. NKF reduced its price by 33%, becoming the lowest bidder. The Navy chose to disqualify NKF, based on its suspicion of a possible conflict of interest, but made no actual determination that NKF had "inside" information. 805 F.2d at 375.

The Claims Court determined that a bid could be rejected only based on actual improprieties, not on merely the appearance of impropriety. *NKF Engineering, Inc. v. United States*, 9 Cl. Ct. 585, 592 (1986). The Federal Circuit reversed, and upheld NKF's disqualification. However, the Federal Circuit's decision is premised on upholding the broad discretion of the Contracting Officer, *allowing* him to take actions in

response to suspected improprieties "[d]espite the seeming absence of any authority expressly authorizing the actions taken." 805 F.2d at 377 (quoting Claims Court). Nowhere in the opinion is there any language *imposing* a duty to take particular actions with regard to apparent improprieties.

In *Compliance Corp*., the bidder solicited protected information from a rival bidder's employees. Compliance's actions apparently did not directly violate any laws or regulations. However, the agency disqualified Compliance based on the appearance of impropriety. Like the Federal Circuit in *NFK Engineering*, the Claims Court upheld the authority of the Contracting Officer, but did not impose any affirmative duty:

> Like *NKF Engineering*, in this case there is apparently no . . . statute or regulation expressly authorizing the contracting officer to disqualify Compliance based on an appearance of impropriety. However, in *NKF Engineering* the Federal Circuit found the contracting officer's authority to disqualify Compliance based on an appearance of impropriety is inherent in his duty to "safeguard[ ] the interests of the United States in its contractual relationships," citing 48 C.F.R. § 1.602.2 (1985).

22 Cl. Ct. at 201 (internal citations omitted).

The Plaintiff also cites *R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1324 (Fed. Cir. 2003) for the assertion that "procurement officers **must act** to prevent an appearance of impropriety..." Pl.'s Opp'n Br. at 5. (emphasis added by Plaintiff). The selection of the quotation is misleading. The full sentence reads:

> The trial court relies on *NFK Engineering, Incorporated v. United States*, for the proposition that procurement officers must act to prevent an appearance of impropriety in order to meet FAR requirements of "safeguarding the interests of the United States in its contractual relationships," 48 C.F.R. § 1.602-2 (2000), and ensuring that "contractors receive impartial, fair, and equitable treatment," id. § 1.602-2(b) (2000).

339 F.3d at 1324. Not only is the Federal Circuit merely reporting the lower court's characterization of *NFK Engineering*, but it goes on to distinguish *NFK Engineering* as inapplicable.

b. DIA's Response to the Allegations

Even if we accept that DIA had a duty to investigate Ravens' allegations against Rowe, Ravens' cannot demonstrate that DIA failed in that duty. The record does contain evidence that DIA considered Ravens' allegations and we so conclude. A May 4, 2006, letter from DIA to a Mr. Ballard at The Ravens Group, LLC states:

> [T]he Government has reviewed the allegations contained in the protest by the Ravens Group and has decided to take the following corrective action. The Agency intends to conduct a new source selection and a new source selection decision will be issued.

AR at 202. The letter lists the bid protest number for Ravens' March 27, 2006, protest rather than its April 6 protest (B-296741.3 instead of B-296741.4). However, the date of the letter and its reference to "allegations" suggest that it was intended to address the later protest. This conjecture is unnecessary, however, because Ravens mistakes the standard of review applicable to agency actions in bid protest cases.

In its final brief, Ravens insists that the Administrative Record "confirms that DIA *did not* review the available evidence and took *no* action to address The Ravens Group's contentions that Rowe had engaged in unfair business practices to obtain its March 2006 Contract Award." Pl.'s Resp. Br. at 4 (emphasis in original). The Plaintiff has "the burden of showing that the agency did not consider all relevant factors and failed to articulate a rational connection between the facts found and the choice made." *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed.Cl. 350, 366 -367 (2004). The Plaintiff cannot do so.

DIA's eventual award of the Contract to Rowe after a third round of corrective action in December of 2006 constituted an affirmative finding of Rowe's responsibility. 48 C.F.R. 9.105-2(b). Such a finding is "not readily susceptible to reasoned judicial review" and "affirmative determinations of responsibility generally will not be overturned absent allegations of fraud or bad faith." *Hayes Intern. Corp. v. United States*, 7 Cl. Ct. 681, 687 (Cl. Ct. 1985). The Federal Circuit has recently confirmed that an affirmative finding of responsibility does not need to be exhaustively documented in the administrative record:

> Contracting officers are not obligated by the APA to provide written explanations for their actions. Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing. *See John C. Grimberg Co. v. United States*, 185 F.3d at 1303. Nor are they formal rulemakings. As the government correctly points out, where the contracting officer makes a determination of responsibility, as opposed to the situation in which he makes a determination of non-responsibility, the regulations do not require the contracting officer to "make, sign and place in the contract file a determination of" responsibility which states the basis for the determination. 48 C.F.R. § 9.105-2(a).

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337-8 (Fed. Cir. 2001).

DIA had ample material before it to justify its finding of responsibility and award to Rowe. Of the four allegations made by Ravens, the first is entirely without basis; Ravens itself has belatedly dropped its assertion that Rowe received improper notice of Ravens' price. The second allegation, regarding work schedules, is equally baseless; the record shows that Rowe had a work schedule in its original proposal and made no alterations to it in the FPR. AR at 590, 612-17, 656-98. Mr. Rowe's letter to the Contracting Officer in response to Ravens' April 6, 2006, protest provides rational explanations for circumstances giving rise to the other two allegations (that Rowe made payments to Ravens employees and transferred their JPAS records). Rowe's actions were taken in order to assure a smooth transition in a short period of time.

Ravens cannot demonstrate that DIA's refusal to disqualify Rowe was arbitrary and capricious in the face of the evidence in the record. Therefore we grant judgment on the administrative record in favor of the Government as respects new Count VIII.

8. New Count IX

Ravens once again makes a new argument in its opposition brief in the guise of further development of Count II. Ravens asserts that it (Ravens) had a better technical proposal than Rowe and that DIA irrationally inflated Rowe's past performance ratings, resulting in a faulty cost/price-technical evaluation. Pl.'s Opp'n Br. at 14-15. For the reasons mentioned in our discussion of the 'new' Count VIII above, and because these allegations are presumably the result of the Plaintiff's access to the Administrative Record during litigation, we consider this argument. However, we find that it is not supported by the Administrative Record, and therefore grant judgment in favor of the Government.

The claim that Ravens had a superior technical proposal is based on the TEP report. In this report, Rowe received the second best ranking for its technical proposal, following NOSLOT. AR at 895. The Ravens Group was rated third. AR at 895. Although Rowe is rated second, the report criticizes Rowe's proposal, stating that Rowe's Best and Final offer is "an improvement, but a disappointment." The report also notes other areas where Rowe is lacking. AR at 898. Despite the comments, Rowe's technical proposal was rated Excellent. *Id.* The TEP report states that Ravens made a number of positive changes to its proposal, and it is also rated Excellent. *Id.* Ravens argues that Rowe's receipt of an "Excellent" technical rating was irrational.

As discussed above, it is the Plaintiff's burden to demonstrate irrationality in the face of the deference normally allotted to agency determinations. Ravens fails to meet that burden. The TEP report shows careful consideration and weighing of various technical factors. AR at 895-900.

The Plaintiff also argues that DIA's past performance rating of Rowe is unreasonable. In the Source Selection Decision, DIA rated Rowe's past performance as Excellent. AR at 912-913. It also rated Ravens' past performance as Excellent. *Id.* The data concerning Ravens' past performance was supplied by questionnaires from two companies, both of which gave Ravens a rating of Excellent. AR at 913. The data concerning Rowe's past performance was also supplied by two companies for which Rowe previously worked. *Id.* One company rated Rowe as Outstanding. AR 867-71. The other company gave Rowe different ratings on each question, ranging from 3-Fair to 5-Excellent. AR at 872-75. Taken together, the average of the second questionnaire is 4.64, which is between Good and Excellent. *Id.* Combined with the Outstanding rating of Rowe's first questionnaire, it was not irrational for DIA to give Rowe an overall past performance rating of Excellent. Ravens' allegation of irrationality is again baseless.

Because Rowe's technical and past performance ratings were equivalent to Ravens' while its price was significantly lower, it was not irrational for DIA to award the Contract to Rowe. With regard to the new Count IX, we grant judgment on the administrative record in favor of the Government.

9. Allegations of Deficiencies in the GAO Record

In its final brief, Ravens asserts for the first time that DIA failed to provide a proper record to the GAO. Pl.'s Resp. Br. at 6-8. Because this argument was introduced at a time when the Government and Intervenor had no opportunity to respond to it in the course of briefing, we consider it out of order. *See* the Court's Special Procedures Order, issued April 20, 2007. Nevertheless, we point out (as the Plaintiff itself notes on page 8 of its response brief) that in this Court "it is the agency's decision, not the decision of the GAO that is the subject of judicial review." *Chas H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 719 (Cl. Ct. 1999). Whatever documents DIA may or may not have provided to GAO are irrelevant to our review of DIA's determinations with regard to this Contract. Ravens has, of course, now had access to the entire administrative record.

III. Conclusion

For the reasons discussed above, we find that all of Ravens' claims are without merit. **We DISMISS for lack of jurisdiction Counts I and V. We DISMISS for failure to state a claim Counts II, IV and VII and Count VI in part. Count III was CONCEDED at oral argument, and in any event should be dismissed for failure to state a claim. We hereby GRANT the Government's motion for judgment on the administrative record with regard to Counts VIII, IX and the remainder of Count VI. The Plaintiff's cross motion for judgment on the administrative record is DENIED.**

The Clerk of the Court is directed to dismiss the Complaint. Fees and costs are hereby awarded to the Defendant and Intervenor.

**IT IS SO ORDERED.**

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge