# In the United States Court of Federal Claims

Case No. 07-243C
(Filed: October 31, 2007)
TO BE PUBLISHED

| | |
|---|---|
| **THE RAVENS GROUP, INC.,** *Plaintiff,* v. **THE UNITED STATES OF AMERICA,** *Defendant,* and **ROWE CONTRACTING SERVICES, INC.,** *Intervenor.* | Rule 11; sanctions; bid protest; pleadings; administrative record; 28 U.S.C. § 1491; withdrawal of claims; factual allegations; legal arguments; evidentiary support; frivolous legal theories. |

***Daryle A. Jordan***, Patrick Henry LLP, Annandale, VA, Counsel of Record for Plaintiff.

***Roger A. Hipp***, Trial Attorney, Civil Division, Department of Justice, Washington, D.C., Counsel of Record for the Defendant. ***Peter D. Keisler***, Assistant Attorney General, ***Jeanne E. Davidson***, Director and ***Franklin E. White, Jr.***, Assistant Director, on the briefs.

***Kenneth B. Weckstein***, Epstein, Becker & Green, P.C., Washington, D.C., Counsel of Record for Intervenor Rowe Contracting Services, Inc.

***Lauren A. Weeman***, law clerk.

## OPINION

**BASKIR, Judge.**

This case is before the Court on a Motion by bid protest Intervenor Rowe Contracting Services, Inc. ("Rowe") for Rule 11 sanctions against the Plaintiff, The Ravens Group, Inc. ("Ravens"), and its attorney, Daryle Jordan.

The Court finds that the pleadings filed by the Plaintiff rest on tenuous legal and factual grounds at best but were not filed for an improper purpose and do not warrant Rule 11 sanctions. **The Court therefore DENIES Intervenor Rowe's Motion.**

## I. Background

A full recital of the facts is set forth in our Opinion granting the Government's Motion to Dismiss several of the Plaintiff's claims, granting the Government's Motion for Judgment on the Administrative Record on the remaining claims, and denying the Plaintiff's Cross-Motion for Judgment on the Administrative Record. *The Ravens Group, Inc. v. United States*, No. 07-243C (August 2, 2007) ("Opinion"). We therefore include below only those facts relevant to the sanctions issue.

### A. Initial Award to Ravens, First Round of GAO Protests, and DIA Corrective Action

Ravens was awarded a contract for janitorial services at the Defense Intelligence Agency's ("DIA") Bolling Air Force Base facility on June 17, 2005. Ravens was selected from a group of nine offerors, including NOSLOT Cleaning Services, Inc. ("NOSLOT"), Olympus Building Services, Inc. ("Olympus"), and Rowe, all of which were in the competitive range. Ravens began performing the contract on July 1, 2005. Opinion at 2.

Shortly after award of the contract, both NOSLOT and Olympus filed protests with GAO. *Id.* at 3. GAO dismissed NOSLOT's protest when DIA decided to take corrective action and Olympus subsequently withdrew its protest. Ravens was not informed of either protest. DIA's corrective action included re-evaluating the nine original proposals and inviting final revised proposals ("FPRs") from the six offerors within the competitive range, including Ravens. Throughout this corrective action, DIA elected to allow Ravens to continue performing the contract pursuant to 48 C.F.R. § 33.104(c)(2)(i). *Id.*

Based on the corrective action, which included a review of the FPRs and re-ranking of the bids, DIA awarded the contract to Rowe on March 22, 2006, with performance to begin on April 1, 2006. On March 27, 2006, Ravens protested the award to Rowe. The grounds for Ravens' protest appear to be that awarding the contract to Rowe was irrational and that DIA provided deficient notification to Ravens. *Id.* at 4. GAO dismissed Ravens' protest on April 6, 2006, after DIA again took corrective action. *Id.* at 5.

B. Ravens' Second GAO Protest, Allegations Against Rowe, and DIA Corrective Action

After this protest was dismissed, Ravens filed a second protest with GAO on April 6. In it, Ravens alleged that Rowe had engaged in "unfair business practices." Specifically, Ravens claimed that Rowe had (1) learned of Ravens' bid price before submitting its FPR, (2) learned of and copied Ravens' "work schedule" before submitting its FPR, and (3) made payments to two Ravens employees in exchange for information about Ravens to use in its FPR. *Id.*

Ravens included two documents labeled "Sworn Statement" with its April 6 protest. Both documents were signed by Milton J. Grant III, Ravens' Director of Facilities Management and Security. The documents contained Mr. Grant's report of conversations he allegedly had with Scott Rowe, President of Rowe, on March 27 and April 3, 2006. According to Mr. Grant, Mr. Rowe claimed that Rowe won the DIA contract because it had bid $1.5 million less per year than Ravens. Mr. Grant also stated that during these conversations Mr. Rowe indicated that the only reason Rowe had not won the original round of bidding was that Ravens provided a "work schedule" while Rowe did not. Opinion at 5; Administrative Record ("AR") at 189-90.

In these documents, Mr. Grant also alleged that Rowe had made $500 payments to two Ravens employees on March 28 and 29, 2006, "in exchange for information on Ravens Group employees and the working and scheduling of the contract." Opinion at 5; AR at 190. The parties agree that a third "Sworn Statement" from J. Jeff Robertson, Ravens' Executive Vice President, also accompanied the April 6 protest. However, this document does not appear in that portion of the Administrative Record. Consolidated Statement of Uncontroverted Facts ("CSUF") ¶ 20; AR at 189-90, 1059. Regardless of when the document entered the record, Mr. Robertson's statement includes the same allegations that payments were made by Rowe to two Ravens employees.

On April 20, 2006, Ravens supplemented its protest alleging that on April 14, 2006, it became aware that Rowe had altered the records of Ravens' employees in the Joint Personnel Adjudication System ("JPAS"). JPAS is a confidential database in which the Department of Defense maintains information about the security clearances of its employees and contractors. According to Ravens, the changes in JPAS showed that certain Ravens employees were employed by Rowe, not by Ravens. Opinion at 5. In a letter to DIA on April 21, 2006, Ravens reiterated its allegations that $500 payments had been improperly made to two Ravens employees and that Rowe had interfered with Ravens' employee records in JPAS. In this letter, Ravens requested that Rowe be disqualified from the bidding process based on its improper conduct. *Id.*

Rowe was provided with redacted copies of Ravens' April 6 and April 20 protests. In a sworn and notarized letter to DIA dated April 28, 2006, Mr. Rowe responded to Ravens' allegations of improper conduct. *Id.* at 6; Supplemental Administrative Record ("Supp. AR") Ex. 1. In his notarized letter to DIA, Mr. Rowe

stated that his knowledge of Ravens' contract price came from DIA's June 27, 2005, award notification letter, which disclosed the winning bid price to all disappointed offerors. Opinion at 6; Supp. AR Ex. 1 at 8-9.

Mr. Rowe also confirmed in this letter that $500 payments were made to two Ravens employees on March 29, 2006. According to Mr. Rowe, the payments were intended to ensure a smooth transition when Rowe began performance of the contract on April 1, 2006. Mr. Rowe stated: "To create good will and to make sure that the new contract got off on the right foot, . . . . I gave Mr. Fields and Ms. Scott [two Ravens employees] each a $500 signing bonus." Supp. AR Ex. 1 at 6. Mr. Rowe further indicated in this letter that Wendy Scott, one of the Ravens employees to whom he paid a bonus, gave him a copy of Ravens' employee roster and copies of the work schedules Ravens was using at the time. *Id.* at 4-5.

Mr. Rowe also discussed the JPAS changes in this April 28 letter. He indicated that Rowe used the information provided by Ms. Fields and information contained in JPAS to verify whether Ravens' employees had security clearances and the level of security clearance each had. *Id.* at 6. Specifically, Rowe verified the clearances of those Ravens employees who had agreed to start work for Rowe on April 1, 2006. Rowe was only able to confirm that 14 of the employees had appropriate clearances. As of March 31, 2006, with the contract scheduled to transfer to Rowe the next day, Rowe obtained these clearances in JPAS and made these 14 people its employees. *Id.* A copy of Mr. Rowe's notarized April 28 letter was not provided to Ravens.

GAO dismissed Ravens' second protest on May 19, 2006, after determining that Ravens had not demonstrated competitive prejudice. Opinion at 6. Specifically, GAO found that Rowe's FPR was submitted prior to the alleged improper actions about which Ravens complained. GAO also concluded that "DIA's proposed corrective action [wa]s limited to reconsidering its award decision based on the proposals as already submitted" and was not requesting new or revised proposals. *Id.*; AR at 221.

C. <u>Ravens' Request for Reconsideration, Award to NOSLOT, and Further DIA Corrective Action</u>

Despite this finding, Ravens filed a Request for Reconsideration with GAO on June 1, 2006. Ravens included with its request a fourth "Sworn Statement" from Mr. Robertson. In it, Mr. Robertson elaborated on the factual allegations against Rowe that he had made in his first statement. Opinion at 6; AR at 223.

GAO denied Ravens' request for reconsideration, reiterating its conclusion that Ravens had suffered no competitive prejudice. GAO found that the sworn statements did "not indicate that the Rowe official stated that its employees viewed Ravens' work schedule before, or even after, Rowe submitted its FPR, or stated that [Rowe's] work schedule was based on [the schedule submitted by] Ravens." Opinion at 6; AR at 243.

As a result of this second round of corrective action, DIA awarded the contract to NOSLOT on September 13, 2006. Opinion at 7; AR at 286. DIA terminated Ravens' contract for convenience on September 15, 2006. Opinion at 7; AR at 1119. Between September 23 and October 13, 2006, Ravens, Rowe, and Olympus protested the award to NOSLOT on various grounds, including deficiencies in NOSLOT's security clearance. Opinion at 7.

In response to this round of protests, DIA decided once again to take corrective action and notified Rowe and Olympus accordingly. *See* Opinion at 7; AR at 373-75, 414-16. Based on the corrective action, DIA determined that NOSLOT did not possess the Top Secret (TS/SCI) security clearance required by the contract and that its facility clearance had expired in 1999. Opinion at 7.

The Administrative Record does not reflect that DIA provided Ravens notice of this corrective action. However, the notice of corrective action provided to Rowe and Olympus did not allow, permit, or require any offeror to take any action. *Id.*; AR at 375. On October 12, 2006, DIA sent Ravens a letter rescinding the September 15 termination for convenience. In it, DIA stated, "[t]he current contract remains in effect until further notice." Opinion at 7; AR at 1119.

After receiving notice of DIA's intent to take corrective action, GAO dismissed the protest filed by Olympus on November 13, 2006, and dismissed the protests filed by Rowe and Ravens on December 1 and 6, 2006, respectively. Opinion at 7; AR at 419, 382, 293.

D. <u>DIA Exercises Options with Ravens</u>

The original contract awarded to Ravens was for one year with the possibility of four one-year extensions. Opinion at 7; AR at 437-438. On December 20, 2005, while it was considering the FPRs submitted during the first round of corrective action, DIA executed the first option year of the contract with Ravens, extending the contract from October 31, 2005 through October 31, 2006. On November 2, 2006, during the third round of corrective action, DIA executed the second option year. Opinion at 7; *see also* CSUF ¶ 6.

E. <u>Award to Rowe and Ravens' Final GAO Protest</u>

Following its third round of corrective action, DIA awarded the contract to Rowe on December 19, 2006. Opinion at 7; AR at 1055. Disappointed offerors were notified of this award by letter dated December 19, 2006. Opinion at 8.

On December 29, 2006, Ravens filed its final protest with GAO arguing that DIA's award to Rowe was in bad faith. *Id.*; AR at 1038-41. In making this bad faith allegation, Ravens relied on DIA's October 12, 2006 letter rescinding its prior

termination for convenience of the award to Ravens and stating that the contract "remain[ed] in effect until further notice." Opinion at 8; AR at 1040, 1119.

Ravens filed a supplemental protest with GAO on January 8, 2007. The supplemental protest complained of various procedural defects in DIA's third round of corrective action and asserted that awarding the contract to Rowe was irrational. Ravens further asserted that the award to Rowe contradicted DIA's prior determination, as evidenced through DIA's exercise of the options with Ravens, that Ravens was the "most advantageous" choice for the contract. Opinion at 8; AR at 1045-47.

Finally, Ravens reiterated its "unfair business practices" allegations against Rowe in its supplemental protest. GAO dismissed these protests as untimely on March 15, 2007. Opinion at 8; AR at 1132-34.

## II. Ravens' Claims and Procedural History

Ravens filed a Complaint in this Court on April 19, 2007, one month after its final protest was dismissed by GAO. At the time, Ravens was still performing the janitorial contract at DIA's Bolling facility. Rowe was admitted as an intervenor.

Ravens' Complaint contained seven counts: Counts I and V alleging "unfair business practices" by Rowe; Count II alleging "irrational contract award" by DIA; Count III complaining of "DIA's breach of the implied duty of good faith and fair dealing"; Count IV complaining of DIA's "violation of FAR notification requirements"; Count VI asserting that DIA's "initial award to The Ravens Group was proper"; and finally, Count VII, which was based on the "totality of the circumstances." However, Ravens' claims evolved during the course of litigation from what was set forth in the Complaint.

On May 18, 2007, the Government filed a Motion to Dismiss, in part, and a Motion for Judgment on the Administrative Record. In its opposition and cross-motion brief, Ravens apparently abandoned Counts I and V and added new counts, which we designated Counts VIII and IX. The new counts alleged that DIA had a duty, which it failed to fulfill, to investigate Ravens' allegations against Rowe, and that DIA gave irrationally high technical and past performance ratings to Rowe, respectively.

Following oral argument, we found that all of Ravens' claims were without merit. In our August 2, 2007 Opinion, we dismissed for lack of jurisdiction Counts I and V. We dismissed for failure to state a claim Counts II, IV, and VII, and Count VI in part. Count III was conceded at oral argument and, regardless, would have been dismissed for failure to state a claim. We also granted the Government's Motion for Judgment on the Administrative Record with regard to Counts VIII, IX, and the remainder of Count VI. The Plaintiff's Cross-Motion for Judgment on the Administrative Record was denied. We directed the Clerk of the Court to dismiss the Complaint and awarded fees and costs to the Government and to Intervenor Rowe.

Rowe served Ravens with a copy of its Motion for Rule 11 Sanctions on May 4, 2007, before filing its Motion in this Court. Rowe thereby complied with Rule 11(c) and provided Ravens with notice of its intent to request sanctions. Rowe waited the requisite 21 days before filing its Motion in this Court on May 25, 2007. During this 21-day safe harbor period, Ravens did not voluntarily withdraw its Complaint. Ravens defended against Rowe's Rule 11 Motion on June 8, 2007, when it filed a brief in opposition. However, the bulk of Ravens' response re-argued the merits of its claims. The brief did not directly address the bases Rowe invoked as grounds for Rule 11 sanctions.

We did not address sanctions in our August 2 Opinion. It is to this issue that we now turn.

## III. Discussion

Rowe's Motion presents two justifications for sanctioning Ravens. It charges Ravens with making unverified and baseless accusations of improper conduct against Rowe and its President, Scott Rowe. The Motion also asserts that many of Ravens' legal arguments were so deficient as to be frivolous and thus subject to Rule 11 sanctions.

### A. The Rule 11 Legal Standard

Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC") is patterned after Rule 11 of the Federal Rules of Civil Procedure. *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997). The Federal Circuit has held that its rulings under Rule 11 of the Federal Rules are applicable to RCFC 11. *Id.* The Rule requires that every pleading filed by a party be signed by the party's attorney. RCFC 11(a) ("Every pleading, motion, and other paper shall be signed by or for the attorney of record in the signing attorney's own individual name . . . . "). The attorney's signature acts as a certification that the pleading is well-grounded in fact, has a basis in law, and is not filed for an improper purpose. *View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 984 (Fed. Cir. 2000); *see also* RCFC 11(b).

Rule 11 is aimed at curbing baseless filings by parties that burden the courts and cause needless expense and delay. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397-98 (1990). The Advisory Committee Notes to the 1993 amendments to the Rule are instructive on this point: "The [R]ule [] require[s] litigants to 'stop and think' before initially making legal or factual contentions." Fed. R. Civ. P. 11 (Notes of Advisory Committee on 1993 Amendments). The Rule therefore requires that parties make a reasonable inquiry of the applicable law and underlying facts to ensure that claims brought before the court are not frivolous. *Persyn v. United States*, 35 Fed. Cl. 708, 712 (1996). The reasonableness of a party's pre-filing inquiry is measured by an

objective standard. *See id.* A party's good faith belief in the merits of an argument is not sufficient to avoid sanction. *See Bus. Guides, Inc. v. Chromatic Commc'ns. Enters., Inc.*, 498 U.S. 533, 548-49 (1991).

Rule 11 authorizes the court to sanction an attorney for failure to comply with its requirements. Fed. R. Civ. P. 11(c); RCFC 11(c). The court may sanction the attorney to the extent sufficient to deter the repetition of such conduct. Fed. R. Civ. P. 11(c)(2); RCFC 11(c)(2). The sanction may consist of, or include, nonmonetary directives, an order to pay a penalty to the court, or an order directing payment to the movant of reasonable attorneys' fees and other expenses incurred as a direct result of the Rule 11 violation. Fed. R. Civ. P. 11(c)(2); RCFC 11(c)(2).

However, the decision whether to impose sanctions rests firmly within the discretion of the court. *See A. Hirsch, Inc. v. United States*, 948 F.2d 1240, 1246 (Fed. Cir. 1991); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (emphasizing the inherent power of federal courts to "manage their own affairs" and stating that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence."). Furthermore, the mandates of Rule 11 are not absolute. The Rule tolerates a certain margin of error by parties. Specifically, the Rule emphasizes a duty of candor by subjecting litigants to potential sanctions for "insisting upon a position after it is no longer tenable" but generally provides for "protection against sanctions if [litigants] withdraw or correct contentions after a potential violation [of the Rule] is called to their attention." Fed. R. Civ. P. 11 (Notes of Advisory Committee on 1993 Amendments). In fact, parties have a duty under Rule 11 not to persist with a contention that lacks evidentiary support once it is clear that no such support exists. *Id.*

The U.S. Court of Federal Claims retains jurisdiction to impose Rule 11 sanctions even after resolution of the case on the merits. *See Cooter & Gell*, 496 U.S. at 384 (holding that a plaintiff's voluntary dismissal of a complaint does not deprive the trial court of jurisdiction to entertain a motion for sanctions under Rule 11). Like the imposition of costs, attorneys' fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits. Rather, it requires determining a collateral issue: whether the attorney has abused the judicial process and, if so, the appropriate sanction. *Lefley v. United States*, No. 259-89, 1997 U.S. Claims LEXIS 309, at *34-35 (Ct. Cl. July 31, 1997); *see also Willy v. Coastal Corp.*, 503 U.S. 131, 137-38 (1992) (holding that a district court may impose sanctions for abuse of judicial process pursuant to Rule 11 even after it is determined that the court lacked subject matter jurisdiction over the plaintiff's claims).

In *Cooter & Gell*, the Supreme Court set forth three issues to be considered when deciding a motion for Rule 11 sanctions: (1) factual questions regarding the nature of the attorney's pre-filing inquiry and the factual basis of the pleading; (2) whether a pleading or argument is "warranted by existing law or a good faith argument" for changing the law; and (3) the appropriate sanction if a violation has in

fact occurred. *See* 496 U.S. at 399. The court therefore must examine both the factual and legal bases of the claims set forth in the pleading. However, the Supreme Court has noted that it is often difficult to distinguish between factual and legal issues, and that the task is "particularly difficult" in the Rule 11 context. *Id.* at 401.

Given this difficulty, the Supreme Court has suggested that Rule 11 analysis requires consideration of "issues rooted in factual determinations" and does not mandate an inquiry into purely legal questions, such as whether a legal argument was correct. *Id.*; *see also id.* at 403 ("a determination whether a legal position is 'substantially justified' depends greatly on factual determinations"). Furthermore, determining whether a party's pre-filing inquiry was reasonable requires a consideration of "all the circumstances of [the] case." *Id.* at 401.

Based on *Cooter & Gell*, it seems we are not obligated to analyze the merits of both the factual allegations and the legal arguments set forth in Ravens' Complaint. However, we have found no precedent prohibiting us from doing so. And, because Rowe's Motion raises both as grounds for sanctions, we will analyze each in turn.

B. Rowe's Motion for Rule 11 Sanctions

1. Ravens' Factual Allegations Against Rowe

At the outset, we note that many of the factual allegations included in Ravens' Complaint are based on one or more of the sworn statements Ravens submitted to GAO with its protests. However, in some instances, further information revealed during the pendency of the protests brought into doubt the accuracy of the sworn statements.

For example, in the sworn statement of Milton J. Grant III, which accompanied Ravens' April 6 protest, Mr. Grant states that Mr. Rowe admitted to having access to Ravens' bid price. Mr. Grant's sworn statement says that Mr. Rowe told him "that he knew of [Ravens] in great detail" and that Mr. Rowe further stated "that he bid about 1.5 million a year less than The Ravens Group did on the contract." AR at 189. The sworn statement indicates that Mr. Rowe repeated this assertion one week later in the DIA cafeteria in the presence of Jeff Robertson, Executive Vice President of Ravens. *Id.* Ravens assumed that Rowe could only have obtained knowledge of Ravens' bid price through improper means, and so alleged.

For some time, Ravens was apparently unaware that DIA had informed disappointed bidders by letter dated June 27, 2005, that it had awarded the contract to Ravens and disclosed Ravens' bid price for the initial procurement. *Id.* at 233. In the June 27 letter, DIA stated that award to Ravens was "determined to be in the best interest of the Government . . . price and other factors considered" and that Ravens' total price for the contract, including base period and all options, was $21,731,005.09. *Id.* Because it won the contract, Ravens was not provided a copy of this letter.

Ravens was apparently first made aware of DIA's June 27, 2005, letter to disappointed offerors by Rowe in June 2006. On June 14, 2006, Rowe sent Ravens a letter indicating that it had obtained information about Ravens' bid price directly from DIA. Rowe included DIA's June 2005 correspondence as an attachment. *See* Supp. AR Ex. 1. Nevertheless, Ravens repeated its allegation that Rowe had improperly obtained information about Ravens' initial bid price in its Complaint, which was filed in this Court on April 19, 2007, almost one year after Ravens learned of DIA's disclosure. Compl. at ¶¶ 19, 35-39, 68-73. Ravens attached the sworn statement of Mr. Grant to the Complaint. *See id.* at Ex. A.

After it reviewed Rowe's Motion for Rule 11 Sanctions, Ravens sent a letter to Rowe on May 23, 2007. In this letter, Ravens acknowledged receipt of Rowe's June 14, 2006 letter and, consequently, a copy of DIA's June 2005 letter to disappointed bidders. Ravens explained that including the assertion that Rowe had engaged in unfair business practices to obtain Ravens' contract price in the Complaint was "inadvertent." Supp. AR Ex. 1. In this May 23 letter, Ravens stated: "[W]e hereby notify you, [sic] that we no longer contend that Rowe improperly obtained The Ravens Group's contract price, and will no longer assert this legal position." *Id.* Ravens further stated: "DIA did not notify (and has never notified) The Ravens Group of the release of its contract price." *Id.* Ravens thereby advised Rowe that it was withdrawing this assertion of unfair business practices by Rowe.

After sending the May 23, 2007 letter to Rowe, Ravens filed briefs in this Court responding to Rowe's Motion to Dismiss and for Judgment on the Administrative Record and to Rowe's Motion for Rule 11 Sanctions. In both opposition briefs, Ravens reiterated that it was withdrawing its assertion regarding Rowe's improper knowledge of Ravens' contract price. In the opening section of its brief in opposition to Rowe's Motion to Dismiss and for Judgment on the Administrative Record, which was filed on May 25, 2007, Ravens included a footnote which states:

> Upon review of our file, we determined that [Rowe] is correct in its assertion that it provided credible evidence to The Ravens Group on June 16 [sic], 2006, that DIA had provided it [Ravens'] contract price. Our suggestion in the Complaint that [Rowe] had improperly obtained that information was inadvertent.

Plaintiff's Brief in Opposition ("Pl. Opp'n. Br.") at 3-4 n.1.

Similarly, in its brief in opposition to Rowe's Motion for Rule 11 Sanctions dated June 8, 2007, Ravens acknowledged that it had been provided with "'credible evidence' (via [Rowe's] June 14, 2006, letter and enclosure) that [DIA] released The Ravens Group's contract prices [sic]." Plaintiff's Brief in Opposition to Intervenor Rowe's Motion for Rule 11 Sanctions ("Pl. Opp'n. Br. Sanctions") at 2.

As the Advisory Committee Notes on the 1993 amendments to Rule 11 make clear, the Rule provides protection against sanctions if the party withdraws or corrects baseless or inaccurate contentions after they are made aware of a potential violation. *See* Fed. R. Civ. P. 11 (Notes of Advisory Committee on 1993 Amendments). The Rule effectuates this policy by requiring the moving party to serve the alleged offending party with a copy of its Rule 11 motion 21 days before filing the motion with the court. During this 21-day period, the putative offending party may withdraw or correct unwarranted allegations or arguments and escape sanctions. Fed. R. Civ. P. 11(c)(1)(A); RCFC 11(c)(1)(A). A party who is put on notice of a potential violation must ensure that offending allegations or arguments are “withdrawn or appropriately corrected” to avoid sanction. *Id.* Given the remedial action it took after being notified of a potential violation of Rule 11, Ravens comes within the protection of the Rule’s safe harbor provision.

Rowe contends that other factual allegations made in Ravens’ Complaint also should not have been presented and provide grounds for sanctions. Specifically, Rowe argues that Ravens should be sanctioned for claiming in its Complaint that Rowe used improper means, in the form of $500 payments, to gain access to proprietary information about Ravens. Memorandum of Law in Support of Intervenor’s Motion for Rule 11 Sanctions (“Int. Memo.”) at 5. As noted in the background section of this Opinion, Rowe made $500 payments to two Ravens employees in March 2006. In exchange for these payments, Rowe received a copy of Ravens’ employee roster and a copy of the work schedule Ravens was using to perform the contract. *See* Supp. AR Ex. 1 at 4-5. Ravens first alleged that Rowe had made these improper payments when it filed its April 6 protest. Ravens relied on the sworn statements as proof. *See* Opinion at 5; AR at 189-90.

Rowe argues that Ravens’ allegations of improper payments by Rowe were baseless and should not have been presented to this Court because GAO “specifically found that Ravens ‘mischaracterized’ the contents of its employees’ statements.” Int. Memo. at 5. It is true that GAO rejected Ravens’ allegations of improper payments by Rowe. GAO found the fact that Ravens’ employees admitted during the company’s April 6 protest that the payments were made “‘during the pendency of [T]he Ravens Group’s Protest’” significant. Supp. AR Ex. 4 at 3 (quoting Ravens’ protest); *see also* AR at 241-43. GAO concluded that the timing of these payments would have precluded Rowe from using any information it obtained to gain a competitive advantage in the re-evaluation process. Supp. AR Ex. 4 at 3.

Although the timing of these payments meant that they were not prejudicial to Ravens as respects the contract award, when it filed its Complaint in this Court, Ravens did not have access to the Administrative Record. Ravens was therefore unaware of Mr. Rowe’s notarized April 28, 2006 letter to DIA responding to Ravens’ allegations regarding the payments and explaining that they were intended as a signing bonus and to ensure a smooth transition of the contract from Ravens to Rowe as of the April 1,

2006, start date. *See* Supp. AR Ex. 1 at 6. Mr. Rowe's explanation notwithstanding, he did admit that he made $500 payments to two Ravens employees prior to beginning performance of the contract. The accuracy of Ravens' factual charge was never challenged, merely its import.

When viewed in hindsight, the payments may appear innocuous. In fact, the Administrative Record reflects that Rowe incorporated the use of signing bonuses into its initial proposal. AR at 642-43. However, the payments appear more suspect when viewed in the context of the contentious bid protest that was ongoing during the spring of 2006 and through the time Ravens filed its protest in this Court on April 19, 2007.

Ravens' suspicions about Rowe's actions were compounded by two additional events it learned of during the pendency of the bid protests at GAO. First, there was the issue of the transfer of Ravens employees to Rowe in JPAS. Ravens found the changes, which it was not notified about, suspicious. *See* Opinion at 5. In addition to the JPAS transfers, Ravens suspected improper conduct by Rowe based on Mr. Rowe's alleged admission to Mr. Grant in late-March 2006 that the only reason Rowe had not won the original bid was because Ravens provided a work schedule to DIA and Rowe did not. *See id.*

Rowe argues that Ravens should be sanctioned for alleging that Rowe made improper changes in JPAS because Rowe executed the changes in preparation for the impending transfer of the contract from Ravens to Rowe on April 1, 2006. *Id.*; Supp. AR Ex. 1 at 7. Mr. Rowe confirmed that this was the reason for the changes in the notarized April 28 letter he sent to DIA. However, a copy of this letter was never provided to Ravens, which did not have access to it until it was able to review the Administrative Record after commencing a proceeding in this Court. Moreover, Mr. Rowe's benign explanation need not be taken as the absolute truth. We would have to have an evidentiary hearing to determine the actual purpose of Mr. Rowe's conduct.

Mr. Rowe did not address Ravens' allegations about its improper knowledge of Ravens' submission of a work schedule in his notarized April 28 letter to DIA. However, the Administrative Record shows that Rowe's initial proposal contained a work schedule and that Rowe's FPR did not contain revisions to that schedule. Opinion at 5; AR at 590, 612-17, 656-98. Ravens did not have access to the Administrative Record until it was filed under seal by the Government on May 4, 2007. Ravens could not have known that this allegation lacked evidentiary support until that date.

Based on the foregoing, it is clear that the factual allegations set forth in Ravens' Complaint ultimately lacked evidentiary support or were susceptible to benign explanations. However, Ravens' error with regard to its allegations about Rowe's improper access to its bid price and work schedule was not apparent until Ravens was able to review the Administrative Record or was otherwise apprised of the facts.

Furthermore, Ravens was correct in its factual allegations about the two $500 payments and employee transfers in JPAS. To date, the import of both events remains undetermined.

2. Ravens' Legal Arguments

We turn now to the specific counts set forth in Ravens' Complaint and analyze the sufficiency of the legal basis of each. We begin by noting that Rule 11 precludes the imposition of monetary sanctions on represented parties when the Rule is violated by the presentation of unwarranted or frivolous legal contentions. Fed. R. Civ. P. 11(c)(2)(A); RCFC 11(c)(2)(A).

a. Counts I and V

We combine our discussion of Counts I and V. Both counts were subtitled "Unfair Business Practices" in Ravens' Complaint. Complaint ("Compl.") at 12, 16. However, in its brief opposing Rowe's Motion for Rule 11 Sanctions, Ravens admitted that the two counts were the same. Pl. Opp'n. Br. Sanctions at 2. We treated them as such in our August 2 Opinion. Opinion at 10.

In the Complaint, Ravens alleged that Rowe had improperly obtained information about Ravens' contract price and details about Ravens' technical proposal, had paid Ravens' employees for information to use to win the contract, and had tampered with Ravens' employee records in JPAS. Compl. at ¶¶ 18-21. As explained above, Ravens has since withdrawn its contention that Rowe improperly obtained information about Ravens' contract price. Opinion at 10; Pl. Opp'n. Br. Sanctions at 2; Pl. Opp'n. Br. at 5-13.

In our August 2 Opinion, we held that to the extent Counts I and V were directed solely against Rowe, we clearly lacked jurisdiction to entertain them. Opinion at 10. Ravens apparently conceded this jurisdictional defect because it did not defend the issue in its brief in opposition to the dispositive motions filed by the Government and Rowe. *See* Pl. Opp'n. Br. at 5-13.

Rowe argues that sanctions are appropriate because these counts were "unwarranted and frivolous." Int. Memo. at 13, 23. Specifically, Rowe requests sanctions on these counts because the U.S. Court of Federal Claims lacked jurisdiction to consider either. Rowe contends that "Ravens' failure to examine the subject matter requirements of 28 U.S.C. § 1491 [the Tucker Act] merits sanctions." *Id.* at 23. This is because Counts I and V as originally drafted were aimed at Rowe, rather than at the United States, and because the Counts "sound[ed] in tort." *Id.* at 13-14, 23.

It is well-settled that the Tucker Act "grants the U.S. Court of Federal Claims 'jurisdiction to render judgment upon any claim against the United States founded either

upon the Constitution, or any Act of Congress or any regulation or an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.'" *See, e.g.*, *United States v. Navajo Nation*, 537 U.S. 488, 503 n.10 (2003) (quoting 28 U.S.C. § 1491(a)(1)). Rowe argues that Ravens should be sanctioned for bringing Counts I and V because "'even a rudimentary search into the applicable law would have informed [Ravens] immediately' that the court lacked jurisdiction over [the] claims." Int. Memo. at 14 (citing *Verdon v. Consol. Rail Corp.*, 828 F. Supp. 1129, 1142 (S.D.N.Y. 1993)).

We decline to impose sanctions based on the jurisdictional defects of these counts. We do so for several reasons. First, the scope of the Tucker Act is continually litigated. *See, e.g.*, 28 U.S.C.A. § 1491 (citing countless Court of Federal Claims decisions resolving disputes about the scope of the Court's jurisdiction under the Tucker Act). Second, by failing to defend the issue in its brief opposing the dispositive motions, Ravens conceded the jurisdictional defects of Counts I and V. Third, Ravens amended these counts, albeit informally, during the course of litigation so they were directed at DIA. *See* Pl. Opp'n. Br. at 5-14 (New Counts VIII and IX).

We note further that Rule 11 provides an exception if the "claims . . . are warranted by . . . a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2); RCFC 11(b)(2). It is not necessary that the advocate explicitly make such an argument. Rather, the protection afforded by this provision appears to be limited only by the subject attorney's imagination. With regard to this case, it is not a frivolous stretch to contend that participation in a government procurement brings into scrutiny the participant's conduct during the procurement, and permits another participant to challenge that conduct in this forum. Counts I and V, although poorly drafted, can be read as an expression of this theory.

Finally, in its brief in opposition to the dispositive motions of the Government and Rowe, rather than explicitly arguing that Rowe had engaged in "unfair business practices," Ravens argued that DIA had failed to discharge its duty to investigate Ravens' claims of improper conduct by Rowe. *See* Pl. Opp'n. Br. at 5-14 (New Count VIII). Ravens thereby changed the import of Counts I and V and is protected against sanctions. *See* Fed. R. Civ. P. 11 (Notes of Advisory Committee on 1993 Amendments) ("[the Rule] generally provid[es] protection against sanctions if the [parties] withdraw or correct contentions after a potential violation is called to their attention."). Ravens' argument that DIA had a duty to investigate alleged improper conduct by Rowe comports with Ravens' ongoing efforts throughout the procurement to disqualify Rowe as a bidder.

b. <u>Count II</u>

The second count set forth in Ravens' Complaint was subtitled "Irrational

Contract Award." The crux of this claim was that the initial award to Ravens, coupled with DIA's subsequent exercise of the two options, constituted a determination by DIA that Ravens was the "best or most advantageous" contract award for the Government. Compl. at ¶ 42. Ravens claimed that, based on these actions, DIA's December 2006 award to Rowe was "inexplicable, irrational and unreasonable." *Id.* at ¶ 47.

Unfortunately, Ravens did not offer much detail regarding this claim. We were therefore left to construe the argument as best we could when we ruled on the dispositive motions filed by the Government and Rowe. *See* Opinion at 10-11. We concluded that the argument made little sense given the purpose of taking corrective action and the broad discretion of the contracting officer in deciding whether to exercise an option. *See id.* We therefore dismissed Count II for failure to state a claim upon which relief could be granted. *Id.* at 11.

Rowe asks the Court to sanction Ravens and its attorney for bringing Count II on the grounds that the claim was not ripe for review pursuant to the Contract Disputes Act ("CDA") and was based on a misrepresentation of law. Specifically, Rowe asserts that this Court lacked jurisdiction over the claim, which was not first submitted to the contracting officer. Int. Memo. at 15. The CDA requires that all claims arising under a contract with the Government "shall be in writing and shall be submitted to the contracting officer." 41 U.S.C. § 605(a). The Court of Federal Claims lacks jurisdiction to entertain claims which are not subject to a final decision of the contracting officer. 28 U.S.C. § 1491(a)(2).

Rowe further contends that sanctions are warranted because Count II is "based on a misrepresentation of law." Int. Memo. at 16. Rowe argues that Ravens erred in concluding that DIA's exercise of option years without reservations or conditions established that Ravens had an entitlement to the contract. *Id.* at 18. Specifically, Rowe asserts that Ravens misrepresented the content of FAR provision 17.207, which governs the exercise of options in government contracts. Rowe points out that in paragraph 43 of its Complaint, Ravens stated: "In exercising [Option year 2], DIA was required under FAR Subpart 17.207, to make a finding that award of the option represented the 'best value' to the Government." *Id.* at 17.

Rowe requests sanctions on the grounds that this is a misstatement of the FAR provision and sets forth a faulty conclusion. Rowe argues that, rather than requiring the Government to exercise an option based on finding that such exercise represents the "best value," the Government is required to determine that "[t]he exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors . . . considered." *Id.* at 17 (quoting 48 C.F.R. § 17.207(c)(3)). Rowe emphasizes that nowhere in the provision is there any reference to a determination of "best value" prior to exercising an option. *Id.*

Rowe is correct that the FAR provision does not mention a "best value" determination. However, the provision also states that:

> The contracting officer, after considering price and other factors, shall make the determination [of whether to exercise an option] on the basis of one of the following:
> (1) A new solicitation fails to produce a better price or a more advantageous offer than that offered by the option . . . .

48 C.F.R. § 17.207(d)(1).

We believe that this language provides a legal basis for the argument set forth in Ravens' Complaint. Although Ravens' interpretation of this FAR clause may be strained, Rule 11 does not require that the legal contentions set forth in a pleading are correct, only that they have some basis in existing law. *See Saladino v. United States*, 63 Fed. Cl. 754, 757 (2005) ("A legal argument that ultimately is incorrect . . . does not necessarily equate to one that is not warranted by existing law or by a 'nonfrivolous argument for its extension.'") (quoting RCFC 11(b)(2)).

We further note that Ravens' attorney dropped this contention at oral argument. Rather than insist that exercise of the options was the functional equivalent of a "best value" contract award, Ravens' attorney argued instead that his client relied on exercise of the options as evidence that award of the contract was no longer in contention. *See* Opinion at 11. We ultimately dismissed Count II for failure to state a claim upon which relief could be granted because Ravens' attorney was unable to demonstrate how this alleged "reliance" altered his client's circumstances or what prejudice it suffered. *Id.*

c. <u>Count III</u>

Count III of the Complaint was subtitled, "DIA's Breach of the Implied Duty of Good Faith and Fair Dealing." In our August 2 Opinion, we noted that Ravens' argument, as set forth in the Complaint, was difficult to understand. We were forced to fill in some gaps in Ravens' reasoning. *Id.* As we understood it, this claim was based on DIA's October 12, 2006, rescission of its September 15 termination for convenience of Ravens' contract and its statement in the termination letter that "[t]he current contract remains in effect until further notice." *Id.*; AR at 1119. Ravens' contention was that DIA's subsequent exercise of the second option year on November 2, 2006, constituted "further notice." *Id.* Ravens argued that DIA's actions in no way indicated that it was continuing to re-evaluate other proposals and that DIA never advised Ravens of this re-evaluation process nor informed Ravens that it intended to terminate the contract prior to the expiration of the second option period. Opinion at 11; Compl. at ¶ 50.

At no point did Ravens clarify its argument. At oral argument, however, Ravens' attorney conceded Count III. Had he not done so, we would have dismissed Count III for failure to state a claim upon which relief could be granted. *See* Opinion at 12.

Count III is arguably the most deficient of all counts set forth in the Complaint. Ravens had difficulty clarifying its argument to the Court because the argument lacked a clear factual or legal basis. We believe that, to the extent Count III pertains to DIA's exercise of the options, it is related to Ravens' interpretation of FAR section 17.207, as discussed above. *See* Opinion at 12 ("[I]f Ravens' argument is construed as an objection to the award of the Contract to Rowe, it adds nothing to the arguments made in Count II . . . . ").

d. Count IV

Ravens subtitled Count IV "Violation of FAR Notification Requirements." Ravens asserted that DIA failed to notify it of NOSLOT's June 29, 2005 protest, NOSLOT'S "protest in September," and of DIA's October 24, 2006, decision to take corrective action. Compl. at ¶¶ 62-64. We noted two defects with this Count when we ruled on the dispositive motions disposing of this case. First, there was no protest filed by NOSLOT "in September." Opinion at 12. We assumed, however, that Ravens was in fact referring to NOSLOT's July 12, 2005 protest. *Id.* Second, the Complaint did not state how the alleged violations of FAR notification regulations by DIA prejudiced Ravens. *Id.*

When basing a protest on an agency's alleged violation of regulations, the plaintiff must demonstrate that the violation was significant and that it was prejudiced by the violation. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). We concluded that Ravens was unable to demonstrate either. We therefore dismissed Count IV for failure to state a claim.

Rowe seeks sanctions on this Count because Ravens was unable to demonstrate prejudice. Rowe maintains that Ravens did not suffer prejudice because the alleged lack of notice "ha[d] no bearing on the proposal submitted by Ravens, the evaluation of Ravens' proposal or Rowe's proposal, or the best value determination that resulted in award to Rowe." Int. Memo. at 22. Rowe concludes that, because Ravens was unable to demonstrate prejudice, Count IV was unwarranted and merits sanctions. *Id.* at 23.

The determination of prejudice is an issue to be resolved by the Court. *See Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005) (explaining that a bid protest requires a two-step analysis whereby the trial court first determines whether the Government acted without a rational basis or contrary to law in the procurement process and, if it so finds, proceeds to determine, as a factual matter, "if the bid protester was prejudiced by that conduct."). In defending this Count against the dispositive motions filed by the Government and Rowe, Ravens alleged that it might have been able to negotiate a withdrawal of NOSLOTS's protest before DIA took corrective action had it been given appropriate notice. Ravens alleged that this in turn

would have enabled it to preserve the original award in its favor. Ravens argued that the lack of notice therefore constituted prejudice. *See* Opinion at 12; Pl. Opp'n. Br. at 27.

We rejected Ravens' argument as not being persuasive. Opinion at 12. However, the fact that Ravens' claim was dismissed on the merits does not mean sanctions are warranted. *See* Fed. R. Civ. P. 11 (Notes of Advisory Committee on 1993 Amendments) ("The certification is that there is (or likely will be) 'evidentiary support' for the allegation, not that the party will prevail with respect to its contention regarding the fact . . . . [The rendering of] summary judgment . . . against a party does not necessarily mean . . . that [the party] had no evidentiary support for its position."). As set forth in the Complaint, Count IV was poorly crafted and based on weak facts, but was not frivolous. *Cf. Saladino*, 63 Fed. Cl. at 757-58 (finding that the theory presented by the plaintiff was frivolous and "wholly without merit" because the theory had been discredited when another judge of the Court of Federal Claims ruled against the plaintiff in a separate, previously filed case and because binding precedent applicable to his claims had warned litigants that "pressing such claims would be sanctionable").

e. Count VI

Ravens' Count VI was titled "Initial Award to the Ravens Group was Proper." Although this Count incorporated the substance of some of Ravens' other claims, it was essentially based on the premise that NOSLOT was ineligible to compete for the contract and therefore ineligible to protest the award to Ravens. Ravens further argued that NOSLOT's ineligibility meant there was no justification for DIA's decision to disturb the original contract award. Opinion at 13.

We rejected this argument on the merits for three reasons but acknowledged Ravens' attorney's statement at oral argument that, until it had access to the Administrative Record, it was unaware of the Olympus protest. Olympus' protest presumably furnished a basis – assuming one was needed – for DIA's decision to take corrective action. *See id.* We further noted in our August 2 Opinion Ravens' attorney's insistence at oral argument that the invalidity of the NOSLOT protest was not an essential element of its argument. *Id.*

Rowe argues that Ravens and its attorney should be sanctioned for bringing this claim because it is "unsupported by existing law." Int. Memo. at 23. The thrust of Rowe's argument is that DIA had broad discretion to take corrective action and to make a new source selection decision without any protest. *Id.* We agree that contracting officers are "'entitled to broad discretion to take corrective action if they determine that such action is necessary to ensure fair and impartial competition.'" Opinion at 13 (quoting *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 574 (2002)). However, as we understood it, this Count set forth a "reverse protest" argument. *See id.* Ravens was alleging that, because the initial award in its favor was "proper," it was irrational for DIA to reopen the award. *Id.*

We rejected Count VI on the merits. The claim ultimately lacked both evidentiary and legal support. However, Ravens was not aware of the factual deficiencies until it had access to the Administrative Record.

f. Count VII

The final count in Ravens' Complaint was titled "Totality of the Circumstances." This claim added nothing new to the arguments set forth in the other counts set forth in the Complaint. For this reason, we dismissed Count VII as mere surplusage. Opinion at 14.

Rowe seeks sanctions on this Count arguing that it was merely "a compilation of Counts I through VI" and therefore was unwarranted. Int. Memo. at 24-25. We agree that this "kitchen sink" count added nothing new to the Complaint.

g. (New) Counts VIII and IX

As mentioned above, in its opposition and cross-motion brief responding to the dispositive motions filed by Government and Rowe, Ravens recast Counts I and V, which were originally directed against Rowe, as totally new allegations against DIA. Specifically, Ravens argued that DIA had a duty to investigate Ravens' allegations that Rowe had engaged in unfair business practices. Ravens also argued for the first time in its opposition and cross-motion brief that, because Ravens had a superior technical proposal, DIA's award to Rowe was irrational. In our August 2 Opinion, we captioned these claims new Counts VIII and IX.

Although these claims were not included in Ravens' Complaint and therefore were not briefed by Rowe in its Rule 11 Motion, we discuss both counts here because they are related to our decision not to impose sanctions.

i. New Count VIII

In its opposition and cross-motion brief, Ravens argued for the first time that DIA had a duty to investigate Ravens' allegations of unfair business practices by Rowe, which it failed to discharge, thereby tainting the integrity of the procurement process. Opinion at 14-15. This was consistent with Ravens' overall strategy throughout the procurement of having Rowe disqualified for its alleged improper conduct. We addressed this argument on the merits because both the Government and Rowe responded to it in their reply briefs and did not move the Court to require a formal amendment of the Complaint. *See id.*; RCFC 15(b).

Ravens relied on Federal Circuit and Court of Federal Claims cases to support its theory. *See* Opinion at 15-16 (discussing *NKF Eng'g, Inc. v. United States*, 805 F.2d 372 (Fed. Cir. 1986); *Compliance Corp. v. United States*, 22 Cl. Ct. 193 (1990)). We rejected Ravens' interpretation of these cases and held that DIA had no duty to

investigate. We further held that, even if DIA had a duty to investigate, Ravens failed to demonstrate how DIA failed in that duty. *See id.* In doing so, we engaged in a thorough analysis of the precedent relied upon by Ravens.

A legal argument that ultimately is incorrect is not necessarily one that is not warranted by existing law or by a nonfrivolous argument to extend it. *See Saladino*, 63 Fed. Cl. at 757; *see also* Fed. R. Civ. P. 11 (Advisory Committee Notes on 1993 Amendments) ("Arguments for extensions, modifications, or reversales of existing law or for creation of new law do not violate subdivision (b)(2) provided they are 'nonfrivolous.'"); RCFC 11(b)(2). We rejected on the merits Ravens' interpretation of the law with regard to DIA's alleged duty to investigate and stated our disapproval of Ravens' failure to amend its Complaint. Opinion at 15-16. Ravens presented this claim out of order. However, in doing so, Ravens responded to the jurisdictional defects in Counts I and V as originally set forth in the Complaint.

ii. New Count IX

Ravens also argued for the first time in its opposition and cross-motion brief that it had a better technical proposal than Rowe and that DIA irrationally inflated Rowe's past performance ratings, resulting in a faulty cost/price-technical evaluation. Pl. Opp'n. Br. at 14-21. Ravens disguised this claim in the brief as a further development of Count II. Although this claim was not presented in the Complaint, we addressed it on the merits because it apparently evolved from Ravens' access to the Administrative Record during litigation. *See* Opinion at 15-16. We ultimately granted summary judgment in favor of the Government and Rowe on this Count because the Administrative Record did not in fact provide persuasive support for it.

We mention new Count IX here to reiterate how, given the nature of bid protest proceedings, claims brought by parties are likely to evolve during litigation. This is particularly so because important information contained in the Administrative Record is not available to the parties until litigation is commenced in this Court. We in no way mean to suggest that parties should be excused for bringing baseless claims because they do not have access to the Administrative Record. We also do not mean to suggest that parties should be excused from amending their pleadings after review of the Administrative Record reveals such amendment is necessary. We simply point out that Ravens' inability to access the Administrative Record prior to drafting its Complaint affected the substance of the claims it initially set forth.

h. Improper Purpose

In addition to moving for sanctions based on the factual allegations and counts included in Ravens' Complaint, Rowe argues that Ravens should be sanctioned because it presented the Complaint for "an improper purpose in violation of Rule 11(b)(1)." Int. Memo. at 38. Rowe contends that Ravens' continued protests and allegations against Rowe, all of which lacked any sound basis, resulted in a windfall to

Ravens, which was being paid to perform the Contract while the protests were pending. *Id.* at 38-39.

We reject Rowe's argument. At the time Ravens filed its Complaint in this Court on April 19, 2007, Rowe's performance of the contract was suspended as a result of the "automatic stay" triggered by the protest filed at GAO by Olympus. Olympus filed an initial protest at GAO on December 29, 2006, and filed a supplemental protest on February 2, 2007. AR at 1312. GAO had until May 29, 2007 to issue its decision on these protests. *See id.* at 1318. GAO issued its decision on April 20, 2007. *Id.* at 1312.

Rowe's performance of the Contract had been suspended while Olympus' protest was pending at GAO. Furthermore, the mere filing of a complaint in this Court does not ensure that the incumbent will continue to perform the contract. That decision is made by the relevant agency, subject only to potential review by this Court. Rowe's contention that Ravens filed its protest in this Court for the improper purpose of delaying Rowe's performance is not persuasive.

Finally, Rowe contends that sanctions are justified because Ravens lost its protest at GAO therefore should not have presented the same claims and evidence in this Court. In its Memorandum in Support of its Motion for Rule 11 Sanctions, Rowe argues that sanctions are warranted "[g]iven that Ravens [] posed the exact same accusations and presented the exact same evidence to support [the] allegations [in its Complaint] that it argued unsuccessfully before GAO." Int. Memo. at 25. This is an accurate observation. However, it does nothing to advance Rowe's argument in favor of sanctions. Although the recommendations of GAO are accorded "due weight and deference by this [C]ourt given the GAO's long experience and special expertise in . . . . bid protest matters . . . [d]ecisions of the GAO are merely 'recommendations' and not binding on [the Court of Federal Claims]." *Honeywell, Inc. v. United States*, 16 Cl. Ct. 173, 181 (1989) (citations omitted).

Bid protest jurisprudence permits a disappointed bidder to have a second bite in this forum if its GAO challenge is not successful. In 2006, the Court of Federal Claims published several decisions in protests brought by disappointed bidders seeking a second look after they were denied relief by GAO. *See, e.g.*, *Automation Techs., Inc. v. United States*, 73 Fed. Cl. 617 (2006); *NVT Techs., Inc. v. United States*, 73 Fed. Cl. 459 (2006); *Securenet Co. V. United States*, 72 Fed. Cl. 236 (2006). This is so because the Court of Federal Claims is not bound by GAO decisions. The fact that Ravens was unsuccessful in its protests before GAO had no effect on its entitlement to bring an action in this Court based on the same allegations.

## IV. Conclusion

We decline to impose sanctions on Ravens or its attorney. In doing so, we do not express our approval of Ravens' performance in this Court. To the contrary, we note our frustration with Ravens' inability to present its arguments logically. In the future, this

Court will not tolerate the presentation of claims by Ravens or its attorney that are clearly outside the Court's jurisdiction or which lack a firm factual or legal basis.

**Based on the foregoing, Intervenor Rowe's Motion for Rule 11 Sanctions is DENIED.**

**IT IS SO ORDERED.**

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge